**MDL 1760**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

FEB 17 2006

FILED
CLERK'S OFFICE

**PLEADING NO. 12**

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

|  |  |
|---|---|
| IN RE: BISPHOSPHONATE DRUGS PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) |

MDL Docket No. 1760

## RESPONSE OF NOVARTIS PHARMACEUTICALS CORPORATION
## TO PLAINTIFF'S MOTION TO TRANSFER AND AVERMENTS OF FACT

Novartis Pharmaceuticals Corporation ("NPC") opposes plaintiff's motion to transfer and

consolidate cases pursuant 28 U.S.C. § 1407.  Set forth below, pursuant to Rule 7.1(b) of the

Rules of Procedure of the Judicial Panel on Multidistrict Litigation, are NPC's specific responses

to the averments made in Plaintiffs' [sic] Averments of Fact.  NPC addresses the arguments in

plaintiff's motion in the accompanying memorandum.

1.      NPC admits the allegations in Paragraph 1.

2.      NPC admits that NPC, Merck & Co., Inc., Procter & Gamble Pharmaceuticals,

Inc. and Aventis Pharmaceuticals, Inc., are defendants in the actions encompassed within the

scope of Paragraph 1.  NPC also admits that it is named as a defendant in the majority of these

cases.

3.      NPC admits that Aredia®, Zometa®, Fosamax®, and Actonel® are all prescription

medications and are all bisphosphonates.  NPC denies any remaining allegations in Paragraph 3.

IMAGED FEB 2 1 2006      OFFICIAL FILE COPY

4.      In response to Paragraph 4, NPC states that Aredia® and Zometa® are approved by the United States Food and Drug Administration ("FDA") for the indications listed on each product's label.  NPC denies the remaining allegations in Paragraph 4.

5.      The allegations in Paragraph 5 are directed at parties other than NPC, and thus no response is required.  To the extent a response is required, NPC is aware, upon information and belief, that Fosamax® is manufactured by Merck & Co., Inc. and has gained FDA approval for the treatment of osteoporosis and other indications.  NPC is further aware, upon information and belief, that Actonel® is manufactured by Procter & Gamble Pharmaceuticals, Inc. or OSG Norwich Pharmaceuticals, Inc. and has gained FDA approval for the treatment of osteoporosis and other indications.  NPC denies the remaining allegations in Paragraph 5.

6.      NPC lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 6, and therefore denies the same.

7.      NPC admits that its principal place of business is located in New Jersey.  The remaining allegations in Paragraph 7 are directed at parties other than NPC, and thus no response is required.  To the extent a response is required, upon knowledge and belief, NPC admits the remaining allegations in Paragraph 7.

8.      NPC lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 8, and therefore denies the same.

WHEREFORE, NPC respectfully requests that this Panel deny plaintiff's motion to transfer.

Respectfully submitted:

February 16, 2006

SPRIGGS & HOLLINGSWORTH

Joe G. Hollingsworth
Katharine R. Latimer
Donald W. Fowler
Robert E. Johnston
1350 I Street, N.W., Ninth Floor
Washington, DC 20005
(202) 898-5800
(202) 682-1639 (fax)

*Attorneys for Defendant*
*Novartis Pharmaceuticals Corporation*

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

FEB 17 2006

FILED
CLERK'S OFFICE

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 16th of February 2006, I served a true and correct

copy of the foregoing Response of Novartis Pharmaceuticals Corporation to Plaintiff's Motion to

Transfer and Averments of Fact by United States Mail, postage prepaid, on the parties listed in

the attached Panel Attorney Service List.

In addition, a true and correct copy of the foregoing Response of Novartis

Pharmaceuticals Corporation to Plaintiff's Motion to Transfer and Averments of Fact by United

States Mail, postage prepaid, was served on the following parties who represent plaintiffs in

potential tag-along actions:

Gregory S. Spizer
Dara Lovitz
Anapol, Schwartz, Weiss, Cohan, Feldman & Smalley, P.C.
1040 Kings Highway North, Suite 304
Cherry Hill, NJ  08034

*Representing plaintiff Bernice Frick*

Carol Cayer
Terrel, Hogan, Ellis & Yegerwel, P.A.
233 E. Bay Street, 8th Floor
Jacksonville, FL  32202

*Representing plaintiffs J. Hunter Chiles III and Dianna Chiles*



Terence J. Sweeney
Law Offices of Terence J. Sweeney, Esq.
225 Broadway, Suite 2500
New York, NY  10007

*Representing plaintiffs Barbara Davids, Helene Deutsch and John Napolitano*

Paul A. Daniels
Teague, Rotenstreich & Stanaland, L.L.P.
101 South Elm Street, Suite 350
Greensboro, NC  27401

 *Representing plaintiffs Rita Fussman, Herbert Fussman and Karen Fichter-Venners*

Bart T. Valad
The Law Firm of Bart T. Valad, P.L.L.C.
10640 Main Street, Suite 200
Fairfax, VA  22030

 *Representing plaintiffs J. Hunter Chiles III, Dianna Chiles, Barbara Davids, Helene*
 *Deutsch, John Napolitano, Rita Fussman, Herbert Fussman and Karen Fichter-Venners*

Jack J. Fine
Fine, Farkash & Parlapiano, P.A.
622 N.E. First Street
Gainesville, FL  32601

 *Representing plaintiffs Pamela Krause and William Krause*

Printed on 02/07/2006

# Judicial Panel on Multidistrict Litigation - Panel Attorney Service List
## for
# MDL 1760 - In re Bisphosphonate Drugs Products Liability Litigation

**\*\*\* Report Key and Title Page \*\*\***

Please Note: This report is in alphabetical order by the last name of the attorney. A party may not be represented by more then one attorney. See Panel rule 5.2(c).

**Party Representation Key**
  \* Signifies that an appearance was made on behalf of the party by the representing attorney.
  # Specified party was dismissed in some, but not all, of the actions in which it was named as a party.
  All counsel and parties no longer active in this litigation have been suppressed.

**This Report is Based on the Following Data Filters**
  Docket: 1760 - Bisphosphonate Drugs Products Liability
  For Open Cases

**Judicial Panel on Multidistrict Litigation - Panel Attorney Service List**

Docket: 1760 - In re Bisphosphonate Drugs Products Liability Litigation
Status: Pending on  /  /
Transferee District:          Judge:

| ATTORNEY - FIRM | REPRESENTED PARTY(S) |
|---|---|
| Beatie, Russel H.<br>Beatie & Osborn, LLP<br>521 Fifth Avenue<br>Suite 3400<br>New York, NY 10175 | => Bartoli, John*; Biocca, Zena*; Burt, Burdette*; Cartelli, Margaret*; Carter, Patsy*; Champion, Runette*; Cuthbert, Jack*; Dengel, Suzanne*; Fry, Gary*; Gee, Loretta*; Grizzle, Shirley A.*; Guilbeau, Elaine*; Harrison, Ramon L.*; Harth, Margaret Peggy*; Hendrix, Michel*; Hiller, Glenn*; Hogan (Surviving Spouse/Exe./Est.-Timothy), Karleen*; Johnson, Linda H.*; Kalily, Victor*; Knopf, Mindy J.*; Martinez, Mayra*; Perkins, Arlene*; Punnose, K. Thomas*; Radin, Nancy*; Shrum, Helen E.*; Simmons, Lena*; Stevens, Gary*; Ulatowskl, Charles*; Wallace, Linda*; Wilson, Jacqueline* |
| Germany, Robert G.<br>Pittman, Germany, Roberts & Welsh, LLP<br>P.O. Box 22985<br>Jackson, MS 39225-2985 | => Anderson, Terry*; Arbuckle, Donald*; Becker, Susan*; Blumenshine, Mary*; Bowden, Abbie*; Brown, Marsha*; Brown, Victor*; Calloway, Francis Jo*; Casali, Angelina*; Eberhart, Susan*; Evers, Karen*; Foster, Betty*; Fragomenli, Fred*; Hill, Carol*; Kennedy, James*; Landesman, Jacob*; Lopreato, Carolyn*; McCleery, Sally*; McDaniel, Eula Mae*; Melau, Edwin*; Melching, Brenda*; Miller, Elizabeth*; Montgomery, Bobby Lynn*; Newman, Phyllis*; Nichols, Trent*; Olson, Donna*; Orozco, Sam*; Patton, James*; Raber, Sarah*; Reinardy, Sally*; Roman, Corina Maria*; Russo, Addolorata*; Smith, Carol*; Strakhov, Suzanne*; Talley, Marie*; Thompson, Debra*; Tracy, George*; White, Denise*; Williams, Alison*; Wolfe, Gwendolyn*; Wood, Angela*; Woollard, Randy*; Zinger, Otilia* |
| Hill, III, M. King<br>Venable, LLP<br>210 Allegheny Avenue<br>P.O. Box 5517<br>Towson, MD 21204 | => Merck & Co., Inc.* |
| Latimer, Katharine R.<br>Spriggs & Hollingsworth<br>1350 I Street, N.W.<br>9th Floor<br>Washington, DC 20005 | => Novartis Pharmaceuticals Corp.* |
| Turley, Windle<br>Law Offices of Windle Turley, P.C.<br>1000 Turley Law Center<br>6440 North Central Expressway<br>Dallas, TX 75206 | => Ingram (Ind./Surviving Spouse-Rick), Linda* |
| Varney, Lana K.<br>Fulbright & Jaworski, L.L.P.<br>600 Congress Avenue<br>Suite 2400<br>Austin, TX 78701-3271 | => Aventis Pharmaceuticals, Inc.*; Proctor & Gamble Pharmaceuticals, Inc.* |

Note: Please refer to the report title page for complete report scope and key.

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

FEB 17 2006

FILED
CLERK'S OFFICE

# BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

|  |  |  |
|---|---|---|
| IN RE: BISPHOSPHONATE DRUGS | ) | MDL Docket No. 1760 |
| PRODUCTS LIABILITY LITIGATION | ) | |
| | ) | |
| | ) | |

## NOVARTIS PHARMACEUTICALS CORPORATION'S
## MEMORANDUM OF LAW IN OPPOSITION
## <u>TO MOTION FOR MULTIDISTRICT TRANSFER</u>

**Table of Contents**

Page

FACTUAL BACKGROUND ................................................................................................ 2

A.    The Drug Products Alleged To Be At Issue ........................................................ 2

B.    The Status of the Pending Matters ...................................................................... 5

ARGUMENT ..................................................................................................................... 6

I.    MOVANT'S ATTORNEYS' UNILATERAL ATTEMPT TO CREATE A SITUATION
      WARRANTING CONSOLIDATION FAILS. ................................................. 7

II.   THE CASES INVOLVE DIFFERENT PHARMACEUTICAL PRODUCTS AND
      DIFFERENT DEFENDANTS AND ARE ILL-SUITED FOR CENTRALIZED
      TREATMENT. ................................................................................................ 10

A.    There Are Few Questions of Fact Common To All Four Drugs And All Four Defendants.
      ........................................................................................................................... 11

      1.    Development, Testing, Manufacturing and Marketing ................................. 11

      2.    Knowledge of Alleged Effects .................................................................... 12

      3.    Causation ..................................................................................................... 13

B.    Individual Issues Predominate In The Pending Lawsuits. ................................. 15

III.  EVEN IF THE PANEL FINDS TRANSFER IS APPROPRIATE, MOVANT'S FORUM
      SHOPPING FOR THE SOUTHERN OR EASTERN DISTRICT OF NEW YORK
      SHOULD NOT BE REWARDED. ................................................................. 18

CONCLUSION ................................................................................................................ 19

## TABLE OF AUTHORITIES

**Cases**

*Carroll v. Litton Sys., Inc.*, No. B-C-88-253, 1990 WL 312969 (W.D.N.C. Oct. 29, 1990)........ 14

*Castano v. Am. Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996)............................................................. 17

*Glastetter v. Novartis Pharms. Corp.*, 252 F.3d 986 (8th Cir. 2001) ........................................... 14

*In re "Agent Orange" Prod. Liab. Litig.*, 373 F. Supp. 2d 7 (E.D.N.Y. 2005)............................. 14

*In re Accutane Prods. Liab. Litig.*, 343 F. Supp. 2d 1382 (J.P.M.L. 2004)................................... 12

*In re Am. Med. Sys., Inc.*, 75 F.3d 1069 (6th Cir. 1996)................................................................ 17

*In re Amino Acid Lysine Antitrust Litigation*, 910 F. Supp. 696 (J.P.M.L. 1995) ........................ 14

*In re Asbestos & Asbestos Insulation Material Prods. Liab. Litig*, 431 F. Supp. 906
(J.P.M.L. 1977) ......................................................................................................................... 16, 17

*In re BridgeStone/Firestone, Inc.*, 288 F.3d 1012 (7th Cir. 2002) ................................................ 16

*In re Cable Tie Patent Litig.*, 487 F. Supp. 1351 (J.P.M.L. 1980) ............................................... 6, 8

*In re Chiropractic Antitrust Litig.*, 483 F. Supp. 811, 813 (J.P.M.L. 1980).................................. 8

*In re Drowning Incident at Quality Inn Northeast, Washington, D.C. on May 3, 1974*, 405 F.
Supp. 1304 (J.P.M.L. 1976)......................................................................................................... 18

*In re Eli Lilly & Co. "OraFlex" Prods. Liab. Litig.*, 578 F. Supp. 422 (J.P.M.L. 1984)......... 8, 16

*In re Ephedra Products Liability Litigation*, No. 1598 (J.P.M.L. Apr. 13, 2004)........................ 13

*In Re G.D. Searle & Co., "Copper 7" IUD Prods. Liab. Litig.*, 483 F. Supp. 1343 (J.P.M.L.
1980) ............................................................................................................................................. 8

*In re Nortel Networks Corp. Sec. & "ERISA" Litig.*, 269 F. Supp. 2d 1367 (J.P.M.L. 2003) ..... 18

*In re Orthopedic Bone Screw Prod. Liab. Litig.*, No. 1014, 1997 WL 109595 (E.D. Pa. Mar. 7,
1997) ............................................................................................................................................. 17

*In re Pharmacy Benefit Plan Adm'rs Pricing Litig.*, 206 F. Supp. 2d 1362 (J.P.M.L. 2002) ...... 17

*In re Phenylpropanolamine Prods. Liab. Litig.*, No. 1407, 2004 WL 2034587 (W.D. Wash. Sept.
2, 2004) ......................................................................................................................................... 17

*In re Phenylpropanolamine Products Liability Litigation*, 173 F. Supp. 2d 1377 (J.P.M.L. 2001)
......................................................................................................................................................... 13

*In re Prempro Products Liability Litigation*, 254 F. Supp. 2d 1366 (J.P.M.L. 2003) ................. 12

*In re Rely Tampon Prods. Liab. Litig.*, 533 F. Supp. 1346 (J.P.M.L. 1982) ............................... 16

*In re Repetitive Stress Injury Prods. Liab. Litig.*, No. 955, 1992 WL 403023 (J.P.M.L. Nov. 27, 1992) ........................................................................................................................... 15, 18

*In re Vioxx Prods. Liab. Litig.*, 360 F.Supp. 2d 1352 (J.P.M.L. 2005) ....................................... 15

*In re Zyprexa Products Liability Litigation*, 314 F. Supp. 2d 1380 (J.P.M.L. 2004) ................. 13

*In re: Blood & Blood Prods. Hepatitis C Virus Prods. Liab. Litig.*, No. 1349, 2000 U.S. Dist. LEXIS 11149 (J.P.M.L. Aug. 2, 2000) ................................................................................ 9, 15

*Ingram v. Novartis Pharms. Corp.*, No 05-913-L (W.D. Okla. filed Nov. 21, 2005) ................. 16

*Lexecon Inc. v. Milberg, Weiss, Bershand, Hynes & Lerach*, 523 U.S. 26 (1998) ........................ 9

*Mancuso v. Consol. Edison Co.*, 967 F. Supp. 1437,(S.D.N.Y. 1997) ......................................... 14

*Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194 (11th Cir. 2002) ................................................ 14

*Schirripa v. Novartis Pharms. Corp.*, No. 06-cv-978 (S.D.N.Y.) .................................................. 7

*Thorn v. Novartis Pharms. Corp.*, No. 3:04-cv-586 (E.D. Tenn.) ................................................ 18

**Statutes**

28 U.S.C. § 1407(a) (2006) ............................................................................................................. 6

**Other Authorities**

*Manual for Complex Litigation (Fourth)* § 22.314 (2004) ............................................................ 8

Novartis Pharmaceuticals Corporation ("NPC") hereby opposes Movant Margaret Cartelli's motion to transfer cases involving "bisphosphonate drugs" to a single district for coordinated pre-trial proceedings (the "Motion").

As of January 12, 2006, there were only six federal suits pending that involved any alleged injury from any bisphosphonate drug, to NPC's knowledge: five suits were pending against NPC alleging injuries from the use of its prescription products Aredia® (pamidronate disodium) and/or Zometa® (zoledronic acid), both used primarily in the treatment of metastatic cancers, and one suit was pending against Merck & Co., Inc. ("Merck") alleging injuries from the use of its prescription product Fosamax® (alendronate sodium), used primarily in the treatment of osteoporosis. None of the few pending cases involved Movant's counsel.

In a flurry of activity between January 13, 2006 and January 20, 2006, Movant's attorneys filed a total of thirty cases in the Southern and Eastern Districts of New York: twenty-six lawsuits against NPC (including three in which Merck is named as a co-defendant), three lawsuits solely against Merck, and a single lawsuit against Procter & Gamble Pharmaceuticals, Inc. ("P&G") and Aventis Pharmaceuticals Corp. ("Aventis") alleging injuries from the use of their osteoporosis drug Actonel® (risedronate sodium). Contemporaneously, Movant's counsel initiated her motion to transfer.[1] Movant's counsel outrageously confesses that: "many of these actions could, and perhaps should, have been filed in other districts, and many may be susceptible to a motion to change venue." (Plaintiffs' Memorandum of Law in Support of Her Motion for Multidistrict Transfer (hereinafter "Memo") at 3 n.2). More specifically, twenty-four of the plaintiffs in the twenty-six cases against NPC do not reside in New York. Neither the Panel nor the New York courts nor NPC has any idea whether any given plaintiff would want to

---

[1] Since January 20, 2006, Movant's attorneys have filed five additional suits against NPC and one additional suit against Merck.

pursue a case in New York outside of the context of an MDL setting, or whether the out-of-state plaintiffs would prefer their "home" forum or to bring no suit at all but for the prospect of an MDL. Plaintiffs' counsel's obvious tactical ploy to create the illusion of large-scale litigation (in New York) and the appearance of inefficiencies while forcing their plans on the earlier-filed cases should not be countenanced.

In any event, Movant has failed to establish that transfer would be more convenient and promote the just and efficient conduct of the cases known to be properly filed and genuinely "pending," much less that transfer would be more convenient and promote the just and efficient conduct of the just-filed cases. The Motion should be denied.

## FACTUAL BACKGROUND

### A.     The Drug Products Alleged To Be At Issue

Plaintiffs in these cases allege that they suffered "osteonecrosis of the jaw" ("ONJ")[2] as a result of alleged treatment with one or more of four very different pharmaceutical products: Aredia®, Zometa®, Fosamax® and Actonel®.  While each is a "prescription medication[]," in a broad category of pharmaceuticals called "bisphosphonates," (*see* Memo at 3) they are different compounds, with different chemical names, different chemical compositions, different chemical properties, and different uses in diverse patient populations.[3]

---

[2]  Salvatore Ruggiero et al., *Practical Guidelines for the Prevention, Diagnosis, and Treatment of Osteonecrosis of the Jaw in Patients with Cancer*, 2 J. Oncol. Prac. 7 (2006) (attached as Ex. K). Although ONJ cases have been reported in literature since the 19th century, "there is still no consensus definition for ONJ. It is very likely that ONJ is a clinical entity with many possible etiologies, and its pathogenesis is not well understood." Recognized risk factors include "head and neck radiotherapy, periodontal disease, dental procedures involving bone surgery, edentulous regions and trauma from poorly fitting dentures" as well as underlying malignancy, chemotherapy, corticosteroids, and systemic or regional infection" in cancer patients. *Id.* Contributing factors include "[c]oagulotherapies . . . and impaired blood flow secondary to edema or osteomyelitis." *Id.*

[3]  There are at least three other pharmaceutical products on the market in the United States that fall within the same class as the four drugs that are the subject of the Motion: Boniva (ibandronate sodium), sold by Roche and GlaxoSmithKline; Didronel®, sold by P&G; and Skelid® (tiludronate disodium) sold by

Two of the pharmaceutical products at issue, Aredia® and Zometa®, are primarily used to treat *conditions resulting from various cancers*. *See* Declaration of J. Michael Scott in Support of Novartis Pharmaceuticals Corporation's Memorandum of Law in Opposition to Motion for Multidistrict Transfer (hereinafter "Scott Declaration") at ¶¶4, 5 (attached as Ex. A). Both products are distributed by NPC in the United States, and both are available primarily through doctors, hospitals, and infusion centers; they are not typically sold at pharmacies. *Id.* at ¶12. Fosamax® (Merck) and Actonel® (P&G/Aventis) are approved for *prevention and treatment of osteoporosis* and similar conditions. *Id.* at ¶6. Both are available primarily from pharmacies. *Id.* at ¶12.

Aredia® is the brand name for pamidronate disodium; its chemical formulation is $C_3H_9NO_7P_2Na_2 \cdot 5H_2O$. *See* Aredia® label approved by FDA on November 16, 2005 at 1 (attached as Ex. B) (hereinafter "Aredia® label"). The FDA initially approved Aredia® in 1991. *See* Aredia® letter of approval dated October 31, 1991 (attached as Ex. C). It is presently approved for treatment of hypercalcemia of malignancy, osteolytic lesions of multiple myeloma, osteolytic bone metastases of breast cancer, and Paget's disease, a bone renewal disorder not associated with cancer. *See* Aredia® label at 1, 11 (Ex. B). Aredia® is administered through intravenous infusion only, in doses of 60-90 milligrams for hypercalcemia (taken once); 90 milligrams for multiple myeloma and metastases of breast cancer (taken once monthly and every three-four weeks respectively); and 30 milligrams for Paget's disease (taken three days consecutively, with possible retreatment). *Id.* at 21-23.

Zometa® is the brand name for zoledronic acid; its chemical formulation is $C_5H_{10}N_2O_7P_2 \cdot H_2O$. *See* Zometa® label approved by FDA on October 11, 2005 at 1 (attached as

---

Aventis. Movant does not even attempt to suggest the existence of any "common" issues shared among these products and the products she has targeted in her motion.

Ex. D) (hereinafter "Zometa® label"). Zometa® was first approved by FDA in 2001, and it is presently approved for treatment of hypercalcemia of malignancy, multiple myeloma, and bone metastases of solid tumors (including breast cancer, prostate cancer and other solid tumors). *See* Zometa® label at 1; Zometa® letter of approval dated August 20, 2001 (attached as Ex. E). Zometa® is administered through intravenous infusion only, in doses of 4 milligrams for all indications (taken once for hypercalcemia of malignancy and every 3-4 weeks for the other indications). *See* Zometa® label at 2 (Ex. D).

Fosamax® is the brand name for alendronate sodium; its chemical formulation is $C_4H_{12}NNaO_7P_2 \cdot 3H_2O$. *See* Fosamax® label approved by FDA on December 21, 2005 at 1 (attached as Ex. F) (hereinafter "Fosamax® label "). It was first approved by FDA in 1995 and is presently approved for treatment and prevention of osteoporosis in post-menopausal women, treatment of glucocorticoid-induced osteoporosis in men and women, and treatment of Paget's disease, as well as for increasing bone mass in men with osteoporosis. Scott Declaration at ¶6 (Ex. A); Fosamax® label at 11-12 (Ex. F); Fosamax® FDA approval listing, (Feb. 9, 2006), http://www.fda.gov/cder/da/ddpa995.html. Fosamax® is ingested orally in a tablet or solution form, daily or weekly, in doses ranging from 5-70 milligrams. *See* Fosamax® label at 21 (Ex. F).

Actonel® is the brand name for risedronate sodium; its chemical formulation is $C_7H_{10}NO_7P_2Na \cdot 2.5H_2O$. *See* Actonel® label approved by FDA on January 24, 2006 at 1 (attached as Ex. G) (hereinafter "Actonel® label"). It was first approved by FDA in 1998, and is presently approved for the same indications as Fosamax®, except for increasing bone mass in men with osteoporosis. Scott Declaration at ¶6 (Ex. A); Actonel® label at 15-16 (Ex. G); Actonel® letter of approval dated March 27, 1998 (attached as Ex. H). Actonel® is not administered intravenously, but ingested orally in tablet form, daily or weekly, in doses ranging from 5-35 milligrams. *See* Actonel® label at 26-27 (Ex. G).

Neither Fosamax[®] nor Actonel[®] is approved by the FDA for any of the cancer-related indications for which Zometa[®] and Aredia[®] are approved.  In fact, Aredia[®], Fosamax[®], and Actonel[®] share only one common indication:  treatment of Paget's Disease.  Scott Declaration at ¶¶4, 6-7 (Ex. A).  None of the plaintiffs in the cases at issue alleges that he or she suffered from that condition.  Zometa[®] shares no common indications with Fosamax[®] or Actonel[®].  *Id.* at ¶¶5-7.

**B.       The Status of the Pending Matters**

Before January 13, 2006, when Movant filed her lawsuit, only five of the cases she seeks to consolidate were pending:  four cases were pending against NPC (including three uncertified class actions) and one case (a single uncertified class action) was pending against Merck.  No suits were pending against P&G or Aventis.  No suits were pending with respect to the multiple other bisphosphonate drugs on the market either.[4] Only four different groups of plaintiffs' attorneys (other than Movant's attorneys) are involved in the litigation, notwithstanding the activity occasioned by the filing of the Motion – and one of those four represents almost all of the plaintiffs who had cases pending prior to the filing of the Motion.[5]

As would be expected given the different intended patient populations served by these different drugs, the cases – including the newly filed cases – are not generally proceeding against joint defendants.  Of the thirty-five cases identified by Movant, twenty-eight name NPC as the

---

[4]  *See supra* n.3.

[5]  These plaintiffs' counsel groups are represented by: Robert G. Germany of Pittman, Germany, Roberts & Welsh, L.L.P.; Jeffrey Hightower of Windle Turley, P.C.; Bart Valad of The Valad Law Firm, P.C.; and Gregory S. Spizer of Anapol, Schwartz, Weiss, Cohan, Feldman & Smalley, P.C.  *See* Declaration of Katharine R. Latimer in Support of Novartis Pharmaceuticals Corporation's Memorandum of Law in Opposition to Motion for Multidistrict Transfer (hereinafter "Latimer Declaration") at ¶5 (Ex. I).  Mr. Germany represents almost all of the plaintiffs who had suits pending prior to the filing of the Movant's Complaint.  *Id.*

sole defendant.[6]  Four cases name Merck as the sole defendant.  One case names P&G and

Aventis only.  Only three of the cases assert claims against more than one defendant; these three

claim treatment with NPC and Merck products.[7]  Even those cases putatively styled as class

actions are proceeding against single defendants and do not attempt to lump all

"bisphosphonates" together.

Discovery in the four earlier-filed NPC cases is underway; the parties have exchanged

written discovery, and medical records collection and document review is ongoing.  *See* Latimer

Declaration at ¶¶3-4 (Ex. I).  Scheduling orders setting trial dates have been entered in those four

cases.[8]  *Id.* at ¶¶3-4. The first trial setting is June 2007.  *Id.* at ¶4.

## ARGUMENT

Title 28, section 1407 of the United States Code authorizes the Panel to transfer cases for

coordinated pretrial proceedings only where (1) the "actions involv[e] one or more common

questions of fact"; (2) coordination will further "the convenience of parties and witnesses"; and

(3) coordination "will promote the just and efficient conduct of [the] actions." 28 U.S.C. §

1407(a) (2006).  The movant bears the burden of demonstrating that this standard is met.  *In re*

*Cable Tie Patent Litig.*, 487 F. Supp. 1351, 1354 (J.P.M.L. 1980).  As shown below, Movant has

not met her burden here and her Motion should be denied.

---

[6]  Four of these cases (including one putative class action) allege that the plaintiff was treated solely with
Aredia®.  Twelve of the cases (including one putative class action) allege treatment solely with Zometa®.
Eleven of the cases (including one putative class action) allege treatment with both Zometa® and Aredia®.

[7]  One of these cases alleges treatment with Aredia® and Fosamax®; one alleges treatment with Zometa®
and Fosamax®; and the third alleges treatment with Aredia®, Zometa®, and Fosamax®.

[8]  A fifth federal court suit, *Frick v. Novartis Pharms. Corp.*, was also pending at the time Movant filed
her Motion.  *Frick* is not identified on Movant's roster of cases, but NPC identified the case as a potential
"tag-along" action.

I.   **MOVANT'S ATTORNEYS' UNILATERAL ATTEMPT TO CREATE A SITUATION WARRANTING CONSOLIDATION FAILS.**

Movant's attorneys have gone to great lengths to create the illusion that these cases are transfer-worthy when in fact these cases involve a limited number of plaintiffs, a limited number of plaintiffs' lawyers, a limited number of jurisdictions, and a limited number of judges.  At least as relates to NPC – which is defending the majority of the cases – discovery and pretrial proceedings can easily be coordinated through cooperation, rendering section 1407 centralization unnecessary.

Before January 13, 2006, four suits identified by Movant were pending against NPC. One suit was pending against Merck.  Since January 13, 2006, the number of potentially relevant federal court suits pending against NPC has increased to forty, and the number of federal court suits pending against Merck has increased to eight.  This mini-spike in the number of cases is primarily attributable to actions of Movant's attorneys aimed at increasing the case counts, while otherwise gaming the system for strategic advantage.

Before they initiated any suits, Movant's attorneys were aware that few of the plaintiffs they represent had any meaningful connection to the Eastern and Southern District of New York. In fact, Movant's counsel's clients hail from sixteen different states and only two reside within the confines of the Eastern or Southern District of New York.[9]  Movant's counsel did not bring their single-plaintiff cases in the convenient "home" forum of each plaintiff, however.  Instead, Movant's counsel brought their cases in a New York forum foreign to most of the plaintiffs. Recognizing that their efforts to manipulate the system were palpable, Movant's attorneys admit that "many of these actions could, and perhaps should, have been filed in other districts, and

_____

[9]  Even one of the New York residents filed with venue-shopping in mind; the plaintiff in the recently-filed case *Schirripa v. Novartis Pharms. Corp.*, No. 06-cv-978 (S.D.N.Y.), resides in the Eastern District of New York, but filed suit in the Southern District of New York.

many may be susceptible to a motion to change venue," (Memo at 3 n.2), but disingenuously suggest that they elected to follow this approach to "minimize, or at least centralize" the "time and effort necessary to transfer" the cases should the Panel grant the motion. *Id.* Although it can be assumed that each plaintiff acquiesced in the decision to bring his or her case in the venues where filed, it is unlikely that each plaintiff would have chosen to bring his or her claims in those fora (and it is unknown whether each plaintiff would have chosen to bring his or her claim at all) absent the strategic plan to seek section 1407 transfer devised by Movant's counsel.[10]

Notwithstanding the extraordinary efforts of Movant's counsel, the cases at issue do not warrant transfer; centralization is unnecessary to ensure convenient, just, and efficient litigation because these cases readily can be managed by the presiding district court judges and cooperative efforts of the parties. The Panel has recognized that voluntary coordination by the parties is often preferable to consolidating cases. *See, e.g., In re Eli Lilly & Co. "OraFlex" Prods. Liab. Litig.*, 578 F. Supp. 422, 423 (J.P.M.L. 1984) (noting that despite existence of common questions, consolidation was not warranted in part because of defendant's offer to make discovery already conducted available to later litigants).[11]

Vehicles for coordination already are in place here. All of the cases filed by Movant's counsel have now been assigned to one judge in the Southern District of New York, Judge John

---

[10] Where cases sought to be consolidated are insufficiently mature to determine whether aggregation is appropriate, the Panel should refrain from consolidating until the cases develop. *Manual for Complex Litigation (Fourth)* § 22.314 (2004) ("If there are few prior verdicts, judgments, or settlements, additional information may be needed to determine whether aggregation is appropriate.").

[11] *See also In re Cable Tie Patent Litig.*, 487 F. Supp. at 1354 (same); *In Re G.D. Searle & Co., "Copper 7" IUD Prods. Liab. Litig.*, 483 F. Supp. 1343, 1345 (J.P.M.L. 1980) (finding that coordinated discovery was a "suitable alternative [] to transfer"); *In re Chiropractic Antitrust Litig.*, 483 F. Supp. 811, 813 (J.P.M.L. 1980) (same).

F. Keenan, and one judge in the Eastern District of New York, Judge David G. Trager.[12]  All of

the cases pending in the Middle District of Tennessee are assigned to Chief Judge Todd J.

Campbell.  There are only six relevant cases that are not before one of these three judges – one of

these cases is pending before Senior Judge Arthur D. Spatt in the Eastern District of New York

and could be reassigned, intra district, to Judge Trager.[13]

Moreover, discovery has commenced in several of the Aredia® and Zometa® cases in

coordination with the plaintiffs' attorney's group that includes Pittman Germany and with

Windle Turley P.C.  *See* Latimer Declaration at ¶3.  Although NPC expects to insist that venue

be properly laid in all cases, NPC intends to continue its coordination efforts with respect to

discovery in any case by, for example:  (1) creating a centralized document repository accessible

to all plaintiffs; (2) allowing cross-noticed 30(b)(6) witness depositions; (3) allowing such

depositions to be used in multiple actions (provided that use is consistent with applicable law);

and (4) making document discovery applicable to multiple actions by stipulation.  In addition,

NPC is willing to negotiate a "global" confidentiality agreement with all parties.  This type of

cooperative discovery is particularly appropriate as an alternative to centralization where, as

here, only a small group of plaintiffs' counsel are involved in all of the actions at issue.  *See, e.g.,*

*In re: Blood & Blood Prods. Hepatitis C Virus Prods. Liab. Litig.*, No. 1349, 2000 U.S. Dist.

---

[12]  NPC intends to move to transfer the cases involving plaintiffs who do not reside in the Eastern or Southern District of New York to the plaintiffs' home fora.  Because the Panel must remand each case to "the district from which it is transferred" at the close of pre-trial proceedings, *Lexecon Inc. v. Milberg, Weiss, Bershand, Hynes & Lerach,* 523 U.S. 26, 40 (1998), the Panel should refrain from ordering transfer here – if it determines transfer is warranted - until after the Southern and Eastern Districts of New York determine the appropriate venue for each case to ensure that the cases are remanded to the proper court at the end of consolidated pre-trial proceedings.

[13]  These other cases are pending before: Judge Tim Leonard in the Western District of Oklahoma (*Ingram*), Senior Judge Dickinson R. Debevoise in the District of New Jersey (*Frick*), Judge Henry Lee Adams, Jr. in the Middle District of Florida *(Chiles)*, Judge Stephen P. Mickle in the Northern District of Florida (*Krause*), and Judge James A. Beaty, Jr. in the Middle District of North Carolina (*Fussman*).  *See* Latimer Declaration at ¶5 (Ex. I).

LEXIS 11149, at *3 (J.P.M.L. Aug. 2, 2000) (endorsing alternatives to transfer as means of minimizing the possibility of duplicative discovery "particularly where . . . the same plaintiffs' counsel is involved in all, or nearly all, actions").[14]  In short, voluntary coordination can achieve the same benefits that might be achieved through section 1407 transfer, without the disruption that transfer would cause in those cases that are already progressing.

Permitting transfer on these facts would not promote the just and efficient conduct of these cases, and Movant's counsel's tactical ploys should not be countenanced.

## II.   THE CASES INVOLVE DIFFERENT PHARMACEUTICAL PRODUCTS AND DIFFERENT DEFENDANTS AND ARE ILL-SUITED FOR CENTRALIZED TREATMENT.

Movant's counsel has overreached in asking this Panel to centralize cases involving *four* distinct pharmaceutical products and *four* distinct corporate defendants.  With no support – because none exists – Movant wrongly contends that these cases share common questions regarding (1) the four "defendants' development, testing, manufacturing and marketing" of the four different drugs, (2) the four different companies' "knowledge of the alleged effects" of the four different drugs, and (3) "causation of the side effects" of the four different drugs.  (Memo at 2, 6).  It is simply not the case that these inter-product actions share significant common questions.  Moreover, consolidation of the cases at issue in the Motion would neither enhance convenience nor promote the just and efficient conduct of the actions.  In fact, consolidation would be disruptive to cases already pending against NPC and would needlessly complicate discovery and pre-trial proceedings in all actions.

---

[14] *See supra* note 5.  Mr. Germany's group now represents about 36 of the 88 plaintiffs in 5 of the 46 now-pending cases.  Movant's counsel represents about 42 of the 88 plaintiffs in 36 of the 46 now-pending cases.  *See* Latimer Declaration at ¶5.

A.    **There Are Few Questions of Fact Common To All Four Drugs And All Four Defendants.**

1.    **Development, Testing, Manufacturing and Marketing**

Movant is wrong in suggesting that there are facts common to all four corporate defendants regarding the development, testing, manufacturing and marketing of these drugs. NPC, Merck, and P&G, who developed the four pharmaceutical products at issue, are competitors. *See* Scott Declaration at ¶13 (Ex. A). Each developed its product(s) independently and each conducted independent testing and clinical trials. *Id.* at ¶¶8-9. NPC did not consult with Merck, P&G or Aventis in developing its products, nor did it rely on testing or clinical trials involving the other manufacturers' drugs. *Id.* Moreover, to the best of NPC's knowledge, neither Merck, P&G or Aventis relied upon testing or clinical trials involving Aredia® or Zometa® in seeking FDA approval of Fosamax® and Actonel®. *Id.* Rather, the four pharmaceutical products have separate regulatory histories, including different New Drug Applications ("NDAs"), different clinical trials, and different continuing regulatory correspondence with FDA. *Id.* at ¶9. Similarly, there are no common questions regarding the manufacture of each of the defendant's products. NPC's pharmaceutical products are not manufactured in the same location or by the same entity as Merck's drug, Fosamax®, or P&G's and Aventis' drug, Actonel®. *Id.* at ¶10.

The marketing programs for NPC's products are, as would be expected, completely different from those employed by Merck, P&G and Aventis. *Id.* at ¶11 (Ex. A). Aredia® and Zometa® are prescription drugs approved for use primarily in cancer patients. *Id.* at ¶12. They are administered by intravenous infusion, typically at hospitals or clinics by order of a treating oncologist or urologist. *Id.* As a result, NPC's marketing programs for Aredia® and Zometa® have focused on oncologists and urologists, not the general public, and are generally conducted

through in-person visits by sales representatives to physicians. *Id.* Fosamax® and Actonel®, in contrast, are prescription drugs sold in pill or solution form through pharmacies to patients with, *inter alia*, osteoporosis. *Id.* Fosamax® and Actonel® are marketed directly to the public through print, radio and television advertising, as well as to general practice physicians and physicians specializing in the treatment of osteoporosis. *Id.*

### 2.      Knowledge of Alleged Effects

Likewise, there are no significant common questions regarding each defendant's "knowledge of alleged effects" (Memo at 2) associated with their respective products. Generally, pharmaceutical companies learn of adverse events through reports from a prescribing or treating physician, from the patient, or from FDA upon FDA's receipt of reports from the patient, treating physicians or other pharmaceutical companies. *See* Scott Declaration at ¶13 (Ex. A). Pharmaceutical companies learn of adverse events reported in patients using their *competitors'* products primarily from publicly available case reports, from media reports, or from FDA's public pronouncements. *Id.* When and how NPC learned of any reported adverse events in patients using Aredia® or Zometa® has no connection to when or how Merck learned of adverse event reports for patients taking Fosamax®, if any, or when or how P&G or Aventis learned of adverse event reports for patients taking Actonel®, if any. *Id.* Nor would "notice" of an adverse event report involving a competitor product necessarily be material at all in light of the expected pharmacological differences and the vastly different expected patient population profiles at issue.

Movant relies on the Panel's decision in *In re Accutane Prods. Liab. Litig.*, 343 F. Supp. 2d 1382 (J.P.M.L. 2004) to support the claim that transfer is appropriate where there are common questions between the defendants regarding the development, testing, manufacturing and marketing of the drugs and the defendants' knowledge concerning the drugs' possible

adverse effects.  *Accutane*, however, involved only *one* manufacturer and *one* drug product.[15]
*Accutane* does not support MDL consolidation of cases involving *four different defendants* and
*four different pharmaceutical products*; indeed, nothing Movant cites supports her proposal.

### 3.    Causation

In asserting that the cases "share common questions of fact" relating to the "causation of
the side effects," (Memo at 2), Movant apparently seeks to portray these cases as analogous to
those consolidated in *In re Phenylpropanolamine Products Liability Litigation*, 173 F. Supp. 2d
1377 (J.P.M.L. 2001).  In those cases, however, *only one compound was at issue* –
phenylpropanolamine ("PPA").  Although PPA was combined with other ingredients to form
several different products involved in the litigation, the PPA plaintiffs did not allege that each
different product was unsafe without regard to its ingredients; to the contrary, they claimed
specifically that the shared ingredient PPA was unsafe.[16]  Here, Movant does not allege – nor
could she – that any compound common to the four different products is the cause of some
adverse health effect; "bisphosphonate" is not an ingredient or unique constituent of these
products – the term simply describes the molecular base of the class.  Movant is left to hopefully
but incorrectly assert that the *four distinct products themselves* may each cause the same adverse
effects merely because they are in the same broad pharmaceutical class.[17]

---

[15]  Although there were multiple defendants in the *Accutane* cases, all of the defendants were related
corporate entities.  Plaintiffs' citation to *In re Prempro Products Liability Litigation*, 254 F. Supp. 2d
1366 (J.P.M.L. 2003) is similarly misplaced.  The Panel considered only a request to consolidate cases
pending against a single defendant involving a single drug, Prempro®.

[16]  Reliance by Movant on *In re Ephedra Products Liability Litigation*, No. 1598 (J.P.M.L. Apr. 13,
2004), is similarly misplaced.  As with PPA, ephedra was a common collection of ingredients used in
products manufactured by a number of companies.  The allegation in those cases was that the common
ingredient known as ephedra was causing injuries.

[17]  Movant cites *In re Zyprexa Products Liability Litigation*, 314 F. Supp. 2d 1380 (J.P.M.L. 2004), but
those cases involved a *single* drug distributed and manufactured by a *single* pharmaceutical company.

Movant cannot meet her burden by positing vague, generalized similarities among four distinct pharmaceutical products. As courts uniformly recognize, it is inappropriate to make the "generic assumption" that all drugs of the same class cause the same effects because "even minor deviations in molecular structure can radically change a particular substance's properties and propensities." *Glastetter v. Novartis Pharms. Corp.*, 252 F.3d 986, 990 (8th Cir. 2001); *see also Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1200-01 (11th Cir. 2002) (same) (citing *Glastetter*).

Even if Movant could overcome the fact that even the chemical properties of these products are not "common," other differences among the products would still predominate the causation issue. For example, the four different drugs at issue are administered in different dosages by different methods, rendering any conclusions about particular common effects suspect in the absence of scientifically reliable evidence.[18] Similarly, case reports about one product are not valid evidence of causation because they do not account for considerations such as the variable background incidence of ONJ and the variable risk factors for the development of ONJ in the divergent patient populations at issue here. *See, e.g., Glastetter,* 252 F.3d at 989-90; *Rider*, 295 F.3d at 1199. Any attempt to rely on case reports regarding one product in opinions about a different product is even more untenable because scientific evidence regarding one drug cannot be automatically applied to others, even those in the same class. *Glastetter*, 252 F.3d at 990. For those same reasons, both plaintiffs and defendants will need to retain expert witnesses with different fields of expertise depending on the specific product and indication at issue.[19]

---

[18] *See, e.g., Mancuso v. Consol. Edison Co.,* 967 F. Supp. 1437, 1445 (S.D.N.Y. 1997) (significance of dose); *In re "Agent Orange" Prod. Liab. Litig.,* 373 F. Supp. 2d 7, 41 (E.D.N.Y. 2005) (same) (quoting *Mancuso*); *Carroll v. Litton Sys., Inc.,* No. B-C-88-253, 1990 WL 312969, at *74 n.7 (W.D.N.C. Oct. 29, 1990) (same).

[19] NPC would expect to call experts who are unique to NPC's issues, for example, in the fields of multiple myeloma, prostate and breast cancers, cancer treatments and therapies, and cancer epidemiology.

The diverse range of issues Movant seeks to centralize here is akin to *In re Amino Acid Lysine Antitrust Litigation*, 910 F. Supp. 696 (J.P.M.L. 1995). There, the Panel refused to consolidate antitrust actions involving "different products, with different uses, produced for the most part by different manufacturers, and sold by them to different alleged classes of purchasers, albeit with some overlapping class membership" because the differences outweighed any common questions. *Id.* at 701; *see also In re Vioxx Prods. Liab. Litig.*, 360 F. Supp. 2d 1352, 1354 (J.P.M.L. 2005) ("claims involving a prescription drug other than Vioxx . . . do not share sufficient questions of fact . . . to warrant inclusion"); *In re: Blood & Blood Prods. Hepatitis C Virus Prods. Liab. Litig.*, 2000 U.S. Dist. LEXIS 11149, at *3 ("given the wide array of claims raised, encompassing various blood products, time periods, and transmission modes, . . . individual, not common, questions of fact rise to the forefront"); *In re Repetitive Stress Injury Prods. Liab. Litig.*, No. 955, 1992 WL 403023, at *1 (J.P.M.L. Nov. 27, 1992) (common questions regarding plaintiffs' product liability/personal injury claims against numerous equipment manufacturers did not arise to the "degree" necessary for transfer under § 1407).

No court has determined that any of these drugs cause ONJ, and there is no scientifically-reliable evidence that any of the drugs cause ONJ. It is simply premature for this Panel to conclude that there are common questions regarding the properties and characteristics of these four different drugs or whether any or all cause the injuries alleged.[20]

## B.    Individual Issues Predominate In The Pending Lawsuits.

Individual issues are crucial to virtually every aspect of each plaintiff's affirmative claim, including, *inter alia*:  (1) whether each plaintiff can show exposure to one of the four products caused the specific injury alleged; (2) each plaintiff's individual risk factors including plaintiff's

---

[20]  Even NPC's own two drugs, Aredia® and Zometa®, are different compounds, administered differently, and with different effects, and therefore are ill-suited for combined treatment in a single legal proceeding.

underlying disease(s); (3) each plaintiff's individual and family medical history; [21] (4) the severity of each plaintiff's alleged injury; (5) the warnings provided to plaintiff's prescribing physician; (6) whether each plaintiff's prescribing physician would have prescribed the drug if a different warning had been given; (7) the state of the art at the time each plaintiff used the drug; (8) the appropriate amount of damages, if any; and (9) the applicability of affirmative defenses such as comparative fault, assumption of risk, and statutes of limitations. *See In re Asbestos & Asbestos Insulation Material Prods. Liab. Litig*, 431 F. Supp. 906, 909-10 (J.P.M.L. 1977) ("[t]he question of causation is an individual issue . . . necessarily . . . related to the individual factors of length, intensity, and type of [] exposure, and to the physical characteristics of the person"); *see also In re Asbestos Sch. Prods. Liab. Litig.*, 606 F. Supp. 713, 714 (J.P.M.L. 1985) (same). Consolidation is not appropriate where, as here, individual issues comprise the overwhelming bulk of the questions to be resolved. *See, e.g., In re Eli Lilly & Company "OraFlex" Prods. Liab. Litig.*, 578 F. Supp. at 423; *In re Rely Tampon Prods. Liab. Litig.*, 533 F. Supp. 1346, 1347 (J.P.M.L. 1982); *In re Asbestos & Asbestos Insulation Material Prods. Liab. Litig*, 431 F. Supp. at 910; *In re Asbestos Sch. Prods. Liab. Litig.*, 606 F. Supp. at 714.

The substantive law applicable to each plaintiff's claim also likely varies, precluding fair and efficient resolution of these claims in an aggregate setting. For example, state laws differ as to claims of fraud, warning, negligence, and other claims asserted by the plaintiffs. *See, e.g., In re BridgeStone/Firestone, Inc.*, 288 F.3d 1012, 1015 (7th Cir. 2002) (fraud and products liability

---

[21] NPC expects medical records discovery to be quite extensive, at least as relates to plaintiffs who were prescribed Zometa® or Aredia® as part of therapy for cancer-related complications. For example, in actions pending against NPC in the Middle District of Tennessee and the Western District of Oklahoma, some plaintiffs already have identified as many as 20 physicians and health care providers involved in their individual treatment. *See, e.g.,* Plaintiff's Initial Disclosures, *Ingram v. Novartis Pharms. Corp.,* No 05-913-L (W.D. Okla. filed Nov. 21, 2005) (disclosing 20 treating physicians) (excerpt attached as Exhibit J); Latimer Declaration at ¶4 (Ex. I). Additional treating physicians often are discovered during the review of each plaintiff's medical records.

claims are unsuited for aggregate treatment because of differences between the states).[22]  These

sorts of issues are, therefore, typically *not* decided in an MDL.  For example, in the on-going *In*

*re Phenylpropanolamine* MDL, the transferee court declined to address dispositive motions on

individual claims that implicate state law, instead informing the parties that such motions should

be considered after remand.  *See, e.g., In re Phenylpropanolamine Prods. Liab. Litig.,* No. 1407,

2004 WL 2034587, at *2 (W.D. Wash. Sept. 2, 2004) (declining to rule on motion to dismiss that

would require review of individual complaints and application of the correct state law to each,

noting such decisions are "neither the purpose, nor the forte," of an MDL court); *see also In re*

*Orthopedic Bone Screw Prod. Liab. Litig.*, No. 1014, 1997 WL 109595, at *2-*3 (E.D. Pa. Mar.

7, 1997) (declining to rule on summary judgment motions because to do so "would be an

inefficient and daunting endeavor not contemplated by § 1407").  Thus, centralization here may

well *prevent* timely and orderly litigation (or disposition) of claims.  These inefficiencies are

avoidable by allowing the cases to proceed individually.

<div align="center">*     *     *</div>

This Panel has held repeatedly that a movant does not meet her burden by simply

showing a few common questions may exist.  Transfer is only appropriate if aggregate resolution

of sufficiently complex common questions will meaningfully advance the litigation.  *See, e.g., In*

*re Pharmacy Benefit Plan Adm'rs Pricing Litig.*, 206 F. Supp. 2d 1362, 1363 (J.P.M.L. 2002)

(denying transfer because "common legal questions and, perhaps, a few factual questions, unique

questions of fact predominate[d] over any common questions of fact."); *In re Asbestos &*

*Asbestos Insulation Material Prods. Liab. Litig.*, 431 F. Supp. at 909-10 (same); *In re Repetitive*

---

[22]  *See also Castano v. Am. Tobacco Co.*, 84 F.3d 734, 742 n.15 (5th Cir. 1996) (same); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1085 (6th Cir. 1996) (class certification improper because of differences in state law).

*Stress Injury Prods. Liab. Litig.*, 1992 WL 403023, at *1 (same); *In re Drowning Incident at Quality Inn Northeast, Washington, D.C. on May 3, 1974*, 405 F. Supp. 1304, 1306 (J.P.M.L. 1976) (same). Here, Movant has failed to meet her burden of showing any significant complex common questions among the four different pharmaceutical products and four different defendants and failed to show that centralization would enhance convenience or promote the just and efficient conduct of the cases.

## III. EVEN IF THE PANEL FINDS TRANSFER IS APPROPRIATE, MOVANT'S FORUM SHOPPING FOR THE SOUTHERN OR EASTERN DISTRICT OF NEW YORK SHOULD NOT BE REWARDED.

In the alternative, if this Panel decides that MDL treatment is appropriate for one or more of the products at issue, NPC respectfully requests that the Panel transfer the cases to the Middle District of Tennessee for several reasons.

First, the cases currently filed in the Middle District of Tennessee, though still in early stages, are the most advanced cases against NPC (which is defending the largest number of cases). The Court in the Middle District has heard motions involving factual issues and thus gained knowledge of the claims. *See* Latimer Declaration at ¶3. *See In re Nortel Networks Corp. Sec. & "ERISA" Litig.*, 269 F. Supp. 2d 1367, 1368-69 (J.P.M.L. 2003) (transferring cases to the Middle District of Tennessee because, unlike courts hosting more recently filed cases, the Tennessee court already had developed "a familiarity with the issues in this litigation").[23] By way of contrast, at the time of the filing of this opposition, responsive pleadings were just beginning to be filed in the New

---

[23] The Eastern District of Tennessee (Jordan, S.J.) would also be an appropriate forum for centralization, if it is determined that centralization is appropriate, because of its familiarity with the issues and attorneys involved in the actions before the Panel. *See Thorn v. Novartis Pharms. Corp.*, No. 3:04-cv-586 (E.D. Tenn.) (dismissed voluntarily on October 24, 2005). *See* Latimer Declaration at ¶6.

York cases.  Discovery is also further along in Tennessee than in any other jurisdiction.[24]

Second, despite Movant's counsel's efforts, more plaintiffs have filed their actions in the Middle District of Tennessee than in any other single district.

Third, the Middle District of Tennessee can more readily accommodate an MDL proceeding than either the Eastern or Southern District of New York.  The number of cases pending per judge in the Middle District of Tennessee is approximately 43% less than the caseload of Southern District of New York judges and approximately 37% less than the caseload of the Eastern District of New York judges.  *See* Judicial Caseload Profile Report, (Feb. 15, 2006), http://www.uscourts.gov/cgi-bin/cmsd2005.pl.  Judges in the Middle District of Tennessee are well versed in handling MDL proceedings – two MDL proceedings are currently pending in that Court and it has disposed of three others in the past six years.

Fourth, Nashville is easily accessible to all parties, through its international airport and proximity to major interstate highways.

## CONCLUSION

For the foregoing reasons, the Panel should deny the motion to transfer these cases to a multidistrict proceeding.

---

[24]  Plaintiffs in the Middle District have reviewed documents produced pursuant to their requests to NPC. NPC also has served document production requests to plaintiffs and medical records collection is well underway.  Each of the parties has propounded and responded to interrogatories.  *See* Latimer Declaration at ¶3.

Respectfully submitted,

February 16, 2006

SPRIGGS & HOLLINGSWORTH

Joe G. Hollingsworth
Katharine R. Latimer
Donald W. Fowler
Robert E. Johnston
1350 I Street, N.W., Ninth Floor
Washington, DC 20005
(202) 898-5800
(202) 682-1639 (facsimile)

*Attorneys for Defendant*
*Novartis Pharmaceuticals Corporation*



JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

FEB 17 2006

FILED
CLERK'S OFFICE

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 16th of February 2006, I served a true and correct copy of the foregoing Novartis Pharmaceuticals Corporation's Memorandum of Law in Opposition to Motion for Multidistrict Litigation by United States Mail, postage prepaid, on the parties listed in the attached Panel Attorney Service List.

In addition, a true and correct copy of the foregoing Novartis Pharmaceuticals Corporation's Memorandum of Law in Opposition to Motion for Multidistrict Litigation by United States Mail, postage prepaid, was served on the following parties who represent plaintiffs in potential tag-along actions:

Gregory S. Spizer
Dara Lovitz
Anapol, Schwartz, Weiss, Cohan, Feldman & Smalley, P.C.
1040 Kings Highway North, Suite 304
Cherry Hill, NJ  08034

*Representing plaintiff Bernice Frick*



Carol Cayer
Terrel, Hogan, Ellis & Yegerwel, P.A.
233 E. Bay Street, 8th Floor
Jacksonville, FL  32202

*Representing plaintiffs J. Hunter Chiles III and Dianna Chiles*

Terence J. Sweeney
Law Offices of Terence J. Sweeney, Esq.
225 Broadway, Suite 2500
New York, NY  10007

*Representing plaintiffs Barbara Davids, Helene Deutsch and John Napolitano*

Paul A. Daniels
Teague, Rotenstreich & Stanaland, L.L.P.
101 South Elm Street, Suite 350
Greensboro, NC  27401

   *Representing plaintiffs Rita Fussman, Herbert Fussman and Karen Fichter-Venners*


Bart T. Valad
The Law Firm of Bart T. Valad, P.L.L.C.
10640 Main Street, Suite 200
Fairfax, VA  22030

   *Representing plaintiffs J. Hunter Chiles III, Dianna Chiles, Barbara Davids, Helene*
   *Deutsch, John Napolitano, Rita Fussman, Herbert Fussman and Karen Fichter-Venners*

Jack J. Fine
Fine, Farkash & Parlapiano, P.A.
622 N.E. First Street
Gainesville, FL  32601

   *Representing plaintiffs Pamela Krause and William Krause*

**Judicial Panel on Multidistrict Litigation - Panel Attorney Service List**                                                Page 1

Docket:  1760 - In re Bisphosphonate Drugs Products Liability Litigation
Status:  Pending on  / /
Transferee District:              Judge:

Printed on 02/07/2006

| ATTORNEY - FIRM | REPRESENTED PARTY(S) |
|---|---|

Beatie, Russel H.           ⟹ Bartoli, John*; Biocca, Zena*; Burt, Burdette*; Cartelli, Margaret*; Carter, Patsy*; Champion,
Beatie & Osborn, LLP            Runette*; Cuthbert, Jack*; Dengel, Suzanne*; Fry, Gary*; Gee, Loretta*; Grizzle, Shirley A.*; Guilbeau,
521 Fifth Avenue                Elaine*; Harrison, Ramon L.*; Harth, Margaret Peggy*; Hendrix, Michel*; Hiller, Glenn*; Hogan
Suite 3400                      (Surviving Spouse/Exe./Est.-Timothy), Karleen*; Johnson, Linda H.*; Kalily, Victor*; Knopf, Mindy
New York, NY 10175              J.*; Martinez, Mayra*; Perkins, Arlene*; Punnose, K. Thomas*; Radin, Nancy*; Shrum, Helen E.*;
                                Simmons, Lena*; Stevens, Gary*; Ulatowskl, Charles*; Wallace, Linda*; Wilson, Jacqueline*

Germany, Robert G.          ⟹ Anderson, Terry*; Arbuckle, Donald*; Becker, Susan*; Blumenshine, Mary*; Bowden, Abbie*; Brown,
Pittman, Germany, Roberts & Welsh, LLP    Marsha*; Brown, Victor*; Calloway, Francis Jo*; Casali, Angelina*; Eberhart, Susan*; Evers, Karen*;
P.O. Box 22985                  Foster, Betty*; Fragomenli, Fred*; Hill, Carol*; Kennedy, James*; Landesman, Jacob*; Lopreato,
Jackson, MS 39225-2985          Carolyn*; McCleery, Sally*; McDaniel, Eula Mae*; Melau, Edwin*; Melching, Brenda*; Miller,
                                Elizabeth*; Montgomery, Bobby Lynn*; Newman, Phyllis*; Nichols, Trent*; Olson, Donna*; Orozco,
                                Sam*; Patton, James*; Raber, Sarah*; Reinardy, Sally*; Roman, Corina Maria*; Russo, Addolorata*;
                                Smith, Carol*; Strakhov, Suzanne*; Talley, Marie*; Thompson, Debra*; Tracy, George*; White,
                                Denise*; Williams, Alison*; Wolfe, Gwendolyn*; Wood, Angela*; Woollard, Randy*; Zinger, Otilia*

Hill, III, M. King          ⟹ Merck & Co., Inc.*
Venable, LLP
210 Allegheny Avenue
P.O. Box 5517
Towson, MD 21204

Latimer, Katharine R.       ⟹ Novartis Pharmaceuticals Corp.*
Spriggs & Hollingsworth
1350 I Street, N.W.
9th Floor
Washington, DC 20005

Turley, Windle              ⟹ Ingram (Ind./Surviving Spouse-Rick), Linda*
Law Offices of Windle Turley, P.C.
1000 Turley Law Center
6440 North Central Expressway
Dallas, TX 75206

Varney, Lana K.             ⟹ Aventis Pharmaceuticals, Inc.*; Proctor & Gamble Pharmaceuticals, Inc.*
Fulbright & Jaworski, L.L.P.
600 Congress Avenue
Suite 2400
Austin, TX 78701-3271

Note: Please refer to the report title page for complete report scope and key.

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

FEB 17 2006

FILED
CLERK'S OFFICE

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

|  |  |  |
|---|---|---|
| IN RE: BISPHOSPHONATE DRUGS | ) | MDL Docket No. 1760 |
| PRODUCTS LIABILITY LITIGATION | ) | |

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

Pursuant to Rule 16.1(b) of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, Novartis Pharmaceuticals Corporation ("NPC") submits the following reasons why the Panel should hear oral argument on plaintiff's motion to transfer.

The factual nature of claims involving four separate products and distributed by four companies, as well as the procedural posture of the cases plaintiff seeks to be transferred, compel the conclusion that the requested transfer will neither be for the convenience of the parties and witnesses, nor will it promote the just and efficient conduct of these actions with regard to pretrial proceedings.  NPC believes that oral argument will assist the Panel in understanding the nature and scope of the pending litigation and will satisfy any concerns that the Panel may have about the manner in which the litigation can be managed (as it is currently) without creating an MDL.

Respectfully submitted:

February 16, 2006                               SPRIGGS & HOLLINGSWORTH

Joe G. Hollingsworth
Katharine R. Latimer
Donald W. Fowler
Robert E. Johnston
1350 I Street, N.W., Ninth Floor
Washington, DC 20005
(202) 898-5800
(202) 682-1639 (fax)

*Attorneys for Defendant*
*Novartis Pharmaceuticals Corporation*

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

FEB 17 2006

FILED
CLERK'S OFFICE

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 16th of February 2006, I served a true and correct

copy of the foregoing Reasons Why Oral Argument Should be Heard by United States Mail,

postage prepaid, on the parties listed in the attached Panel Attorney Service List.

In addition, a true and correct copy of the foregoing Reasons Why Oral Argument Should

be Heard by United States Mail, postage prepaid, was served on the following parties who

represent plaintiffs in potential tag-along actions:


Gregory S. Spizer
Dara Lovitz
Anapol, Schwartz, Weiss, Cohan, Feldman & Smalley, P.C.
1040 Kings Highway North, Suite 304
Cherry Hill, NJ  08034

   *Representing plaintiff Bernice Frick*

Carol Cayer
Terrel, Hogan, Ellis & Yegerwel, P.A.
233 E. Bay Street, 8th Floor
Jacksonville, FL  32202

   *Representing plaintiffs J. Hunter Chiles III and Dianna Chiles*

Terence J. Sweeney
Law Offices of Terence J. Sweeney, Esq.
225 Broadway, Suite 2500
New York, NY  10007

   *Representing plaintiffs Barbara Davids, Helene Deutsch and John Napolitano*

Paul A. Daniels
Teague, Rotenstreich & Stanaland, L.L.P.
101 South Elm Street, Suite 350
Greensboro, NC  27401

   *Representing plaintiffs Rita Fussman, Herbert Fussman and Karen Fichter-Venners*

Bart T. Valad
The Law Firm of Bart T. Valad, P.L.L.C.
10640 Main Street, Suite 200
Fairfax, VA 22030

> *Representing plaintiffs J. Hunter Chiles III, Dianna Chiles, Barbara Davids, Helene Deutsch, John Napolitano, Rita Fussman, Herbert Fussman and Karen Fichter-Venners*

Jack J. Fine
Fine, Farkash & Parlapiano, P.A.
622 N.E. First Street
Gainesville, FL 32601

> *Representing plaintiffs Pamela Krause and William Krause*

Printed on 02/07/2006

# Judicial Panel on Multidistrict Litigation - Panel Attorney Service List
## for
# MDL 1760 - In re Bisphosphonate Drugs Products Liability Litigation

**\*\*\* Report Key and Title Page \*\*\***

Please Note: This report is in alphabetical order by the last name of the attorney. A party may not be represented by more then one attorney. See Panel rule 5.2(c).

**Party Representation Key**
   \* Signifies that an appearance was made on behalf of the party by the representing attorney.
   # Specified party was dismissed in some, but not all, of the actions in which it was named as a party.
   All counsel and parties no longer active in this litigation have been suppressed.

**This Report is Based on the Following Data Filters**
   Docket: 1760 - Bisphosphonate Drugs Products Liability
   For Open Cases

**Judicial Panel on Multidistrict Litigation - Panel Attorney Service List**   Page 1

Docket:  1760 - In re Bisphosphonate Drugs Products Liability Litigation
Status:  Pending on  / /
Transferee District:        Judge:

Printed on 02/07/2006

| ATTORNEY - FIRM | REPRESENTED PARTY(S) |
|---|---|
| Beatie, Russel H.<br>Beatie & Osborn, LLP<br>521 Fifth Avenue<br>Suite 3400<br>New York, NY 10175 | => Bartoli, John*; Biocca, Zena*; Burt, Burdette*; Cartelli, Margaret*; Carter, Patsy*; Champion, Runette*; Cuthbert, Jack*; Dengel, Suzanne*; Fry, Gary*; Gee, Loretta*; Grizzle, Shirley A.*; Guilbeau, Elaine*; Harrison, Ramon L.*; Harth, Margaret Peggy*; Hendrix, Michel*; Hiller, Glenn*; Hogan (Surviving Spouse/Exe./Est.-Timothy), Karleen*; Johnson, Linda H.*; Kalily, Victor*; Knopf, Mindy J.*; Martinez, Mayra*; Perkins, Arlene*; Punnose, K. Thomas*; Radin, Nancy*; Shrum, Helen E.*; Simmons, Lena*; Stevens, Gary*; Ulatowskl, Charles*; Wallace, Linda*; Wilson, Jacqueline* |
| Germany, Robert G.<br>Pittman, Germany, Roberts & Welsh, LLP<br>P.O. Box 22985<br>Jackson, MS 39225-2985 | => Anderson, Terry*; Arbuckle, Donald*; Becker, Susan*; Blumenshine, Mary*; Bowden, Abbie*; Brown, Marsha*; Brown, Victor*; Calloway, Francis Jo*; Casali, Angelina*; Eberhart, Susan*; Evers, Karen*; Foster, Betty*; Fragomenli, Fred*; Hill, Carol*; Kennedy, James*; Landesman, Jacob*; Lopreato, Carolyn*; McCleery, Sally*; McDaniel, Eula Mae*; Melau, Edwin*; Melching, Brenda*; Miller, Elizabeth*; Montgomery, Bobby Lynn*; Newman, Phyllis*; Nichols, Trent*; Olson, Donna*; Orozco, Sam*; Patton, James*; Raber, Sarah*; Reinardy, Sally*; Roman, Corina Maria*; Russo, Addolorata*; Smith, Carol*; Strakhov, Suzanne*; Talley, Marie*; Thompson, Debra*; Tracy, George*; White, Denise*; Williams, Alison*; Wolfe, Gwendolyn*; Wood, Angela*; Woollard, Randy*; Zinger, Otilia* |
| Hill, III, M. King<br>Venable, LLP<br>210 Allegheny Avenue<br>P.O. Box 5517<br>Towson, MD 21204 | => Merck & Co., Inc.* |
| Latimer, Katharine R.<br>Spriggs & Hollingsworth<br>1350 I Street, N.W.<br>9th Floor<br>Washington, DC 20005 | => Novartis Pharmaceuticals Corp.* |
| Turley, Windle<br>Law Offices of Windle Turley, P.C.<br>1000 Turley Law Center<br>6440 North Central Expressway<br>Dallas, TX 75206 | => Ingram (Ind./Surviving Spouse-Rick), Linda* |
| Varney, Lana K.<br>Fulbright & Jaworski, L.L.P.<br>600 Congress Avenue<br>Suite 2400<br>Austin, TX 78701-3271 | => Aventis Pharmaceuticals, Inc.*; Proctor & Gamble Pharmaceuticals, Inc.* |

Note: Please refer to the report title page for complete report scope and key.

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

FEB 1 7 2006

FILED
CLERK'S OFFICE

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

|  |  |  |
|---|---|---|
| IN RE: BISPHOSPHONATE DRUGS PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) | MDL Docket No. 1760 |

### NOTICE OF POTENTIAL TAG-ALONG ACTIONS
### BY NOVARTIS PHARMACEUTICALS CORPORATION

Pursuant to Rule 7.2(i) of the Rules of Procedure of the Judicial Panel on Multidistrict

Litigation, Novartis Pharmaceuticals Corporation ("NPC") hereby notifies the Clerk of the Panel

of the following potential "tag-along" actions:

1. *Scott R. Brown v. Novartis Pharmaceuticals Corporation*, No. 1:06-CV-00977-UA (S.D.N.Y) (Unassigned – Referred to Keenan, J. as possibly related to *Harth v. Merck & Co., Inc.*, No. 1:06-CV-00361-JFK (S.D.N.Y.) (Keenan, J.))

2. *J. Hunter Chiles III and Dianna Chiles v. Novartis Pharmaceuticals Corporation*, No. 3:06-CV-00096-HLA-HTS (M.D. Fla.) (Adams, J.) (Jacksonville Division)

3. *Barbara Davids, Helene Deutsch, and John Napolitano v. Novartis Pharmaceuticals Corporation*, No. 2:06-CV-00431-ADS (E.D.N.Y.) (Spatt, J.)

4. *Bernice Frick v. Novartis Pharmaceuticals Corporation, f/k/a Sandoz Pharmaceuticals Corporation Route 10 East Hanover, NJ 07936; and John Doe Corporations 1-50; and John Doe Individuals 50-100*, No. 2:05-CV-05429-DRD-SDW (D.N.J.) (Debevoise, J.)

5. *Rita Fussman, Herbert Fussman and Karen Fichter-Venners, Individually and as Administrator of the Estate of Susanna Elizabeth Michaels v. Novartis Pharmaceuticals Corporation*, No. 1:06-CV-00149-JAB-PTS (M.D.N.C.) (Beaty, J.)

6.   *Linda Herring v. Novartis Pharmaceuticals Corporation*, No. 2:06-CV-00556-DGT-RLM (E.D.N.Y.) (Trager, J.)

7.   *Sharon Hillcoat v. Novartis Pharmaceuticals Corporation*, No. 2:06-CV-00554-DGT-RLM (E.D.N.Y.) (Trager, J.)

8.   *Pamela Krause and William Krause v. Novartis Pharmaceuticals Corporation*, No. 1:06-CV-00012-SPM-AK (N.D. Fla.) (Mickle, J.) (Gainesville Division)

9.   *Diann Romero v. Novartis Pharmaceuticals Corporation*, No. 2:06-CV-00550-DGT-RLM (E.D.N.Y.) (Trager, J.)

10.   Susan Schirripa v. Novartis Pharmaceuticals Corporation, No. 1:06-CV-00978-UA (S.D.N.Y.) (Unassigned – Referred to Keenan, J. as possibly related to *Harth v. Merck & Co., Inc.*, No. 1:06-CV-00361-JFK (S.D.N.Y.) (Keenan, J.))


Respectfully submitted:


February 16, 2006                              SPRIGGS & HOLLINGSWORTH

                                               Joe G. Hollingsworth
                                               Katharine R. Latimer
                                               Donald W. Fowler
                                               Robert E. Johnston
                                               1350 I Street, N.W., Ninth Floor
                                               Washington, DC 20005
                                               (202) 898-5800
                                               (202) 682-1639 (fax)

                                               *Attorneys for Defendant*
                                               *Novartis Pharmaceuticals Corporation*

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

## CERTIFICATE OF SERVICE

FEB 1 7 2006

FILED
CLERK'S OFFICE

I HEREBY CERTIFY that on this 16th of February 2006, I served a true and correct

copy of the foregoing Notice of Potential Tag-Along Actions by Novartis Pharmaceuticals

Corporation by United States Mail, postage prepaid, on the parties listed in the attached Panel

Attorney Service List.

In addition, a true and correct copy of the foregoing Notice of Potential Tag-Along

Actions by Novartis Pharmaceuticals Corporation by United States Mail, postage prepaid, was

served on the following parties who represent plaintiffs in potential tag-along actions:

Gregory S. Spizer
Dara Lovitz
Anapol, Schwartz, Weiss, Cohan, Feldman & Smalley, P.C.
1040 Kings Highway North, Suite 304
Cherry Hill, NJ  08034

*Representing plaintiff Bernice Frick*

Carol Cayer
Terrel, Hogan, Ellis & Yegerwel, P.A.
233 E. Bay Street, 8th Floor
Jacksonville, FL  32202

*Representing plaintiffs J. Hunter Chiles III and Dianna Chiles*

Terence J. Sweeney
Law Offices of Terence J. Sweeney, Esq.
225 Broadway, Suite 2500
New York, NY  10007

*Representing plaintiffs Barbara Davids, Helene Deutsch and John Napolitano*

Paul A. Daniels
Teague, Rotenstreich & Stanaland, L.L.P.
101 South Elm Street, Suite 350
Greensboro, NC  27401

*Representing plaintiffs Rita Fussman, Herbert Fussman and Karen Fichter-Venners*

Bart T. Valad
The Law Firm of Bart T. Valad, P.L.L.C.
10640 Main Street, Suite 200
Fairfax, VA  22030

> *Representing plaintiffs J. Hunter Chiles III, Dianna Chiles, Barbara Davids, Helene Deutsch, John Napolitano, Rita Fussman, Herbert Fussman and Karen Fichter-Venners*

Jack J. Fine
Fine, Farkash & Parlapiano, P.A.
622 N.E. First Street
Gainesville, FL  32601

> *Representing plaintiffs Pamela Krause and William Krause*

Printed on 02/07/2006

# Judicial Panel on Multidistrict Litigation - Panel Attorney Service List
## for
# MDL 1760 - In re Bisphosphonate Drugs Products Liability Litigation

### *** Report Key and Title Page ***

Please Note: This report is in alphabetical order by the last name of the attorney. A party may not be represented by more then one attorney. See Panel rule 5.2(c).

**Party Representation Key**
   \* Signifies that an appearance was made on behalf of the party by the representing attorney.
   # Specified party was dismissed in some, but not all, of the actions in which it was named as a party.
   All counsel and parties no longer active in this litigation have been suppressed.

**This Report is Based on the Following Data Filters**
   Docket: 1760 - Bisphosphonate Drugs Products Liability
   For Open Cases

**Judicial Panel on Multidistrict Litigation - Panel Attorney Service List**                                Page 1

Docket: 1760 - In re Bisphosphonate Drugs Products Liability Litigation
Status: Pending on / /
Transferee District:          Judge:                                                          Printed on 02/07/2006

| ATTORNEY - FIRM | REPRESENTED PARTY(S) |
|---|---|
| Beatie, Russel H.<br>Beatie & Osborn, LLP<br>521 Fifth Avenue<br>Suite 3400<br>New York, NY 10175 | => Bartoli, John*; Biocca, Zena*; Burt, Burdette*; Cartelli, Margaret*; Carter, Patsy*; Champion, Runette*; Cuthbert, Jack*; Dengel, Suzanne*; Fry, Gary*; Gee, Loretta*; Grizzle, Shirley A.*; Guilbeau, Elaine*; Harrison, Ramon L.*; Harth, Margaret Peggy*; Hendrix, Michel*; Hiller, Glenn*; Hogan (Surviving Spouse/Exe./Est.-Timothy), Karleen*; Johnson, Linda H.*; Kalily, Victor*; Knopf, Mindy J.*; Martinez, Mayra*; Perkins, Arlene*; Punnose, K. Thomas*; Radin, Nancy*; Shrum, Helen E.*; Simmons, Lena*; Stevens, Gary*; Ulatowski, Charles*; Wallace, Linda*; Wilson, Jacqueline* |
| Germany, Robert G.<br>Pittman, Germany, Roberts & Welsh, LLP<br>P.O. Box 22985<br>Jackson, MS 39225-2985 | => Anderson, Terry*; Arbuckle, Donald*; Becker, Susan*; Blumenshine, Mary*; Bowden, Abbie*; Brown, Marsha*; Brown, Victor*; Calloway, Francis Jo*; Casali, Angelina*; Eberhart, Susan*; Evers, Karen*; Foster, Betty*; Fragomenli, Fred*; Hill, Carol*; Kennedy, James*; Landesman, Jacob*; Lopreato, Carolyn*; McCleery, Sally*; McDaniel, Eula Mae*; Melau, Edwin*; Melching, Brenda*; Miller, Elizabeth*; Montgomery, Bobby Lynn*; Newman, Phyllis*; Nichols, Trent*; Olson, Donna*; Orozco, Sam*; Patton, James*; Raber, Sarah*; Reinardy, Sally*; Roman, Corina Maria*; Russo, Addolorata*; Smith, Carol*; Strakhov, Suzanne*; Talley, Marie*; Thompson, Debra*; Tracy, George*; White, Denise*; Williams, Alison*; Wolfe, Gwendolyn*; Wood, Angela*; Woollard, Randy*; Zinger, Otilia* |
| Hill, III, M. King<br>Venable, LLP<br>210 Allegheny Avenue<br>P.O. Box 5517<br>Towson, MD 21204 | => Merck & Co., Inc.* |
| Latimer, Katharine R.<br>Spriggs & Hollingsworth<br>1350 I Street, N.W.<br>9th Floor<br>Washington, DC 20005 | => Novartis Pharmaceuticals Corp.* |
| Turley, Windle<br>Law Offices of Windle Turley, P.C.<br>1000 Turley Law Center<br>6440 North Central Expressway<br>Dallas, TX 75206 | => Ingram (Ind./Surviving Spouse-Rick), Linda* |
| Varney, Lana K.<br>Fulbright & Jaworski, L.L.P.<br>600 Congress Avenue<br>Suite 2400<br>Austin, TX 78701-3271 | => Aventis Pharmaceuticals, Inc.*; Proctor & Gamble Pharmaceuticals, Inc.* |

Note: Please refer to the report title page for complete report scope and key.

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

FEB 17 2006

FILED
CLERK'S OFFICE

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

|  |  |
|---|---|
| _____ ) | |
| IN RE: BISPHOSPHONATE DRUGS ) | MDL Docket No. 1760 |
| PRODUCTS LIABILITY LITIGATION ) | |
| ) | |
| _____ ) | |

### EXHIBITS IN SUPPORT OF
### NOVARTIS PHARMACEUTICALS CORPORATION'S
### MEMORANDUM OF LAW IN OPPOSITION
### TO MOTION FOR MULTIDISTRICT TRANSFER

2006 FEB 16 P 3: 57

RECEIVED
CLERK'S OFFICE

## **TABLE OF CONTENTS**

Exhibit A        Declaration of J. Michael Scott in Support of Novartis Pharmaceuticals
                 Corporation's Memorandum of Law in Opposition to Multidistrict Transfer

Exhibit B        Aredia® label approved by FDA on November 16, 2005

Exhibit C        Aredia® letter of approval dated October 31, 1991

Exhibit D        Zometa® label approved by FDA on October 11, 2005

Exhibit E        Zometa® letter of approval dated August 20, 2001

Exhibit F        Fosamax® label approved by FDA on December 21, 2005

Exhibit G        Actonel® label approved by FDA on January 24, 2006

Exhibit H        Actonel® letter of approval dated March 27, 1998

Exhibit I        Declaration of Katharine R. Latimer in Support of Novartis Pharmaceuticals
                 Corporation's Memorandum of Law in Opposition to Multidistrict Transfer

Exhibit J        Plaintiff's Initial Disclosures, *Ingram v. Novartis Pharms. Corp.,* No. 05-913-L
                 (W.D. Okla. filed Nov. 21, 2005)

Exhibit K        Salvatore Ruggiero et al., *Practical Guidelines for the Prevention, Diagnosis, and
                 Treatment of Osteonecrosis of the Jaw in Patients with Cancer,* 2 J. Oncol. Prac. 7
                 (2006)

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

FEB 1 7 2006

FILED
CLERK'S OFFICE

# Exhibit
# A

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE: BISPHOSPHONATE DRUGS ) <br> PRODUCTS LIABILITY LITIGATION ) <br> ) <br> ) | MDL Docket No. 1760 |

### DECLARATION OF J. MICHAEL SCOTT IN SUPPORT OF NOVARTIS PHARMACEUTICALS CORPORATION'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR MULTIDISTRICT TRANSFER

I, J. Michael Scott, declare under penalty of perjury that the following is true and correct.

1.    I, J. Michael Scott, am an employee of Novartis Pharmaceuticals Corporation ("NPC"), located at One Health Plaza, East Hanover, NJ, and have been an employee at NPC since 2003. I am a citizen of the United States, am over the age of eighteen, and have personal knowledge of the facts set forth in this Affidavit.

2.    I am the Zometa Brand Director at NPC.

3.    I make this Affidavit in support of NPC's memorandum of law in opposition to plaintiff's motion for multi-district litigation.

4.    NPC submitted an Investigational New Drug application ("IND") for pamidronate disodium in 1987 and New Drug Applications ("NDA") in 1989 and 1997. Pamidronate disodium was approved, under the brand name Aredia®, in the United States in 1991 for treatment of hypercalcemia of malignancy and in 1994 to treat Paget's disease. In 1995, Aredia® was approved for treatment of lesions of multiple myeloma and in 1996 for bone metastases from breast cancer.

5.    NPC submitted a IND's for zoledronic acid in 1993 and 1998 and NDA's in 1999 and 2001. Zoledronic acid was approved, under the brand name Zometa®, in the United States in 2001 for treatment of hypercalcemia of malignancy and in 2002 for treatment of multiple myeloma, bone metastases from breast cancer, prostate cancer and other solid tumors.

6.    On information and belief, Fosamax® is presently approved for treatment and prevention of osteoporosis in post-menopausal women, treatment of glucocorticoid-induced osteoporosis in men and women, and treatment of Paget's disease, as well as for increasing bone mass in men with osteoporosis. On information and belief, Actonel® is presently approved for treatment and prevention of osteoporosis in post-menopausal women, treatment of glucocorticoid-induced osteoporosis in men and women, and treatment of Paget's disease.

7.  Pursuant to the labeling for Aredia®, Zometa®, Fosamax® and Actonel®, the drugs are not indicated to treat the same conditions, with the exception of Paget's disease. Thus, there is no expectation that Aredia®, Zometa® will or can be used in combination therapy with Fosamax® and Actonel®.

8.  NPC did not develop or test Aredia® or Zometa® in consultation with Procter & Gamble, Aventis, Merck, or any other bisphosphonate manufacturer or distributor. NPC received no assistance from Merck, Procter & Gamble or Aventis throughout the development process for either drug. NPC has not provided Merck, Procter & Gamble or Aventis with information or other forms of assistance on the testing or development of NPC's products. NPC has no knowledge, beyond that which is publicly available, about testing or other work Merck, Procter & Gamble or Aventis engaged in before bringing Fosamax® and Actonel® to market.

9.  Aredia®, Zometa®, Fosamax® and Actonel® each has a unique and self-contained history associated with the development and testing of the drugs, including New Drug Applications, which contain information regarding each product's development, clinical trials, and continuing regulatory correspondence with the Food and Drug Administration ("FDA"). Novartis did not rely on testing or clinical trials conducted by Procter & Gamble, Aventis, and/or Merck in seeking FDA approval of either Aredia® or Zometa®. To the best of NPC's knowledge, neither Merck, Procter & Gamble, nor Aventis relied upon testing or clinical trials involving Aredia® or Zometa® in seeking FDA approval of Fosamax® and Actonel®.

10. The facilities in which Aredia® and Zometa® are manufactured do not manufacture Fosamax® or Actonel®.

11. NPC markets Aredia® and Zometa®. NPC did not market either Aredia® or Zometa® in consultation with Merck, Procter & Gamble, Aventis, or any other bisphosphonate manufacturer or distributor. NPC did not coordinate or share any strategies, plans or other information concerning the marketing of Aredia® or Zometa® with any other bisphosphonate manufacturer or distributor.

12. Aredia® and Zometa® are prescription drugs approved for use primarily in cancer patients and are administered by intravenous infusion at hospitals or clinics by order of a treating oncologist or urologist; they are usually not sold in pharmacies. As a result, NPC's marketing program for Aredia® and Zometa® has focused on oncologists and urologists, not the general public, and is generally conducted through in-person visits by sales representatives to physicians. Fosamax® and Actonel® are prescription drugs sold in pill form through pharmacies to patients suffering from, *inter alia*, osteoporosis. Through publicly available information, NPC is aware that Fosamax® and Actonel® are marketed differently from either Aredia® or Zometa®. Fosamax® and Actonel® are marketed directly to the public through print, radio and television advertising, as well as to general practice physicians and physicians specializing in the treatment of osteoporosis.

13.    NPC became aware of adverse drug experiences ("ADEs") related to Aredia® and/or
       Zometa® through adverse drug experience reports from prescribing or treating physicians,
       patients, or from the FDA.  NPC did not learn of these ADEs involving Aredia® and/or
       Zometa® from Merck, Procter & Gamble or Aventis.  NPC becomes aware of ADEs
       reported in patients using competitors' products primarily from publically available case
       reports, media reporting, and FDA's public pronouncements.  When and how NPC
       became aware of ADEs reported in patients using its own products is independent of
       when or how Merck, Procter & Gamble or Aventis learned of ADEs reported in patients
       using their own products.

Executed on February 15, 2006.


                        /s/ Michael Scott
                        J. Michael Scott

# Exhibit
# B

## ⓾ NOVARTIS

T2005-27

## Aredia®

**pamidronate disodium for Injection**
**For Intravenous Infusion**

**Rx only**

**Prescribing Information**

# DESCRIPTION

Aredia, pamidronate disodium (APD), is a bone-resorption inhibitor available in 30-mg or 90-mg vials for intravenous administration. Each 30-mg, and 90-mg vial contains, respectively, 30 mg and 90 mg of sterile, lyophilized pamidronate disodium and 470 mg and 375 mg of mannitol, USP. The pH of a 1% solution of pamidronate disodium in distilled water is approximately 8.3. Aredia, a member of the group of chemical compounds known as bisphosphonates, is an analog of pyrophosphate. Pamidronate disodium is designated chemically as phosphonic acid (3-amino-1-hydroxypropylidene) bis-, disodium salt, pentahydrate, (APD), and its structural formula is

$$NH_2-CH_2-CH_2-\overset{\displaystyle PO_3HNa}{\underset{\displaystyle PO_3HNa}{\overset{|}{\underset{|}{C}}}}-OH \quad \bullet \quad 5H_2O$$

Pamidronate disodium is a white-to-practically-white powder. It is soluble in water and in 2N sodium hydroxide, sparingly soluble in 0.1N hydrochloric acid and in 0.1N acetic acid, and practically insoluble in organic solvents. Its molecular formula is $C_3H_9NO_7P_2Na_2 \bullet 5H_2O$ and its molecular weight is 369.1.

*Inactive Ingredients.* Mannitol, USP, and phosphoric acid (for adjustment to pH 6.5 prior to lyophilization).

# CLINICAL PHARMACOLOGY

The principal pharmacologic action of Aredia is inhibition of bone resorption. Although the mechanism of antiresorptive action is not completely understood, several factors are thought to contribute to this action. Aredia adsorbs to calcium phosphate (hydroxyapatite) crystals in bone and may directly block dissolution of this mineral component of bone. In vitro studies also suggest that inhibition of osteoclast activity contributes to inhibition of bone resorption. In animal studies, at doses recommended for the treatment of hypercalcemia, Aredia inhibits bone resorption apparently without inhibiting bone formation and mineralization. Of relevance to the treatment of hypercalcemia of malignancy is the finding that Aredia inhibits the

accelerated bone resorption that results from osteoclast hyperactivity induced by various tumors in animal studies.

## Pharmacokinetics

Cancer patients (n=24) who had minimal or no bony involvement were given an intravenous infusion of 30, 60, or 90 mg of Aredia over 4 hours and 90 mg of Aredia over 24 hours (Table 1).

### Distribution

The mean ± SD body retention of pamidronate was calculated to be 54 ± 16% of the dose over 120 hours.

### Metabolism

Pamidronate is not metabolized and is exclusively eliminated by renal excretion.

### Excretion

After administration of 30, 60, and 90 mg of Aredia over 4 hours, and 90 mg of Aredia over 24 hours, an overall mean ± SD of 46 ± 16% of the drug was excreted unchanged in the urine within 120 hours. Cumulative urinary excretion was linearly related to dose. The mean ± SD elimination half-life is 28 ± 7 hours. Mean ± SD total and renal clearances of pamidronate were 107 ± 50 mL/min and 49 ± 28 mL/min, respectively. The rate of elimination from bone has not been determined.

### Special Populations

There are no data available on the effects of age, gender, or race on the pharmacokinetics of pamidronate.

#### Pediatric

Pamidronate is not labeled for use in the pediatric population.

#### Renal Insufficiency

The pharmacokinetics of pamidronate were studied in cancer patients (n=19) with normal and varying degrees of renal impairment. Each patient received a single 90-mg dose of Aredia infused over 4 hours. The renal clearance of pamidronate in patients was found to closely correlate with creatinine clearance (see Figure 1). A trend toward a lower percentage of drug excreted unchanged in urine was observed in renally impaired patients. Adverse experiences noted were not found to be related to changes in renal clearance of pamidronate. Given the recommended dose, 90 mg infused over 4 hours, excessive accumulation of pamidronate in renally impaired patients is not anticipated if Aredia is administered on a monthly basis.

Figure 1:  Pamidronate renal clearance as a function of creatinine
clearance in patients with normal and impaired renal function.
The lines are the mean prediction line and 95% confidence intervals.



*Hepatic Insufficiency*

The pharmacokinetics of pamidronate were studied in male cancer patients at risk for bone metastases with normal hepatic function (n=6) and mild to moderate hepatic dysfunction (n=7). Each patient received a single 90-mg dose of Aredia infused over 4 hours. Although there was a statistically significant difference in the pharmacokinetics between patients with normal and impaired hepatic function, the difference was not considered clinically relevant. Patients with hepatic impairment exhibited higher mean AUC (53%) and $C_{max}$ (29%), and decreased plasma clearance (33%) values. Nevertheless, pamidronate was still rapidly cleared from the plasma. Drug levels were not detectable in patients by 12 to 36 hours after drug infusion. Because Aredia is administered on a monthly basis, drug accumulation is not expected. No changes in Aredia dosing regimen are recommended for patients with mild to moderate abnormal hepatic function. Aredia has not been studied in patients with severe hepatic impairment.

*Drug-Drug Interactions*

There are no human pharmacokinetic data for drug interactions with Aredia.

**Table 1**
**Mean (SD, CV%) Pamidronate Pharmacokinetic Parameters in Cancer Patients**
**(n=6 for each group)**

| Dose (infusion rate) | Maximum Concentration (µg/mL) | Percent of dose excreted in urine | Total Clearance (mL/min) | Renal Clearance (mL/min) |
|---|---|---|---|---|
| 30 mg (4 hrs) | 0.73 (0.14, 19.1%) | 43.9 (14.0, 31.9%) | 136 (44, 32.4%) | 58 (27, 46.5%) |
| 60 mg (4 hrs) | 1.44 (0.57, 39.6%) | 47.4 (47.4, 54.4%) | 88 (56, 63.6%) | 42 (28, 66.7%) |
| 90 mg (4 hrs) | 2.61 (0.74, 28.3%) | 45.3 (25.8, 56.9%) | 103 (37, 35.9%) | 44 (16, 36.4%) |
| 90 mg (24 hrs) | 1.38 (1.97, 142.7%) | 47.5 (10.2, 21.5%) | 101 (58, 57.4%) | 52 (42, 80.8%) |

After intravenous administration of radiolabeled pamidronate in rats, approximately 50%-60% of the compound was rapidly adsorbed by bone and slowly eliminated from the body by the kidneys. In rats given 10 mg/kg bolus injections of radiolabeled Aredia, approximately 30% of the compound was found in the liver shortly after administration and was then redistributed to bone or eliminated by the kidneys over 24-48 hours. Studies in rats injected with radiolabeled Aredia showed that the compound was rapidly cleared from the circulation and taken up mainly by bones, liver, spleen, teeth, and tracheal cartilage. Radioactivity was eliminated from most soft tissues within 1-4 days; was detectable in liver and spleen for 1 and 3 months, respectively; and remained high in bones, trachea, and teeth for 6 months after dosing. Bone uptake occurred preferentially in areas of high bone turnover. The terminal phase of elimination half-life in bone was estimated to be approximately 300 days.

## Pharmacodynamics

Serum phosphate levels have been noted to decrease after administration of Aredia, presumably because of decreased release of phosphate from bone and increased renal excretion as parathyroid hormone levels, which are usually suppressed in hypercalcemia associated with malignancy, return toward normal. Phosphate therapy was administered in 30% of the patients in response to a decrease in serum phosphate levels. Phosphate levels usually returned toward normal within 7-10 days.

Urinary calcium/creatinine and urinary hydroxyproline/creatinine ratios decrease and usually return to within or below normal after treatment with Aredia. These changes occur within the first week after treatment, as do decreases in serum calcium levels, and are consistent with an antiresorptive pharmacologic action.

## Hypercalcemia of Malignancy

Osteoclastic hyperactivity resulting in excessive bone resorption is the underlying pathophysiologic derangement in metastatic bone disease and hypercalcemia of malignancy. Excessive release of calcium into the blood as bone is resorbed results in polyuria and gastrointestinal disturbances, with progressive dehydration and decreasing glomerular filtration rate. This, in turn, results in increased renal resorption of calcium, setting up a cycle

of worsening systemic hypercalcemia. Correction of excessive bone resorption and adequate fluid administration to correct volume deficits are therefore essential to the management of hypercalcemia.

Most cases of hypercalcemia associated with malignancy occur in patients who have breast cancer; squamous-cell tumors of the lung or head and neck; renal-cell carcinoma; and certain hematologic malignancies, such as multiple myeloma and some types of lymphomas. A few less-common malignancies, including vasoactive intestinal-peptide-producing tumors and cholangiocarcinoma, have a high incidence of hypercalcemia as a metabolic complication. Patients who have hypercalcemia of malignancy can generally be divided into two groups, according to the pathophysiologic mechanism involved.

In humoral hypercalcemia, osteoclasts are activated and bone resorption is stimulated by factors such as parathyroid-hormone-related protein, which are elaborated by the tumor and circulate systemically. Humoral hypercalcemia usually occurs in squamous-cell malignancies of the lung or head and neck or in genitourinary tumors such as renal-cell carcinoma or ovarian cancer. Skeletal metastases may be absent or minimal in these patients.

Extensive invasion of bone by tumor cells can also result in hypercalcemia due to local tumor products that stimulate bone resorption by osteoclasts. Tumors commonly associated with locally mediated hypercalcemia include breast cancer and multiple myeloma.

Total serum calcium levels in patients who have hypercalcemia of malignancy may not reflect the severity of hypercalcemia, since concomitant hypoalbuminemia is commonly present. Ideally, ionized calcium levels should be used to diagnose and follow hypercalcemic conditions; however, these are not commonly or rapidly available in many clinical situations. Therefore, adjustment of the total serum calcium value for differences in albumin levels is often used in place of measurement of ionized calcium; several nomograms are in use for this type of calculation (see DOSAGE AND ADMINISTRATION).

### Clinical Trials

In one double-blind clinical trial, 52 patients who had hypercalcemia of malignancy were enrolled to receive 30 mg, 60 mg, or 90 mg of Aredia as a single 24-hour intravenous infusion if their corrected serum calcium levels were ≥12.0 mg/dL after 48 hours of saline hydration.

The mean baseline-corrected serum calcium for the 30-mg, 60-mg, and 90-mg groups were 13.8 mg/dL, 13.8 mg/dL, and 13.3 mg/dL, respectively.

The majority of patients (64%) had decreases in albumin-corrected serum calcium levels by 24 hours after initiation of treatment. Mean-corrected serum calcium levels at days 2-7 after initiation of treatment with Aredia were significantly reduced from baseline in all three dosage groups. As a result, by 7 days after initiation of treatment with Aredia, 40%, 61%, and 100% of the patients receiving 30 mg, 60 mg, and 90 mg of Aredia, respectively, had normal-corrected serum calcium levels. Many patients (33%-53%) in the 60-mg and 90-mg dosage groups continued to have normal-corrected serum calcium levels, or a partial response (≥15% decrease of corrected serum calcium from baseline), at Day 14.

In a second double-blind, controlled clinical trial, 65 cancer patients who had corrected serum calcium levels of ≥12.0 mg/dL after at least 24 hours of saline hydration were

randomized to receive either 60 mg of Aredia as a single 24-hour intravenous infusion or 7.5 mg/kg of etidronate disodium as a 2-hour intravenous infusion daily for 3 days. Thirty patients were randomized to receive Aredia and 35 to receive etidronate disodium.

The mean baseline-corrected serum calcium for the Aredia 60-mg and etidronate disodium groups were 14.6 mg/dL and 13.8 mg/dL, respectively.

By Day 7, 70% of the patients in the Aredia group and 41% of the patients in the etidronate disodium group had normal-corrected serum calcium levels (P<0.05). When partial responders (≥15% decrease of serum calcium from baseline) were also included, the response rates were 97% for the Aredia group and 65% for the etidronate disodium group (P<0.01). Mean-corrected serum calcium for the Aredia and etidronate disodium groups decreased from baseline values to 10.4 and 11.2 mg/dL, respectively, on Day 7. At Day 14, 43% of patients in the Aredia group and 18% of patients in the etidronate disodium group still had normal-corrected serum calcium levels, or maintenance of a partial response. For responders in the Aredia and etidronate disodium groups, the median duration of response was similar (7 and 5 days, respectively). The time course of effect on corrected serum calcium is summarized in the following table.

### Change in Corrected Serum Calcium by Time from Initiation of Treatment

| Time (hr) | Mean Change from Baseline in Corrected Serum Calcium (mg/dL) | | |
|---|---|---|---|
| | Aredia® | Etidronate Disodium | P-Value[1] |
| Baseline | 14.6 | 13.8 | |
| 24 | -0.3 | -0.5 | |
| 48 | -1.5 | -1.1 | |
| 72 | -2.6 | -2.0 | |
| 96 | -3.5 | -2.0 | <0.01 |
| 168 | -4.1 | -2.5 | <0.01 |

[1]Comparison between treatment groups

In a third multicenter, randomized, parallel double-blind trial, a group of 69 cancer patients with hypercalcemia was enrolled to receive 60 mg of Aredia as a 4- or 24-hour infusion, which was compared to a saline treatment group. Patients who had a corrected serum calcium level of ≥12.0 mg/dL after 24 hours of saline hydration were eligible for this trial.

The mean baseline-corrected serum calcium levels for Aredia 60-mg 4-hour infusion, Aredia 60-mg 24-hour infusion, and saline infusion were 14.2 mg/dL, 13.7 mg/dL, and 13.7 mg/dL, respectively.

By Day 7 after initiation of treatment, 78%, 61%, and 22% of the patients had normal-corrected serum calcium levels for the 60-mg 4-hour infusion, 60-mg 24-hour infusion, and saline infusion, respectively. At Day 14, 39% of the patients in the Aredia 60-mg 4-hour infusion group and 26% of the patients in the Aredia 60-mg 24-hour infusion group had normal-corrected serum calcium levels or maintenance of a partial response.

For responders, the median duration of complete responses was 4 days and 6.5 days for Aredia 60-mg 4-hour infusion and Aredia 60-mg 24-hour infusion, respectively.

In all three trials, patients treated with Aredia had similar response rates in the presence or absence of bone metastases. Concomitant administration of furosemide did not affect response rates.

Thirty-two patients who had recurrent or refractory hypercalcemia of malignancy were given a second course of 60 mg of Aredia over a 4- or 24-hour period. Of these, 41% showed a complete response and 16% showed a partial response to the retreatment, and these responders had about a 3-mg/dL fall in mean-corrected serum calcium levels 7 days after retreatment.

In a fourth multicenter, randomized, double-blind trial, 103 patients with cancer and hypercalcemia (corrected serum calcium $\geq 12.0$ mg/dL) received 90 mg of Aredia as a 2-hour infusion. The mean baseline corrected serum calcium was 14.0 mg/dL. Patients were not required to receive IV hydration prior to drug administration, but all subjects did receive at least 500 mL of IV saline hydration concomitantly with the pamidronate infusion. By Day 10 after drug infusion, 70% of patients had normal corrected serum calcium levels (<10.8 mg/dL).

## Paget's Disease

Paget's disease of bone (osteitis deformans) is an idiopathic disease characterized by chronic, focal areas of bone destruction complicated by concurrent excessive bone repair, affecting one or more bones. These changes result in thickened but weakened bones that may fracture or bend under stress. Signs and symptoms may be bone pain, deformity, fractures, neurological disorders resulting from cranial and spinal nerve entrapment and from spinal cord and brain stem compression, increased cardiac output to the involved bone, increased serum alkaline phosphatase levels (reflecting increased bone formation) and/or urine hydroxyproline excretion (reflecting increased bone resorption).

### Clinical Trials

In one double-blind clinical trial, 64 patients with moderate to severe Paget's disease of bone were enrolled to receive 5 mg, 15 mg, or 30 mg of Aredia as a single 4-hour infusion on 3 consecutive days, for total doses of 15 mg, 45 mg, and 90 mg of Aredia.

The mean baseline serum alkaline phosphatase levels were 1,409 U/L, 983 U/L, and 1,085 U/L, and the mean baseline urine hydroxyproline/creatinine ratios were 0.25, 0.19, and 0.19 for the 15-mg, 45-mg, and 90-mg groups, respectively.

The effects of Aredia on serum alkaline phosphatase (SAP) and urine hydroxyproline/creatinine ratios (UOHP/C) are summarized in the following table:

**Percent of Patients With**
**Significant % Decreases in SAP and UOHP/C**

| | SAP | | | UOHP/C | | |
|---|---|---|---|---|---|---|
| % Decrease | 15 mg | 45 mg | 90 mg | 15 mg | 45 mg | 90 mg |
| ≥50 | 26 | 33 | 60 | 15 | 47 | 72 |
| ≥30 | 40 | 65 | 83 | 35 | 57 | 85 |

The median maximum percent decreases from baseline in serum alkaline phosphatase and urine hydroxyproline/creatinine ratios were 25%, 41%, and 57%, and 25%, 47%, and 61% for the 15-mg, 45-mg, and 90-mg groups, respectively. The median time to response (≥50% decrease) for serum alkaline phosphatase was approximately 1 month for the 90-mg group, and the response duration ranged from 1 to 372 days.

No statistically significant differences between treatment groups, or statistically significant changes from baseline were observed for the bone pain response, mobility, and global evaluation in the 45-mg and 90-mg groups. Improvement in radiologic lesions occurred in some patients in the 90-mg group.

Twenty-five patients who had Paget's disease were retreated with 90 mg of Aredia. Of these, 44% had a ≥50% decrease in serum alkaline phosphatase from baseline after treatment, and 39% had a ≥50% decrease in urine hydroxyproline/creatinine ratio from baseline after treatment.

## Osteolytic Bone Metastases of Breast Cancer and Osteolytic Lesions of Multiple Myeloma

Osteolytic bone metastases commonly occur in patients with multiple myeloma or breast cancer. These cancers demonstrate a phenomenon known as osteotropism, meaning they possess an extraordinary affinity for bone. The distribution of osteolytic bone metastases in these cancers is predominantly in the axial skeleton, particularly the spine, pelvis, and ribs, rather than the appendicular skeleton, although lesions in the proximal femur and humerus are not uncommon. This distribution is similar to the red bone marrow in which slow blood flow possibly assists attachment of metastatic cells. The surface-to-volume ratio of trabecular bone is much higher than cortical bone, and therefore disease processes tend to occur more floridly in trabecular bone than at sites of cortical tissue.

These bone changes can result in patients having evidence of osteolytic skeletal destruction leading to severe bone pain that requires either radiation therapy or narcotic analgesics (or both) for symptomatic relief. These changes also cause pathologic fractures of bone in both the axial and appendicular skeleton. Axial skeletal fractures of the vertebral bodies may lead to spinal cord compression or vertebral body collapse with significant neurologic complications. Also, patients may experience episode(s) of hypercalcemia.

## Clinical Trials

In a double-blind, randomized, placebo-controlled trial, 392 patients with advanced multiple myeloma were enrolled to receive Aredia or placebo in addition to their underlying antimyeloma therapy to determine the effect of Aredia on the occurrence of skeletal-related

events (SREs). SREs were defined as episodes of pathologic fractures, radiation therapy to bone, surgery to bone, and spinal cord compression. Patients received either 90 mg of Aredia or placebo as a monthly 4-hour intravenous infusion for 9 months. Of the 392 patients, 377 were evaluable for efficacy (196 Aredia, 181 placebo). The proportion of patients developing any SRE was significantly smaller in the Aredia group (24% vs 41%, P<0.001), and the mean skeletal morbidity rate (#SRE/year) was significantly smaller for Aredia patients than for placebo patients (mean:  1.1 vs 2.1, P<.02). The times to the first SRE occurrence, pathologic fracture, and radiation to bone were significantly longer in the Aredia group (P=.001, .006, and .046, respectively).  Moreover, fewer Aredia patients suffered any pathologic fracture (17% vs 30%, P=.004) or needed radiation to bone (14% vs 22%, P=.049).

In addition, decreases in pain scores from baseline occurred at the last measurement for those Aredia patients with pain at baseline (P=.026) but not in the placebo group. At the last measurement, a worsening from baseline was observed in the placebo group for the Spitzer quality of life variable (P<.001) and ECOG performance status (P<.011) while there was no significant deterioration from baseline in these parameters observed in Aredia-treated patients.*

After 21 months, the proportion of patients experiencing any skeletal event remained significantly smaller in the Aredia group than the placebo group (P=.015). In addition, the mean skeletal morbidity rate (#SRE/year) was 1.3 vs 2.2 for Aredia patients versus placebo patients (P=.008), and time to first SRE was significantly longer in the Aredia group compared to placebo (P=.016). Fewer Aredia patients suffered vertebral pathologic fractures (16% vs 27%, P=.005).  Survival of all patients was not different between treatment groups.

Two double-blind, randomized, placebo-controlled trials compared the safety and efficacy of 90 mg of Aredia infused over 2 hours every 3 to 4 weeks for 24 months to that of placebo in preventing SREs in breast cancer patients with osteolytic bone metastases who had one or more predominantly lytic metastases of at least 1 cm in diameter:  one in patients being treated with antineoplastic chemotherapy and the second in patients being treated with hormonal antineoplastic therapy at trial entry.

382 patients receiving chemotherapy were randomized, 185 to Aredia and 197 to placebo.  372 patients receiving hormonal therapy were randomized, 182 to Aredia and 190 to placebo. All but three patients were evaluable for efficacy. Patients were followed for 24 months of therapy or until they went off study.  Median duration of follow-up was 13 months in patients receiving chemotherapy and 17 months in patients receiving hormone therapy. Twenty-five percent of the patients in the chemotherapy study and 37% of the patients in the hormone therapy study received Aredia for 24 months. The efficacy results are shown in the table below:

| | Breast Cancer Patients Receiving Chemotherapy | | | | | | Breast Cancer Patients Receiving Hormonal Therapy | | | | | |
| | Any SRE | | Radiation | | Fractures | | Any SRE | | Radiation | | Fractures | |
| | A | P | A | P | A | P | A | P | A | P | A | P |
| N | 185 | 195 | 185 | 195 | 185 | 195 | 182 | 189 | 182 | 189 | 182 | 189 |
| **Skeletal Morbidity Rate (#SRE/year)** | | | | | | | | | | | | |
| Mean | 2.5 | 3.7 | 0.8 | 1.3 | 1.6 | 2.2 | 2.4 | 3.6 | 0.6 | 1.2 | 1.6 | 2.2 |
| P-Value | <.001 | | <.001† | | .018† | | .021 | | .013† | | .040† | |
| **Proportion of patients having an SRE** | 46% | 65% | 28% | 45% | 36% | 49% | 55% | 63% | 31% | 40% | 45% | 55% |
| P-Value | <.001 | | <.001† | | .014† | | .094 | | .058† | | .054† | |
| **Median Time to SRE (months)** | 13.9 | 7.0 | NR** | 14.2 | 25.8 | 13.3 | 10.9 | 7.4 | NR** | 23.4 | 20.6 | 12.8 |
| P-Value | <.001 | | <.001† | | .009† | | .118 | | .016† | | .113† | |

†Fractures and radiation to bone were two of several secondary endpoints. The statistical significance of these analyses may be overestimated since numerous analyses were performed.

**NR = Not Reached.

Bone lesion response was radiographically assessed at baseline and at 3, 6, and 12 months. The complete + partial response rate was 33% in Aredia patients and 18% in placebo patients treated with chemotherapy (P=.001). No difference was seen between Aredia and placebo in hormonally-treated patients.

Pain and analgesic scores, ECOG performance status and Spitzer quality of life index were measured at baseline and periodically during the trials. The changes from baseline to the last measurement carried forward are shown in the following table:

**Mean Change (Δ) from Baseline at Last Measurement**

| | Breast Cancer Patients Receiving Chemotherapy | | | | | Breast Cancer Patients Receiving Hormonal Therapy | | | | |
| | Aredia | | Placebo | | A vs P | Aredia | | Placebo | | A vs P |
| | N | Mean Δ | N | Mean Δ | P-Value* | N | Mean Δ | N | Mean Δ | P-Value* |
| Pain Score | 175 | +0.93 | 183 | +1.69 | .050 | 173 | +0.50 | 179 | +1.60 | .007 |
| Analgesic Score | 175 | +0.74 | 183 | +1.55 | .009 | 173 | +0.90 | 179 | +2.28 | <.001 |
| ECOG PS | 178 | +0.81 | 186 | +1.19 | .002 | 175 | +0.95 | 182 | +0.90 | .773 |
| Spitzer QOL | 177 | -1.76 | 185 | -2.21 | .103 | 173 | -1.86 | 181 | -2.05 | .409 |

Decreases in pain, analgesic scores and ECOG PS, and increases in Spitzer QOL indicate an improvement from baseline.

*The statistical significance of analyses of these secondary endpoints of pain, quality of life, and performance status in all three trials may be overestimated since numerous analyses were performed.

## INDICATIONS AND USAGE

### Hypercalcemia of Malignancy

Aredia, in conjunction with adequate hydration, is indicated for the treatment of moderate or severe hypercalcemia associated with malignancy, with or without bone metastases. Patients who have either epidermoid or non-epidermoid tumors respond to treatment with Aredia. Vigorous saline hydration, an integral part of hypercalcemia therapy, should be initiated promptly and an attempt should be made to restore the urine output to about 2 L/day throughout treatment. Mild or asymptomatic hypercalcemia may be treated with conservative measures (i.e., saline hydration, with or without loop diuretics). Patients should be hydrated adequately throughout the treatment, but overhydration, especially in those patients who have cardiac failure, must be avoided. Diuretic therapy should not be employed prior to correction of hypovolemia. The safety and efficacy of Aredia in the treatment of hypercalcemia associated with hyperparathyroidism or with other non-tumor-related conditions has not been established.

### Paget's Disease

Aredia is indicated for the treatment of patients with moderate to severe Paget's disease of bone. The effectiveness of Aredia was demonstrated primarily in patients with serum alkaline phosphatase $\geq 3$ times the upper limit of normal. Aredia therapy in patients with Paget's disease has been effective in reducing serum alkaline phosphatase and urinary hydroxyproline levels by $\geq 50\%$ in at least 50% of patients, and by $\geq 30\%$ in at least 80% of patients. Aredia therapy has also been effective in reducing these biochemical markers in patients with Paget's disease who failed to respond, or no longer responded to other treatments.

### Osteolytic Bone Metastases of Breast Cancer and Osteolytic Lesions of Multiple Myeloma

Aredia is indicated, in conjunction with standard antineoplastic therapy, for the treatment of osteolytic bone metastases of breast cancer and osteolytic lesions of multiple myeloma. The Aredia treatment effect appeared to be smaller in the study of breast cancer patients receiving hormonal therapy than in the study of those receiving chemotherapy, however, overall evidence of clinical benefit has been demonstrated (see CLINICAL PHARMACOLOGY, Osteolytic Bone Metastases of Breast Cancer and Osteolytic Lesions of Multiple Myeloma, Clinical Trials section).

## CONTRAINDICATIONS

Aredia is contraindicated in patients with clinically significant hypersensitivity to Aredia or other bisphosphonates.

## WARNINGS

DUE TO THE RISK OF CLINICALLY SIGNIFICANT DETERIORATION IN RENAL FUNCTION, WHICH MAY PROGRESS TO RENAL FAILURE, SINGLE

**DOSES OF AREDIA SHOULD NOT EXCEED 90 MG (see DOSAGE AND ADMINISTRATION for appropriate infusion durations).**

Bisphosphonates, including Aredia, have been associated with renal toxicity manifested as deterioration of renal function and potential renal failure.

Patients who receive Aredia should have serum creatinine assessed prior to each treatment. Patients treated with Aredia for bone metastases should have the dose withheld if renal function has deteriorated. (See DOSAGE AND ADMINISTRATION.)

In both rats and dogs, nephropathy has been associated with intravenous (bolus and infusion) administration of Aredia.

Two 7-day intravenous infusion studies were conducted in the dog wherein Aredia was given for 1, 4, or 24 hours at doses of 1-20 mg/kg for up to 7 days. In the first study, the compound was well tolerated at 3 mg/kg (1.7 x highest recommended human dose [HRHD] for a single intravenous infusion) when administered for 4 or 24 hours, but renal findings such as elevated BUN and creatinine levels and renal tubular necrosis occurred when 3 mg/kg was infused for 1 hour and at doses of $\geq$10 mg/kg. In the second study, slight renal tubular necrosis was observed in 1 male at 1 mg/kg when infused for 4 hours. Additional findings included elevated BUN levels in several treated animals and renal tubular dilation and/or inflammation at $\geq$1 mg/kg after each infusion time.

Aredia was given to rats at doses of 2, 6, and 20 mg/kg and to dogs at doses of 2, 4, 6, and 20 mg/kg as a 1-hour infusion, once a week, for 3 months followed by a 1-month recovery period. In rats, nephrotoxicity was observed at $\geq$6 mg/kg and included increased BUN and creatinine levels and tubular degeneration and necrosis. These findings were still present at 20 mg/kg at the end of the recovery period. In dogs, moribundity/death and renal toxicity occurred at 20 mg/kg as did kidney findings of elevated BUN and creatinine levels at $\geq$6 mg/kg and renal tubular degeneration at $\geq$4 mg/kg. The kidney changes were partially reversible at 6 mg/kg. In both studies, the dose level that produced no adverse renal effects was considered to be 2 mg/kg (1.1 x HRHD for a single intravenous infusion).

## PREGNANCY: AREDIA SHOULD NOT BE USED DURING PREGNANCY

Aredia may cause fetal harm when administered to a pregnant woman. (See PRECAUTIONS, Pregnancy Category D.)

There are no studies in pregnant women using Aredia. If the patient becomes pregnant while taking this drug, the patient should be apprised of the potential harm to the fetus. Women of childbearing potential should be advised to avoid becoming pregnant.

Studies conducted in young rats have reported the disruption of dental dentine formation following single- and multi-dose administration of bisphosphonates. The clinical significance of these findings is unknown.

# PRECAUTIONS

## General

Standard hypercalcemia-related metabolic parameters, such as serum levels of calcium, phosphate, magnesium, and potassium, should be carefully monitored following initiation of therapy with Aredia. Cases of asymptomatic hypophosphatemia (12%), hypokalemia (7%), hypomagnesemia (11%), and hypocalcemia (5%-12%), were reported in Aredia-treated patients. Rare cases of symptomatic hypocalcemia (including tetany) have been reported in association with Aredia therapy. If hypocalcemia occurs, short-term calcium therapy may be necessary. In Paget's disease of bone, 17% of patients treated with 90 mg of Aredia showed serum calcium levels below 8 mg/dL.

## Renal Insufficiency

Aredia is excreted intact primarily via the kidney, and the risk of renal adverse reactions may be greater in patients with impaired renal function. Patients who receive Aredia should have serum creatinine assessed prior to each treatment. In patients receiving Aredia for bone metastases, who show evidence of deterioration in renal function, Aredia treatment should be withheld until renal function returns to baseline (see WARNINGS and DOSAGE AND ADMINISTRATION).

Aredia has not been tested in patients who have class Dc renal impairment (creatinine >5.0 mg/dL), and has been tested in few multiple myeloma patients with serum creatinine ≥3.0 mg/dL. (See also CLINICAL PHARMACOLOGY, Pharmacokinetics.) For the treatment of bone metastases, the use of Aredia in patients with severe renal impairment is not recommended. In other indications, clinical judgment should determine whether the potential benefit outweighs the potential risk in such patients.

## Osteonecrosis of the Jaw

Osteonecrosis of the jaw (ONJ) has been reported in patients with cancer receiving treatment regimens including bisphosphonates. Many of these patients were also receiving chemotherapy and corticosteroids. The majority of reported cases have been associated with dental procedures such as tooth extraction.  Many had signs of local infection including osteomyelitis.

A dental examination with appropriate preventive dentistry should be considered prior to treatment with bisphosphonates in patients with concomitant risk factors (e.g., cancer, chemotherapy, corticosteroids, poor oral hygiene).

While on treatment, these patients should avoid invasive dental procedures if possible. For patients who develop ONJ while on bisphosphonate therapy, dental surgery may exacerbate the condition. For patients requiring dental procedures, there are no data available to suggest whether discontinuation of bisphosphonate treatment reduces the risk of ONJ. Clinical judgment of the treating physician should guide the management plan of each patient based on individual benefit/risk assessment.

## Musculoskeletal Pain

In post-marketing experience, severe and occasionally incapacitating bone, joint, and/or muscle pain has been reported in patients taking bisphosphonates. However, such reports have been infrequent. This category of drugs includes Aredia (pamidronate disodium for injection). The time to onset of symptoms varied from one day to several months after starting the drug. Most patients had relief of symptoms after stopping. A subset had recurrence of symptoms when rechallenged with the same drug or another bisphosphonate.

## Laboratory Tests

Patients who receive Aredia should have serum creatinine assessed prior to each treatment. Serum calcium, electrolytes, phosphate, magnesium, and CBC, differential, and hematocrit/hemoglobin must be closely monitored in patients treated with Aredia. Patients who have preexisting anemia, leukopenia, or thrombocytopenia should be monitored carefully in the first 2 weeks following treatment.

## Drug Interactions

Concomitant administration of a loop diuretic had no effect on the calcium-lowering action of Aredia.

Caution is indicated when Aredia is used with other potentially nephrotoxic drugs.

## Carcinogenesis, Mutagenesis, Impairment of Fertility

In a 104-week carcinogenicity study (daily oral administration) in rats, there was a positive dose response relationship for benign adrenal pheochromocytoma in males (P <0.00001). Although this condition was also observed in females, the incidence was not statistically significant. When the dose calculations were adjusted to account for the limited oral bioavailability of Aredia in rats, the lowest daily dose associated with adrenal pheochromocytoma was similar to the intended clinical dose. Adrenal pheochromocytoma was also observed in low numbers in the control animals and is considered a relatively common spontaneous neoplasm in the rat. Aredia (daily oral administration) was not carcinogenic in an 80-week study in mice.

Aredia was nonmutagenic in six mutagenicity assays:  Ames test, *Salmonella* and *Escherichia/* liver-microsome test, nucleus-anomaly test, sister-chromatid-exchange study, point-mutation test, and micronucleus test in the rat.

In rats, decreased fertility occurred in first-generation offspring of parents who had received 150 mg/kg of Aredia orally; however, this occurred only when animals were mated with members of the same dose group. Aredia has not been administered intravenously in such a study.

## Pregnancy Category D (See WARNINGS)

There are no adequate and well-controlled studies in pregnant women.

Bolus intravenous studies conducted in rats and rabbits determined that Aredia produces maternal toxicity and embryo/fetal effects when given during organogenesis at doses of 0.6 to 8.3 times the highest recommended human dose for a single intravenous infusion. As

it has been shown that Aredia can cross the placenta in rats and has produced marked maternal and nonteratogenic embryo/fetal effects in rats and rabbits, it should not be given to women during pregnancy.

Bisphosphonates are incorporated into the bone matrix, from where they are gradually released over periods of weeks to years. The extent of bisphosphonate incorporation into adult bone, and hence, the amount available for release back into the systemic circulation, is directly related to the total dose and duration of bisphosphonate use. Although there are no data on fetal risk in humans, bisphosphonates do cause fetal harm in animals, and animal data suggest that uptake of bisphosphonates into fetal bone is greater than into maternal bone. Therefore, there is a theoretical risk of fetal harm (e.g., skeletal and other abnormalities) if a woman becomes pregnant after completing a course of bisphosphonate therapy. The impact of variables such as time between cessation of bisphosphonate therapy to conception, the particular bisphosphonate used, and the route of administration (intravenous versus oral) on this risk has not been established.

## Nursing Mothers

It is not known whether Aredia is excreted in human milk. Because many drugs are excreted in human milk, caution should be exercised when Aredia is administered to a nursing woman.

## Pediatric Use

Safety and effectiveness of Aredia in pediatric patients have not been established.

## Geriatric Use

Of the total number of subjects in clinical studies of Aredia, approximately 20% were 65 and over, while approximately 15% were 75 and over. No overall differences in safety or effectiveness were observed between these subjects and younger subjects, and other reported clinical experience has not identified differences in responses between the elderly and younger patients, but greater sensitivity of some older individuals cannot be ruled out. In general, dose selection for an elderly patient should be cautious, usually starting at the low end of the dosing range, reflecting the greater frequency of decreased hepatic, renal, or cardiac function , and of concomitant disease or other drug therapy.

# ADVERSE REACTIONS

## Clinical Studies

### *Hypercalcemia of Malignancy*

Transient mild elevation of temperature by at least 1 °C was noted 24 to 48 hours after administration of Aredia in 34% of patients in clinical trials. In the saline trial, 18% of patients had a temperature elevation of at least 1 °C 24 to 48 hours after treatment.

Drug-related local soft-tissue symptoms (redness, swelling or induration and pain on palpation) at the site of catheter insertion were most common in patients treated with 90 mg of Aredia. Symptomatic treatment resulted in rapid resolution in all patients.

Rare cases of uveitis, iritis, scleritis, and episcleritis have been reported, including one case of scleritis, and one case of uveitis upon separate rechallenges.

Five of 231 patients (2%) who received Aredia during the four U.S. controlled hypercalcemia clinical studies were reported to have had seizures, 2 of whom had preexisting seizure disorders. None of the seizures were considered to be drug-related by the investigators. However, a possible relationship between the drug and the occurrence of seizures cannot be ruled out. It should be noted that in the saline arm 1 patient (4%) had a seizure.

There are no controlled clinical trials comparing the efficacy and safety of 90-mg Aredia over 24 hours to 2 hours in patients with hypercalcemia of malignancy. However, a comparison of data from separate clinical trials suggests that the overall safety profile in patients who received 90-mg Aredia over 24 hours is similar to those who received 90-mg Aredia over 2 hours. The only notable differences observed were an increase in the proportion of patients in the Aredia 24-hour group who experienced fluid overload and electrolyte/mineral abnormalities.

At least 15% of patients treated with Aredia for hypercalcemia of malignancy also experienced the following adverse events during a clinical trial:

**General:**  Fluid overload, generalized pain

**Cardiovascular:**  Hypertension

**Gastrointestinal:**  Abdominal pain, anorexia, constipation, nausea, vomiting

**Genitourinary:**  Urinary tract infection

**Musculoskeletal:**  Bone pain

**Laboratory   Abnormality:**   Anemia, hypokalemia, hypomagnesemia, hypophosphatemia

Many of these adverse experiences may have been related to the underlying disease state.  The following table lists the adverse experiences considered to be treatment-related during comparative, controlled U.S. trials.

**Treatment-Related Adverse Experiences Reported in Three U.S. Controlled Clinical Trials**

| | Percent of Patients | | | | |
| | Aredia[®] | | | Etidronate Disodium | Saline |
| | 60 mg over 4 hr | 60 mg over 24 hr | 90 mg over 24 hr | 7.5 mg/kg x 3 days | |
| | n=23 | n=73 | n=17 | n=35 | n=23 |
| **General** | | | | | |
| Edema | 0 | 1 | 0 | 0 | 0 |
| Fatigue | 0 | 0 | 12 | 0 | 0 |
| Fever | 26 | 19 | 18 | 9 | 0 |
| Fluid overload | 0 | 0 | 0 | 6 | 0 |
| Infusion-site reaction | 0 | 4 | 18 | 0 | 0 |
| Moniliasis | 0 | 0 | 6 | 0 | 0 |
| Rigors | 0 | 0 | 0 | 0 | 4 |
| **Gastrointestinal** | | | | | |
| Abdominal pain | 0 | 1 | 0 | 0 | 0 |
| Anorexia | 4 | 1 | 12 | 0 | 0 |
| Constipation | 4 | 0 | 6 | 3 | 0 |

| | | | | | |
|---|---|---|---|---|---|
| Diarrhea | 0 | 1 | 0 | 0 | 0 |
| Dyspepsia | 4 | 0 | 0 | 0 | 0 |
| Gastrointestinal hemorrhage | 0 | 0 | 6 | 0 | 0 |
| Nausea | 4 | 0 | 18 | 6 | 0 |
| Stomatitis | 0 | 1 | 0 | 3 | 0 |
| Vomiting | 4 | 0 | 0 | 0 | 0 |
| **Respiratory** | | | | | |
| Dyspnea | 0 | 0 | 0 | 3 | 0 |
| Rales | 0 | 0 | 6 | 0 | 0 |
| Rhinitis | 0 | 0 | 6 | 0 | 0 |

| | | | | | |
|---|---|---|---|---|---|
| Upper respiratory infection | 0 | 3 | 0 | 0 | 0 |
| **CNS** | | | | | |
| Anxiety | 0 | 0 | 0 | 0 | 4 |
| Convulsions | 0 | 0 | 0 | 3 | 0 |
| Insomnia | 0 | 1 | 0 | 0 | 0 |
| Nervousness | 0 | 0 | 0 | 0 | 4 |
| Psychosis | 4 | 0 | 0 | 0 | 0 |
| Somnolence | 0 | 1 | 6 | 0 | 0 |
| Taste perversion | 0 | 0 | 0 | 3 | 0 |
| **Cardiovascular** | | | | | |
| Atrial fibrillation | 0 | 0 | 6 | 0 | 4 |
| Atrial flutter | 0 | 1 | 0 | 0 | 0 |
| Cardiac failure | 0 | 1 | 0 | 0 | 0 |
| Hypertension | 0 | 0 | 6 | 0 | 4 |
| Syncope | 0 | 0 | 6 | 0 | 0 |
| Tachycardia | 0 | 0 | 6 | 0 | 4 |
| **Endocrine** | | | | | |
| Hypothyroidism | 0 | 0 | 6 | 0 | 0 |
| **Hemic and Lymphatic** | | | | | |
| Anemia | 0 | 0 | 6 | 0 | 0 |
| Leukopenia | 4 | 0 | 0 | 0 | 0 |
| Neutropenia | 0 | 1 | 0 | 0 | 0 |
| Thrombocytopenia | 0 | 1 | 0 | 0 | 0 |
| **Musculoskeletal** | | | | | |
| Myalgia | 0 | 1 | 0 | 0 | 0 |
| **Urogenital** | | | | | |
| Uremia | 4 | 0 | 0 | 0 | 0 |
| **Laboratory Abnormalities** | | | | | |
| Hypocalcemia | 0 | 1 | 12 | 0 | 0 |
| Hypokalemia | 4 | 4 | 18 | 0 | 0 |
| Hypomagnesemia | 4 | 10 | 12 | 3 | 4 |
| Hypophosphatemia | 0 | 9 | 18 | 3 | 0 |
| Abnormal liver function | 0 | 0 | 0 | 3 | 0 |

## *Paget's Disease*

Transient mild elevation of temperature >1 °C above pretreatment baseline was noted within 48 hours after completion of treatment in 21% of the patients treated with 90 mg of Aredia in clinical trials.

Drug-related musculoskeletal pain and nervous system symptoms (dizziness, headache, paresthesia, increased sweating) were more common in patients with Paget's disease treated with 90 mg of Aredia than in patients with hypercalcemia of malignancy treated with the same dose.

Adverse experiences considered to be related to trial drug, which occurred in at least 5% of patients with Paget's disease treated with 90 mg of Aredia in two U.S. clinical trials, were fever, nausea, back pain, and bone pain.

At least 10% of all Aredia-treated patients with Paget's disease also experienced the following adverse experiences during clinical trials:

***Cardiovascular:*** Hypertension

*Musculoskeletal:* Arthrosis, bone pain

*Nervous system:* Headache

Most of these adverse experiences may have been related to the underlying disease state.

## Osteolytic Bone Metastases of Breast Cancer and Osteolytic Lesions of Multiple Myeloma

The most commonly reported (>15%) adverse experiences occurred with similar frequencies in the Aredia- and placebo-treatment groups, and most of these adverse experiences may have been related to the underlying disease state or cancer therapy.

### Commonly Reported Adverse Experiences in Three U.S. Controlled Clinical Trials

| | Aredia® 90 mg over 4 hours N=205 % | Placebo N=187 % | Aredia® 90 mg over 2 hours N=367 % | Placebo N=386 % | All Aredia® 90 mg N=572 % | Placebo N=573 % |
|---|---|---|---|---|---|---|
| **General** | | | | | | |
| Asthenia | 16.1 | 17.1 | 25.6 | 19.2 | 22.2 | 18.5 |
| Fatigue | 31.7 | 28.3 | 40.3 | 28.8 | 37.2 | 29.0 |
| Fever | 38.5 | 38.0 | 38.1 | 32.1 | 38.5 | 34.0 |
| Metastases | 1.0 | 3.0 | 31.3 | 24.4 | 20.5 | 17.5 |
| Pain | 13.2 | 11.8 | 15.0 | 18.1 | 14.3 | 16.1 |
| **Digestive System** | | | | | | |
| Anorexia | 17.1 | 17.1 | 31.1 | 24.9 | 26.0 | 22.3 |
| Constipation | 28.3 | 31.7 | 36.0 | 38.6 | 33.2 | 35.1 |
| Diarrhea | 26.8 | 26.8 | 29.4 | 30.6 | 28.5 | 29.7 |
| Dyspepsia | 17.6 | 13.4 | 18.3 | 15.0 | 22.6 | 17.5 |
| Nausea | 35.6 | 37.4 | 63.5 | 59.1 | 53.5 | 51.8 |
| Pain Abdominal | 19.5 | 16.0 | 24.3 | 18.1 | 22.6 | 17.5 |
| Vomiting | 16.6 | 19.8 | 46.3 | 39.1 | 35.7 | 32.8 |
| **Hemic and Lymphatic** | | | | | | |
| Anemia | 47.8 | 41.7 | 39.5 | 36.8 | 42.5 | 38.4 |
| Granulocytopenia | 20.5 | 15.5 | 19.3 | 20.5 | 19.8 | 18.8 |
| Thrombocytopenia | 16.6 | 17.1 | 12.5 | 14.0 | 14.0 | 15.0 |
| **Musculoskeletal System** | | | | | | |
| Arthralgias | 10.7 | 7.0 | 15.3 | 12.7 | 13.6 | 10.8 |
| Myalgia | 25.4 | 15.0 | 26.4 | 22.5 | 26.0 | 20.1 |
| Skeletal Pain | 61.0 | 71.7 | 70.0 | 75.4 | 66.8 | 74.0 |
| **CNS** | | | | | | |
| Anxiety | 7.8 | 9.1 | 18.0 | 16.8 | 14.3 | 14.3 |
| Headache | 24.4 | 19.8 | 27.2 | 23.6 | 26.2 | 22.3 |
| Insomnia | 17.1 | 17.2 | 25.1 | 19.4 | 22.2 | 19.0 |
| **Respiratory System** | | | | | | |
| Coughing | 26.3 | 22.5 | 25.3 | 19.7 | 25.7 | 20.6 |
| Dyspnea | 22.0 | 21.4 | 35.1 | 24.4 | 30.4 | 23.4 |
| Pleural Effusion | 2.9 | 4.3 | 15.0 | 9.1 | 10.7 | 7.5 |
| Sinusitis | 14.6 | 16.6 | 16.1 | 10.4 | 15.6 | 12.0 |
| Upper Respiratory Tract Infection | 32.2 | 28.3 | 19.6 | 20.2 | 24.1 | 22.9 |
| **Urogenital System** | | | | | | |
| Urinary Tract Infection | 15.6 | 9.1 | 20.2 | 17.6 | 18.5 | 15.6 |

Of the toxicities commonly associated with chemotherapy, the frequency of vomiting, anorexia, and anemia were slightly more common in the Aredia patients whereas stomatitis and alopecia occurred at a frequency similar to that in placebo patients. In the breast cancer trials, mild elevations of serum creatinine occurred in 18.5% of Aredia patients and 12.3% of placebo patients. Mineral and electrolyte disturbances, including hypocalcemia, were reported rarely and in similar percentages of Aredia-treated patients compared with those in the placebo group. The reported frequencies of hypocalcemia, hypokalemia, hypophosphatemia, and hypomagnesemia for Aredia-treated patients were 3.3%, 10.5%, 1.7%, and 4.4%, respectively, and for placebo-treated patients were 1.2%, 12%, 1.7%, and 4.5%, respectively. In previous hypercalcemia of malignancy trials, patients treated with Aredia (60 or 90 mg over 24 hours) developed electrolyte abnormalities more frequently (see ADVERSE REACTIONS, Hypercalcemia of Malignancy).

Arthralgias and myalgias were reported slightly more frequently in the Aredia group than in the placebo group (13.6% and 26% vs 10.8% and 20.1%, respectively).

In multiple myeloma patients, there were five Aredia-related serious and unexpected adverse experiences. Four of these were reported during the 12-month extension of the multiple myeloma trial. Three of the reports were of worsening renal function developing in patients with progressive multiple myeloma or multiple myeloma-associated amyloidosis. The fourth report was the adult respiratory distress syndrome developing in a patient recovering from pneumonia and acute gangrenous cholecystitis. One Aredia-treated patient experienced an allergic reaction characterized by swollen and itchy eyes, runny nose, and scratchy throat within 24 hours after the sixth infusion.

In the breast cancer trials, there were four Aredia-related adverse experiences, all moderate in severity, that caused a patient to discontinue participation in the trial. One was due to interstitial pneumonitis, another to malaise and dyspnea. One Aredia patient discontinued the trial due to a symptomatic hypocalcemia. Another Aredia patient discontinued therapy due to severe bone pain after each infusion, which the investigator felt was trial-drug-related.

## Renal Toxicity

In a study of the safety and efficacy of Aredia 90 mg (2-hour infusion) versus Zometa 4 mg (15-minute infusion) in bone metastases patients with multiple myeloma or breast cancer, renal deterioration was defined as an increase in serum creatinine of 0.5 mg/dL for patients with normal baseline creatinine (<1.4 mg/dL) or an increase of 1.0 mg/dL for patients with an abnormal baseline creatinine ($\geq$1.4 mg/dL). The following are data on the incidence of renal deterioration in patients in this trial. See Table below.

**Incidence of Renal Function Deterioration in Multiple Myeloma and Breast Cancer Patients with Normal and Abnormal Serum Creatinine at Baseline***

| Patient Population/Baseline Creatinine | Aredia[®] 90 mg/2 hours | | Zometa[®] 4 mg/15 minutes | |
|---|---|---|---|---|
| | n/N | (%) | n/N | (%) |
| Normal | 20/246 | (8.1%) | 23/246 | (9.3%) |
| Abnormal | 2/22 | (9.1%) | 1/26 | (3.8%) |
| Total | 22/268 | (8.2%) | 24/272 | (8.8%) |

*Patients were randomized following the 15-minute infusion amendment for the Zometa arm.*

## Post-Marketing Experience

Rare instances of allergic manifestations have been reported, including hypotension, dyspnea, or angioedema, and, very rarely, anaphylactic shock. Aredia is contraindicated in patients with clinically significant hypersensitivity to Aredia or other bisphosphonates (see CONTRAINDICATIONS).

Cases of osteonecrosis (primarily of the jaws) have been reported since market introduction. Osteonecrosis of the jaws has other well documented multiple risk factors. It is not possible to determine if these events are related to Aredia or other bisphosphonates, to concomitant drugs or other therapies (e.g., chemotherapy, radiotherapy, corticosteroid), to patient's underlying disease, or to other comorbid risk factors (e.g., anemia, infection, preexisting oral disease). (See PRECAUTIONS.)

## OVERDOSAGE

There have been several cases of drug maladministration of intravenous Aredia in hypercalcemia patients with total doses of 225 mg to 300 mg given over 2 ½ to 4 days. All of these patients survived, but they experienced hypocalcemia that required intravenous and/or oral administration of calcium. **Single doses of Aredia should not exceed 90 mg and the duration of the intravenous infusion should be no less than 2 hours. (See WARNINGS.)**

In addition, one obese woman (95 kg) who was treated with 285 mg of Aredia/day for 3 days experienced high fever (39.5°C), hypotension (from 170/90 mmHg to 90/60 mmHg), and transient taste perversion, noted about 6 hours after the first infusion. The fever and hypotension were rapidly corrected with steroids.

If overdosage occurs, symptomatic hypocalcemia could also result; such patients should be treated with short-term intravenous calcium.

## DOSAGE AND ADMINISTRATION

### Hypercalcemia of Malignancy

Consideration should be given to the severity of as well as the symptoms of hypercalcemia. Vigorous saline hydration alone may be sufficient for treating mild, asymptomatic hypercalcemia. Overhydration should be avoided in patients who have potential for cardiac failure. In hypercalcemia associated with hematologic malignancies, the use of glucocorticoid therapy may be helpful.

### *Moderate Hypercalcemia*

**The recommended dose of Aredia in moderate hypercalcemia (corrected serum calcium\* of approximately 12-13.5 mg/dL) is 60 to 90 mg given as a SINGLE-DOSE, intravenous infusion over 2 to 24 hours. Longer infusions (i.e., >2 hours) may reduce the risk for renal toxicity, particularly in patients with preexisting renal insufficiency.**

### Severe Hypercalcemia

**The recommended dose of Aredia in severe hypercalcemia (corrected serum calcium\*>13.5 mg/dL) is 90 mg given as a SINGLE-DOSE, intravenous infusion over 2 to 24 hours. Longer infusions (i.e., >2 hours) may reduce the risk for renal toxicity, particularly in patients with preexisting renal insufficiency.**

---

\*Albumin-corrected serum calcium (CCa,mg/dL) = serum calcium, mg/dL + 0.8 (4.0-serum albumin, g/dL).

### Retreatment

A limited number of patients have received more than one treatment with Aredia for hypercalcemia. Retreatment with Aredia, in patients who show complete or partial response initially, may be carried out if serum calcium does not return to normal or remain normal after initial treatment. **It is recommended that a minimum of 7 days elapse before retreatment, to allow for full response to the initial dose.** The dose and manner of retreatment is identical to that of the initial therapy.

## Paget's Disease

**The recommended dose of Aredia in patients with moderate to severe Paget's disease of bone is 30 mg daily, administered as a 4-hour infusion on 3 consecutive days for a total dose of 90 mg.**

### Retreatment

A limited number of patients with Paget's disease have received more than one treatment of Aredia in clinical trials. When clinically indicated, patients should be retreated at the dose of initial therapy.

### Osteolytic Bone Lesions of Multiple Myeloma

**The recommended dose of Aredia in patients with osteolytic bone lesions of multiple myeloma is 90 mg administered as a 4-hour infusion given on a monthly basis.**

Patients with marked Bence-Jones proteinuria and dehydration should receive adequate hydration prior to Aredia infusion.

Limited information is available on the use of Aredia in multiple myeloma patients with a serum creatinine $\geq 3.0$ mg/dL.

Patients who receive Aredia should have serum creatinine assessed prior to each treatment. Treatment should be withheld for renal deterioration. In a clinical study, renal deterioration was defined as follows:

- For patients with normal baseline creatinine, increase of 0.5 mg/dL.

- For patients with abnormal baseline creatinine, increase of 1.0 mg/dL.

In this clinical study, Aredia treatment was resumed only when the creatinine returned to within 10% of the baseline value.

The optimal duration of therapy is not yet known, however, in a study of patients with myeloma, final analysis after 21 months demonstrated overall benefits (see CLINICAL TRIALS section).

## Osteolytic Bone Metastases of Breast Cancer

**The recommended dose of Aredia in patients with osteolytic bone metastases is 90 mg administered over a 2-hour infusion given every 3-4 weeks.**

Aredia has been frequently used with doxorubicin, fluorouracil, cyclophosphamide, methotrexate, mitoxantrone, vinblastine, dexamethasone, prednisone, melphalan, vincristine, megesterol, and tamoxifen. It has been given less frequently with etoposide, cisplatin, cytarabine, paclitaxel, and aminoglutethimide.

Patients who receive Aredia should have serum creatinine assessed prior to each treatment. Treatment should be withheld for renal deterioration. In a clinical study, renal deterioration was defined as follows:

- For patients with normal baseline creatinine, increase of 0.5 mg/dL.
- For patients with abnormal baseline creatinine, increase of 1.0 mg/dL.

In this clinical study, Aredia treatment was resumed only when the creatinine returned to within 10% of the baseline value.

The optimal duration of therapy is not known, however, in two breast cancer studies, final analyses performed after 24 months of therapy demonstrated overall benefits (see CLINICAL TRIALS section).

## Preparation of Solution

### Reconstitution

Aredia is reconstituted by adding 10 mL of Sterile Water for Injection, USP, to each vial, resulting in a solution of 30 mg/10 mL or 90 mg/10 mL. The pH of the reconstituted solution is 6.0 - 7.4. The drug should be completely dissolved before the solution is withdrawn.

### Method of Administration

**DUE TO THE RISK OF CLINICALLY SIGNIFICANT DETERIORATION IN RENAL FUNCTION, WHICH MAY PROGRESS TO RENAL FAILURE, SINGLE DOSES OF AREDIA SHOULD NOT EXCEED 90 MG. (SEE WARNINGS.)**

There must be strict adherence to the intravenous administration recommendations for Aredia in order to decrease the risk of deterioration in renal function.

### Hypercalcemia of Malignancy

The daily dose must be administered as an intravenous infusion over at least 2 to 24 hours for the 60-mg and 90-mg doses. The recommended dose should be diluted in 1000 mL of sterile 0.45% or 0.9% Sodium Chloride, USP, or 5% Dextrose Injection, USP. This infusion solution is stable for up to 24 hours at room temperature.

Page 24

### Paget's Disease

The recommended daily dose of 30 mg should be diluted in 500 mL of sterile 0.45% or 0.9% Sodium Chloride, USP, or 5% Dextrose Injection, USP, and administered over a 4-hour period for 3 consecutive days.

### Osteolytic Bone Metastases of Breast Cancer

The recommended dose of 90 mg should be diluted in 250 mL of sterile 0.45% or 0.9% Sodium Chloride, USP, or 5% Dextrose Injection, USP, and administered over a 2-hour period every 3-4 weeks.

### Osteolytic Bone Lesions of Multiple Myeloma

The recommended dose of 90 mg should be diluted in 500 mL of sterile 0.45% or 0.9% Sodium Chloride, USP, or 5% Dextrose Injection, USP, and administered over a 4-hour period on a monthly basis.

**Aredia must not be mixed with calcium-containing infusion solutions, such as Ringer's solution, and should be given in a single intravenous solution and line separate from all other drugs.**

*Note:* **Parenteral drug products should be inspected visually for particulate matter and discoloration prior to administration, whenever solution and container permit.**

Aredia reconstituted with Sterile Water for Injection may be stored under refrigeration at 2 °C-8 °C (36 °F-46 °F) for up to 24 hours.

## HOW SUPPLIED

*Vials* - 30 mg - each contains 30 mg of sterile, lyophilized pamidronate disodium and 470 mg of mannitol, USP.

   Carton of 4 vials ...............................................................NDC 0083-2601-04

*Vials* - 90 mg - each contains 90 mg of sterile, lyophilized pamidronate disodium and 375 mg of mannitol, USP.

   Carton of 1 vial ...............................................................NDC 0083-2609-01

Do not store above 30 °C (86 °F).

REV: APRIL 2005                    Printed in U.S.A.

T2005-27
5000347
5000348

 NOVARTIS

Novartis Pharmaceuticals Corporation
East Hanover, New Jersey 07936

© Novartis

# Exhibit
# C



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service

Food and Drug Administration
Rockville MD 20857

NDA 20-036

OCT 3 1 1991

Ciba-Geigy Corporation
Attn: John R. Hanagan, M.D.
Vice President, General Drug Development
556 Morris Avenue
Summit, NJ 07901

Dear Dr. Hanagan:

Reference is made to your new drug application dated December 20, 1989, submitted under section 505(b)(1) of the Federal Food, Drug, and Cosmetic Act for Aredia (pamidronate disodium for injection) for Intravenous Infusion.

We also acknowledge receipt of your additional correspondence dated March 15, April 20 and 26, June 5, 6, and 27, July 24, August 3, 8, 10, and 29, September 4, 7, 24, and 28, October 9, November 8, 13, 14, and 21, and December 3 and 4, 1990; and February 5 and 22, March 12 and 20, April 8, May 10 (2) (revised label and carton), 17 (safety update), and 24, June 7 and 27, and 28, September 27, and October 8 and 31 (revised package insert), 1991.

We have completed our review of this application as amended and have concluded that adequate information has been presented to demonstrate that the drug is safe and effective for use as recommended in the draft labeling. Accordingly, the application is approved, effective on the date of this letter.

Please submit 12 copies of the final printed labeling (FPL) identical to the draft labeling as soon as available. Seven of the copies should be individually mounted on heavy-weight paper or similar material. The submission should be designated for administrative purposes as "FPL for approved NDA 20-036." Approval of the submission by FDA is not required before the labeling is used. Marketing the product with FPL that is not identical to the draft labeling may render the product misbranded and an unapproved new drug.

We note that you agreed in the October 31, 1991, telephone conversation between Mr. Michael Macalush of your firm and Ms. Sharon Olmstead of this Division, to delete "APD" from the fourth line of the carton and vial labels beginning with the next production run. The package insert contained in your October 31, 1991, submission already includes this revision.

We reserve comment as to the adequacy of the methods validation package for Aredia until the results of our laboratory test on the samples submitted are available and have been evaluated. If these results indicate some modifications of the proposed methods are necessary before they can be accepted, or additional samples are required, your cooperation will be expected in finalizing the procedures.

NDA 20-036

We note that, in your February 22, 1991, submission, you committed to the following Phase 4 actions:

1. Determination of the feasibility of studying Aredia in pediatric patients and performance of studies if determined feasible.

2. Submission of Aredia retreatment data.

3. Examination of the pharmacokinetics of pamidronate after 30, 60 and 90 mg infusions over 4 and 24 hours. (Protocol 09 submitted March 1, 1990.)

We also note in the October 31, 1991, telephone conversation between Mr. Michael Macalush of your firm and Ms. Sharon Olmstead of this Division, we verified your commitment to perform pharmacokinetic studies in patients with renal impairment, as well as in patients with hepatic impairment as stated in your June 5, 1990, correspondence.

In addition, we recommend that you conduct a study in which Aredia therapy would be preceded by the administration of calcitonin. The study design can be discussed further at a later date.

Please submit, in duplicate, the advertising copy that you intend to use in your proposed introductory promotional and/or advertising campaign. Please submit one copy to the Division of Metabolism and Endocrine Drug Products and the second copy to the Division of Drug Marketing, Advertising, and Communications, HFD-240, 5600 Fishers Lane, Rockville, Maryland 20857. Please submit all proposed materials in draft or mock-up form, not final print. Also, please do not use form FD-2253 for this submission; that form is for routine use, not proposed materials.

Please submit one market package of the drug product when available.

We remind you that you must comply with the requirements set forth under 21 CFR 314.80 and 314.81 for an approved NDA.

Sincerely yours,

James Bilstad, M.D.
Director
Office of Drug Evaluation II
Center for Drug Evaluation and Research

# Exhibit D

ⓊNOVARTIS

Zometa®
(zoledronic acid) Injection

Rx only

Concentrate for Intravenous Infusion

Prescribing Information

## DESCRIPTION

## CLINICAL PHARMACOLOGY

### Pharmacokinetics

### Special Populations

### Pharmacodynamics

### Clinical Trials

## INDICATIONS AND USAGE

### Hypercalcemia of Malignancy

## CONTRAINDICATIONS

## WARNINGS

## PRECAUTIONS

### Drug Interactions

### Carcinogenesis, Mutagenesis, Impairment of Fertility

### Pregnancy

Pregnancy Category C

### Nursing Mothers

### Pediatric Use

### Geriatric Use

## ADVERSE REACTIONS

## OVERDOSAGE

## DOSAGE AND ADMINISTRATION

Zometa®
(zoledronic acid) Injection

Zometa®
(zoledronic acid) Injection

of bisphosphonates into fetal bone is greater than into maternal bone. Therefore, there is a theoretical risk of fetal harm (e.g., skeletal and other abnormalities) if a woman becomes pregnant after completing a course of bisphosphonate therapy. The impact of variables such as time between cessation of bisphosphonate therapy to conception, the particular bisphosphonate used, and the route of administration (intravenous versus oral) on this risk has not been established.

In female rats given subcutaneous doses of zoledronic acid of 0.01, 0.03, or 0.1 mg/kg/day beginning 15 days before mating and continuing through gestation, the number of stillbirths was increased and survival of neonates was decreased in the mid- and high-dose groups (≥0.2 times the human systemic exposure following an intravenous dose of 4 mg, based on an AUC comparison). Adverse maternal effects were observed in all dose groups (with a systemic exposure of ≥0.07 times the human systemic exposure following an intravenous dose of 4 mg, based on an AUC comparison) and included dystocia and periparturient mortality in pregnant rats allowed to deliver. Maternal mortality may have been related to drug-induced inhibition of skeletal calcium mobilization, resulting in periparturient hypocalcemia. This appears to be a bisphosphonate-class effect.

In pregnant rats given a subcutaneous dose of zoledronic acid of 0.1, 0.2, or 0.4 mg/kg/day during gestation, adverse fetal effects were observed in the mid- and high-dose groups (with systemic exposures of 2.4 and 4.8 times, respectively, the human systemic exposure following an intravenous dose of 4 mg, based on an AUC comparison). These adverse effects included increases in pre- and post-implantation losses, decreases in viable fetuses, and fetal skeletal, visceral, and external malformations. Fetal skeletal effects observed in the high-dose group included unossified or incompletely ossified bones, thickened, curved or shortened bones, wavy ribs, and shortened jaw. Other adverse fetal effects observed in the high-dose group included reduced lens, rudimentary cerebellum, reduction or absence of liver lobes, reduction of lung lobes, vessel dilation, cleft palate, and edema. Skeletal variations were also observed in the low-dose group (with systemic exposure of 1.2 times the human systemic exposure following an intravenous dose of 4 mg, based on an AUC comparison). Signs of maternal toxicity were observed in the high-dose group and included reduced body weights and food consumption, indicating that maximal exposure levels were achieved in this study.

In pregnant rabbits given subcutaneous doses of zoledronic acid of 0.01, 0.03, or 0.1 mg/kg/day during gestation (≤0.5 times the human intravenous dose of 4 mg, based on a comparison of relative body surface areas), no adverse fetal effects were observed. Maternal mortality and abortion occurred in all treatment groups (at doses ≥0.05 times the human intravenous dose of 4 mg, based on a comparison of relative body surface areas). Adverse maternal effects were associated with, and may have been caused by, drug-induced hypocalcemia.

**Nursing Mothers**
It is not known whether Zometa is excreted in human milk. Because many drugs are excreted in human milk, and because Zometa binds to bone long term, Zometa should not be administered to a nursing woman.

**Pediatric Use**
The safety and effectiveness of Zometa in pediatric patients have not been established. Because of long-term retention in bone, Zometa should only be used in children if the potential benefit outweighs the potential risk.

**Geriatric Use**
Clinical studies of Zometa in hypercalcemia of malignancy included 34 patients who were 65 years of age or older. No significant differences in response rate or adverse reactions were seen in geriatric patients receiving Zometa as compared to younger patients. Controlled clinical studies of Zometa in the treatment of multiple myeloma and bone metastases of solid tumors in patients over age 65 revealed similar efficacy and safety in older and younger patients. Because decreased renal function occurs more commonly in the elderly, special care should be taken to monitor renal function.

## ADVERSE REACTIONS

**Hypercalcemia of Malignancy**
Adverse reactions to Zometa® (zoledronic acid) Injection are usually mild and transient and similar to those reported for other bisphosphonates. Intravenous administration has been most commonly associated with fever. Occasionally, patients experience a flu-like syndrome consisting of fever, chills, bone pain and/or arthralgias, and myalgias. Gastrointestinal reactions such as nausea and vomiting have been reported following intravenous infusion of Zometa. Local reactions at the infusion site, such as redness or swelling, were observed infrequently. In most cases, no specific treatment is required and the symptoms subside after 24-48 hours.

Rare cases of rash, pruritus, and chest pain have been reported following treatment with Zometa.

As with other bisphosphonates, cases of conjunctivitis and hypomagnesemia have been reported following treatment with Zometa.

Grade 3 and Grade 4 laboratory abnormalities for serum creatinine, serum calcium, serum phosphorus, and serum magnesium observed in two clinical trials of Zometa in patients with HCM are shown in Table 6.

**Table 6: Grade 3-4 Laboratory Abnormalities for Serum Creatinine, Serum Calcium, Serum Phosphorus, and Serum Magnesium in Two Clinical Trials in Patients with HCM**

| Laboratory Parameter | Grade 3 Zometa® 4 mg n/N | (%) | Grade 3 Pamidronate 90 mg n/N | (%) | Grade 4 Zometa® 4 mg n/N | (%) | Grade 4 Pamidronate 90 mg n/N | (%) |
|---|---|---|---|---|---|---|---|---|
| **Serum Creatinine**[1] | 2/86 | (2.3%) | 3/100 | (3.0%) | 0/86 | — | 1/100 | (1.0%) |
| **Hypocalcemia**[2] | 1/86 | (1.2%) | 2/100 | (2.0%) | 0/86 | — | 0/100 | — |
| **Hypophosphatemia**[3] | 36/70 | (51.4%) | 27/81 | (33.3%) | 1/70 | (1.4%) | 4/81 | (4.9%) |
| **Hypomagnesemia**[4] | 0/71 | — | 0/84 | — | 0/71 | — | 1/84 | (1.2%) |

[1] Grade 3 (>3x Upper Limit of Normal); Grade 4 (>6x Upper Limit of Normal)
[2] Grade 3 (<7 mg/dL); Grade 4 (<6 mg/dL)
[3] Grade 3 (<2 mg/dL); Grade 4 (<1 mg/dL)
[4] Grade 3 (<0.8 mEq/L); Grade 4 (<0.5 mEq/L)

Table 7 provides adverse events that were reported by 10% or more of the 189 patients treated with Zometa 4 mg or pamidronate 90 mg from the two controlled multicenter HCM trials. Adverse events are listed regardless of presumed causality to study drug.

**Table 7: Percentage of Patients with Adverse Events ≥10% Reported in Hypercalcemia of Malignancy Clinical Trials by Body System**

| | Zometa® 4 mg n (%) | Pamidronate 90 mg n (%) |
|---|---|---|
| **Patients Studied** | | |
| Total No. of Patients Studied | 86 (100) | 103 (100) |
| Total No. of Patients with any AE | 81 (94.2) | 95 (92.2) |
| **Body as a Whole** | | |
| Fever | 38 (44.2) | 34 (33.0) |
| Progression of Cancer | 14 (16.3) | 21 (20.4) |
| **Digestive** | | |
| Nausea | 25 (29.1) | 28 (27.2) |
| Constipation | 23 (26.7) | 13 (12.6) |
| Diarrhea | 15 (17.4) | 17 (16.5) |
| Abdominal Pain | 14 (16.3) | 13 (12.6) |
| Vomiting | 12 (14.0) | 17 (16.5) |
| Anorexia | 8 (9.3) | 14 (13.6) |
| **Cardiovascular** | | |
| Hypotension | 9 (10.5) | 2 (1.9) |
| **Hemic and Lymphatic System** | | |
| Anemia | 19 (22.1) | 18 (17.5) |
| **Infections** | | |
| Moniliasis | 10 (11.6) | 4 (3.9) |
| **Laboratory Abnormalities** | | |
| Hypophosphatemia | 11 (12.8) | 2 (1.9) |
| Hypokalemia | 10 (11.6) | 16 (15.5) |
| Hypomagnesemia | 9 (10.5) | 5 (4.9) |
| **Musculoskeletal** | | |
| Skeletal Pain | 10 (11.6) | 10 (9.7) |
| **Nervous** | | |
| Insomnia | 13 (15.1) | 10 (9.7) |
| Anxiety | 12 (14.0) | 8 (7.8) |
| Confusion | 11 (12.8) | 13 (12.6) |
| Agitation | 11 (12.8) | 8 (7.8) |
| **Respiratory** | | |
| Dyspnea | 19 (22.1) | 20 (19.4) |
| Coughing | 10 (11.6) | 12 (11.7) |
| **Urogenital** | | |
| Urinary Tract Infection | 12 (14.0) | 15 (14.6) |

The following adverse events from the two controlled multicenter HCM trials (n=189) were reported by a greater percentage of patients treated with Zometa 4 mg than with pamidronate 90 mg and occurred with a frequency of greater than or equal to 5% but less than 10%. Adverse events are listed regardless of presumed causality to study drug.

*Body as a Whole:* asthenia, chest pain, leg edema, mucositis, and metastases
*Digestive System:* dysphagia
*Hemic and Lymphatic System:* granulocytopenia, thrombocytopenia, and pancytopenia
*Infection:* non-specific infection
*Laboratory Abnormalities:* hypocalcemia
*Metabolic and Nutritional:* dehydration
*Musculoskeletal:* arthralgias
*Nervous System:* headache, somnolence
*Respiratory System:* pleural effusion

**NOTE: In the HCM clinical trials, pamidronate 90 mg was given as a 2-hour intravenous infusion. The relative safety of pamidronate 90 mg given as a 2-hour intravenous infusion compared to the same dose given as a 24-hour intravenous infusion has not been adequately studied in controlled clinical trials.**

**Multiple Myeloma and Bone Metastases of Solid Tumors**
The safety analysis includes patients treated in the core and extension phases of the trials. The analysis includes the 2,042 patients treated with Zometa 4 mg, pamidronate 90 mg or placebo in the three controlled multicenter bone metastases trials, including 969 patients completing the efficacy phase of the trial, and 619 patients that continued in the safety extension phase. Only 347 patients completed the extension phases and were followed for two years (or 21 months for the other solid tumor patients). The median duration of exposure for safety analysis for Zometa 4 mg (core plus extension phases) was 12.8 months for breast cancer and multiple myeloma, 10.8 months for prostate cancer, and 4.0 months for other solid tumors.

Table 8 describes adverse events that were reported by ≥10% of patients. Adverse events are listed regardless of presumed causality to study drug.

**Table 8: Percentage of Patients with Adverse Events ≥10% Reported in Three Bone Metastases Clinical Trials by Body System**

| | Zometa® 4 mg n (%) | Pamidronate 90 mg n (%) | Placebo n (%) |
|---|---|---|---|
| **Patients Studied** | | | |
| Total No. of Patients | 1031 (100) | 556 (100) | 455 (100) |
| Total No. of Patients with any AE | 1015 (98) | 548 (99) | 445 (98) |
| **Blood and Lymphatic** | | | |
| Anemia | 344 (33) | 175 (32) | 128 (28) |
| Neutropenia | 124 (12) | 83 (15) | 35 (8) |
| Thrombocytopenia | 102 (10) | 53 (10) | 20 (4) |
| **Gastrointestinal** | | | |
| Nausea | 476 (46) | 266 (48) | 171 (38) |
| Vomiting | 333 (32) | 183 (33) | 122 (27) |
| Constipation | 320 (31) | 162 (29) | 174 (38) |
| Diarrhea | 249 (24) | 162 (29) | 83 (18) |
| Abdominal Pain | 143 (14) | 81 (15) | 48 (11) |
| Dyspepsia | 105 (10) | 74 (13) | 31 (7) |
| Stomatitis | 86 (8) | 65 (12) | 14 (3) |
| Sore Throat | 82 (8) | 61 (11) | 17 (4) |
| **General Disorders and Administration Site** | | | |
| Fatigue | 398 (39) | 240 (43) | 130 (29) |
| Pyrexia | 328 (32) | 172 (31) | 89 (20) |
| Weakness | 252 (24) | 108 (19) | 114 (25) |
| Edema Lower Limb | 215 (21) | 126 (23) | 84 (19) |
| Rigors | 112 (11) | 62 (11) | 28 (6) |
| **Infections** | | | |
| Urinary Tract Infection | 124 (12) | 50 (9) | 41 (9) |
| Upper Respiratory Tract Infection | 101 (10) | 82 (15) | 30 (7) |
| **Metabolism** | | | |
| Anorexia | 231 (22) | 81 (15) | 105 (23) |
| Weight Decreased | 164 (16) | 50 (9) | 61 (13) |
| Dehydration | 145 (14) | 60 (11) | 59 (13) |
| Appetite Decreased | 130 (13) | 48 (9) | 45 (10) |
| **Musculoskeletal** | | | |
| Bone Pain | 580 (56) | 316 (57) | 284 (62) |
| Myalgia | 239 (23) | 143 (26) | 74 (16) |
| Arthralgia | 216 (21) | 131 (24) | 73 (16) |
| Back Pain | 156 (15) | 106 (19) | 40 (9) |
| Pain in Limb | 143 (14) | 84 (15) | 52 (11) |
| **Neoplasms** | | | |
| Malignant Neoplasm Aggravated | 205 (20) | 97 (17) | 89 (20) |
| **Nervous** | | | |
| Headache | 191 (19) | 149 (27) | 50 (11) |
| Dizziness (excluding vertigo) | 180 (18) | 91 (16) | 58 (13) |
| Insomnia | 166 (16) | 111 (20) | 73 (16) |
| Paresthesia | 149 (15) | 85 (15) | 35 (8) |
| Hypoesthesia | 127 (12) | 65 (12) | 43 (10) |
| **Psychiatric** | | | |
| Depression | 146 (14) | 95 (17) | 49 (11) |
| Anxiety | 112 (11) | 73 (13) | 37 (8) |
| Confusion | 74 (7) | 39 (7) | 47 (10) |
| **Respiratory** | | | |
| Dyspnea | 282 (27) | 155 (28) | 107 (24) |
| Cough | 224 (22) | 129 (23) | 65 (14) |
| **Skin** | | | |
| Alopecia | 125 (12) | 80 (14) | 36 (8) |
| Dermatitis | 114 (11) | 74 (13) | 38 (8) |

Grade 3 and Grade 4 laboratory abnormalities for serum creatinine, serum calcium, serum phosphorus, and serum magnesium observed in three clinical trials of Zometa in patients with bone metastases are shown in Tables 9 and 10.

**Table 9: Grade 3 Laboratory Abnormalities for Serum Creatinine, Serum Calcium, Serum Phosphorus, and Serum Magnesium in Three Clinical Trials in Patients with Bone Metastases**

| Laboratory Parameter | Grade 3 Zometa® 4 mg n/N | (%) | Pamidronate 90 mg n/N | (%) | Placebo n/N | (%) |
|---|---|---|---|---|---|---|
| **Serum Creatinine**[1*] | 7/529 | (1.3%) | 4/268 | (1.5%) | 4/241 | (1.7%) |
| **Hypocalcemia**[2] | 6/973 | (0.6%) | 4/536 | (0.7%) | 0/415 | — |
| **Hypophosphatemia**[3] | 115/973 | (11.8%) | 38/537 | (7.1%) | 14/415 | (3.4%) |
| **Hypermagnesemia**[4] | 19/971 | (2.0%) | 2/535 | (0.4%) | 8/415 | (1.9%) |
| **Hypomagnesemia**[5] | 1/971 | (0.1%) | 0/535 | — | 1/415 | (0.2%) |

[1] Grade 3 (>3x Upper Limit of Normal); Grade 4 (>6x Upper Limit of Normal)
[*] Serum creatinine data for all patients randomized after the 15-minute infusion amendment
[2] Grade 3 (<7 mg/dL); Grade 4 (<6 mg/dL)
[3] Grade 3 (<2 mg/dL); Grade 4 (<1 mg/dL)
[4] Grade 3 (>3 mEq/L); Grade 4 (>8 mEq/L)
[5] Grade 3 (<0.9 mEq/L); Grade 4 (<0.7 mEq/L)

**Table 10: Grade 4 Laboratory Abnormalities for Serum Creatinine, Serum Calcium, Serum Phosphorus, and Serum Magnesium in Three Clinical Trials in Patients with Bone Metastases**

| Laboratory Parameter | Grade 4 Zometa® 4 mg n/N | (%) | Pamidronate 90 mg n/N | (%) | Placebo n/N | (%) |
|---|---|---|---|---|---|---|
| **Serum Creatinine**[1*] | 2/529 | (0.4%) | 1/268 | (0.4%) | 0/241 | — |
| **Hypocalcemia**[2] | 7/973 | (0.7%) | 3/536 | (0.6%) | 2/415 | (0.5%) |
| **Hypophosphatemia**[3] | 5/973 | (0.5%) | 0/537 | — | 1/415 | (0.2%) |
| **Hypermagnesemia**[4] | 0/971 | — | 0/535 | — | 2/415 | (0.5%) |
| **Hypomagnesemia**[5] | 2/971 | (0.2%) | 1/535 | (0.2%) | 0/415 | — |

[1] Grade 3 (>3x Upper Limit of Normal); Grade 4 (>6x Upper Limit of Normal)
[*] Serum creatinine data for all patients randomized after the 15-minute infusion amendment
[2] Grade 3 (<7 mg/dL); Grade 4 (<6 mg/dL)
[3] Grade 3 (<2 mg/dL); Grade 4 (<1 mg/dL)
[4] Grade 3 (>3 mEq/L); Grade 4 (>8 mEq/L)
[5] Grade 3 (<0.9 mEq/L); Grade 4 (<0.7 mEq/L)

Among the less frequently occurring adverse events (<15% of patients), rigors, hypokalemia, influenza-like illness, and hypocalcemia showed a trend for more events with bisphosphonate administration (Zometa 4 mg and pamidronate groups) compared to the placebo group.

Less common adverse events reported more often with Zometa 4 mg than pamidronate included decreased weight, which was reported in 16% of patients in the Zometa 4-mg group compared with 9% in the pamidronate group. Decreased appetite was reported in slightly more patients in the Zometa 4-mg group (13%) compared with the pamidronate (9%) and placebo (10%) groups, but the clinical significance of these small differences is not clear.

**Renal Toxicity**
In the bone metastases trials, renal deterioration was defined as an increase of 0.5 mg/dL for patients with normal baseline creatinine (<1.4 mg/dL) or an increase of 1.0 mg/dL for patients with an abnormal baseline creatinine (≥1.4 mg/dL). The following are data on the incidence of renal deterioration in patients receiving Zometa 4 mg over 15 minutes in these trials. (See Table 11.)

**Table 11: Percentage of Patients with Renal Function Deterioration Who Were Randomized Following the 15-Minute Infusion Amendment**

| Patient Population/Baseline Creatinine | | | | |
|---|---|---|---|---|
| **Multiple Myeloma and Breast Cancer** | **Zometa® 4 mg n/N** | **(%)** | **Pamidronate 90 mg n/N** | **(%)** |
| Normal | 27/246 | (11%) | 23/246 | (9.3%) |
| Abnormal | 2/26 | (7.7%) | 2/22 | (9.1%) |
| Total | 29/272 | (10.7%) | 25/268 | (9.3%) |
| **Solid Tumors** | **Zometa® 4 mg n/N** | **(%)** | **Placebo n/N** | **(%)** |
| Normal | 17/154 | (11%) | 10/143 | (7%) |
| Abnormal | 1/11 | (9.1%) | 1/20 | (5%) |
| Total | 18/165 | (10.9%) | 11/163 | (6.7%) |
| **Prostate Cancer** | **Zometa® 4 mg n/N** | **(%)** | **Placebo n/N** | **(%)** |
| Normal | 12/82 | (14.6%) | 8/68 | (11.8%) |
| Abnormal | 4/10 | (40%) | 2/10 | (20%) |
| Total | 16/92 | (17.4%) | 10/78 | (12.8%) |

The risk of deterioration in renal function appeared to be related to time on study, whether patients were receiving Zometa (4 mg over 15 minutes), placebo, or pamidronate.

Evaluation of serum creatinine is recommended prior to each cycle of therapy with Zometa. In patients receiving Zometa for multiple myeloma and bone metastases of solid tumors, who show evidence of deterioration in renal function, Zometa treatment should be withheld until serum creatinine returns to within 10% of baseline.

In the trials and in post-marketing experience, renal deterioration, progression to renal failure and dialysis have occurred in patients with normal and abnormal baseline renal function, including patients treated with 4 mg infused over a 15-minute period. There have been instances of this occurring after the initial Zometa dose.

**Post-Marketing Experience**
Cases of osteonecrosis (primarily involving the jaws) have been reported in patients treated with bisphosphonates. The majority of the reported cases are in cancer patients attendant to a dental procedure. Osteonecrosis of the jaws has multiple well-documented risk factors including a diagnosis of cancer, concomitant therapies (e.g., chemotherapy, radiotherapy, corticosteroids) and co-morbid conditions (e.g., anemia, coagulopathies, infection, pre-existing oral disease). Although causality cannot be determined, it is prudent to avoid dental surgery as recovery may be prolonged. (See PRECAUTIONS.)

Cases of uveitis and episcleritis have been reported during post-approval use.

## OVERDOSAGE

There is no experience of acute overdose with Zometa® (zoledronic acid) Injection. Two patients received Zometa 32 mg over 5 minutes in clinical trials. Neither patient experienced any clinical or laboratory toxicity. Overdosage may cause clinically significant hypocalcemia, hypophosphatemia, and hypomagnesemia. Clinically relevant reductions in serum levels of calcium, phosphorus, and magnesium should be corrected by intravenous administration of calcium gluconate, potassium or sodium phosphate, and magnesium sulfate, respectively.

In an open-label study of zoledronic acid 4 mg in breast cancer patients, a female patient received a single 48-mg dose of zoledronic acid in error. Two days after the overdose the patient experienced a single episode of hyperthermia (38°C), which resolved after treatment. All other evaluations were normal, and the patient was discharged seven days after the overdose.

A patient with non-Hodgkin's lymphoma received zoledronic acid 4 mg daily on four successive days for a total dose of 16 mg. The patient developed paresthesia and abnormal liver function tests with increased GGT (nearly 100U/L, each value unknown). The outcome of this case is not known.

**In controlled clinical trials, administration of Zometa 4 mg as an intravenous infusion over 5 minutes has been shown to increase the risk of renal toxicity compared to the same dose administered as a 15-minute intravenous infusion. In controlled clinical trials, Zometa 8 mg has been shown to be associated with an increased risk of renal toxicity compared to Zometa 4 mg, even when given as a 15-minute intravenous infusion, and was not associated with added benefit in patients with hypercalcemia of malignancy. Single doses of Zometa should not exceed 4 mg and the duration of the intravenous infusion should be no less than 15 minutes. (See WARNINGS.) In the trials and in post-marketing experience, renal deterioration, progression to renal failure and dialysis, have occurred in patients, including those treated with the approved dose of 4 mg infused over 15 minutes. There have been instances of this occurring after the initial Zometa dose.**

## DOSAGE AND ADMINISTRATION

**Hypercalcemia of Malignancy**
Consideration should be given to the severity of, as well as the symptoms of, tumor-induced hypercalcemia when considering use of Zometa® (zoledronic acid) Injection. Vigorous saline hydration alone may be sufficient to treat mild, asymptomatic hypercalcemia.

The maximum recommended dose of Zometa in hypercalcemia of malignancy (albumin-corrected serum calcium* ≥12 mg/dL [3.0 mmol/L]) is 4 mg. The 4-mg dose must be given as a single-dose intravenous infusion over no less than 15 minutes.

Patients should be adequately rehydrated prior to administration of Zometa. (See WARNINGS and PRECAUTIONS.)

Retreatment with Zometa 4 mg, may be considered if serum calcium does not return to normal or remain normal after initial treatment. It is recommended that a minimum of 7 days elapse before retreatment, to allow for full response to the initial dose. Renal function must be carefully monitored in all patients receiving Zometa and possible deterioration in renal function must be assessed prior to retreatment with Zometa. (See WARNINGS and PRECAUTIONS.)

*Albumin-corrected serum calcium (Cca, mg/dL) = Ca + 0.8 (mid-range albumin-measured albumin in mg/dL).

**Multiple Myeloma and Metastatic Bone Lesions From Solid Tumors**
The recommended dose of Zometa in patients with multiple myeloma and metastatic bone lesions from solid tumors for patients with creatinine clearance >60 mL/min is 4 mg infused over no less than 15 minutes every three to four weeks. The optimal duration of therapy is not known.

Upon treatment initiation, the recommended Zometa doses for patients with reduced renal function (mild and moderate renal impairment) are listed in the following table. These doses are calculated to achieve the same AUC as that achieved in patients with creatinine clearance of 75 mL/min. Creatinine clearance (CrCl) is calculated using the Cockcroft-Gault formula. (See CLINICAL PHARMACOLOGY, Special Populations, Renal Insufficiency.)

| Baseline Creatinine Clearance (mL/min) | Zometa® Recommended Dose* |
|---|---|
| > 60 | 4.0 mg |
| 50 - 60 | 3.5 mg |
| 40 - 49 | 3.3 mg |
| 30 - 39 | 3.0 mg |

*Doses calculated assuming target AUC of 0.66(mg•hr/L) (CrCl=75 mL/min)

During treatment, serum creatinine should be measured before each Zometa dose and treatment should be withheld for renal deterioration. In the clinical studies, renal deterioration was defined as follows:

- For patients with normal baseline creatinine, increase of 0.5 mg/dL
- For patients with abnormal baseline creatinine, increase of 1.0 mg/dL

In the clinical studies, Zometa treatment was resumed only when the creatinine returned to within 10% of the baseline value. Zometa should be re-initiated at the same dose as that prior to treatment interruption.

Patients should also be administered an oral calcium supplement of 500 mg and a multiple vitamin containing 400 IU of Vitamin D daily.

**Preparation of Solution**
***4-mg Dose:*** Vials of Zometa concentrate for infusion contain overfill allowing for the withdrawal of 5 mL of concentrate (equivalent to 4 mg zoledronic acid). This concentrate should immediately be diluted in 100 mL of sterile 0.9% Sodium Chloride, USP, or 5% Dextrose Injection, USP. Do not store undiluted concentrate in a syringe, to avoid inadvertent injection. The dose must be given as a single intravenous infusion over no less than 15 minutes.

***Reduced Doses for Patients with Baseline CrCl ≤60 mL/min:*** Withdraw an appropriate volume of the 5 mL - Zometa concentrate as needed:

4.4 mL for 3.5 mg dose
4.1 mL for 3.3 mg dose
3.8 mL for 3.0 mg dose

The withdrawn concentrate must be diluted in 100 mL of sterile 0.9% Sodium Chloride, USP, or 5% Dextrose Injection, USP. The dose must be given as a single intravenous infusion over no less than 15 minutes.

If not used immediately after dilution with infusion media, for microbiological integrity, the solution should be refrigerated at 2°C-8°C (36°F-46°F). The refrigerated solution should then be equilibrated to room temperature prior to administration. The total time between dilution, storage in the refrigerator, and end of administration must not exceed 24 hours.

**Zometa must not be mixed with calcium-containing infusion solutions, such as Lactated Ringer's solution, and should be administered as a single intravenous solution in a line separate from all other drugs.**

***Method of Administration:*** **Due to the risk of clinically significant deterioration in renal function, which may progress to renal failure, single doses of Zometa should not exceed 4 mg and the duration of infusion should be no less than 15 minutes. (See WARNINGS.) In the trials and in post-marketing experience, renal deterioration, progression to renal failure and dialysis, have occurred in patients, including those treated with the approved dose of 4 mg infused over 15 minutes. There have been instances of this occurring after the initial Zometa dose.**

There must be strict adherence to the intravenous administration recommendations for Zometa in order to decrease the risk of deterioration in renal function.

***Note:*** **Parenteral drug products should be inspected visually for particulate matter and discoloration prior to administration, whenever solution and container permit.**

## HOW SUPPLIED

Each 5-mL vial contains 4.264 mg zoledronic acid monohydrate, corresponding to 4 mg zoledronic acid on an anhydrous basis, 220 mg of mannitol, USP, water for injection and 24 mg of sodium citrate, USP.

Carton of 1 vial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . NDC 0078-0387-25

Store at 25°C (77°F); excursions permitted to 15-30°C (59-86°F) [see USP Controlled Room Temperature].

REV: APRIL 2005 Printed in U.S.A. T2005-26 5000349

NOVARTIS

Manufactured by
Novartis Pharma Stein AG
Stein, Switzerland for
Novartis Pharmaceuticals Corporation
East Hanover, NJ 07936

# Exhibit E

 **DEPARTMENT OF HEALTH & HUMAN SERVICES**          Public Health Service

---

Food and Drug Administration
Rockville MD  20857

NDA 21-223

Novartis Pharmaceuticals Corporation
Attention: Ms. Eileen Ryan
Associate Director, Drug Regulatory Affairs
59 Route 10
East Hanover, NJ  07936-1080

Dear Ms. Ryan:

Please refer to your new drug application (NDA) dated and received December 21, 1999, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act for Zometa (zoledronic acid for injection).

We acknowledge receipt of your submissions dated September 14, 21, and 29, November 6, and December 13 and 21, 2000, and February 19, March 26 and 29, April 2, 9, 11, 25, and 30, May 3, June 1 and 12, July 10, and August 3, 17, and 20, 2001.  Your submission of February 19, 2001, constituted a complete response to our September 21, 2000, action letter.

This new drug application provides for the use of Zometa (zoledronic acid for injection) for the treatment of hypercalcemia of malignancy.

We have completed the review of this application, as amended, and have concluded that adequate information has been presented to demonstrate that the drug product is safe and effective for use as recommended in the agreed-upon draft labeling text submitted August 20, 2001, vial labels submitted August 3, 2001, and carton labels submitted August 20, 2001, for the treatment of hypercalcemia of malignancy when administered as a 4 mg dose over no less than 15 minutes.  Accordingly, the application is approved effective on the date of this letter.  The final printed labeling (FPL) must be identical to the submitted draft labeling.  Marketing the product with FPL that is not identical to the approved labeling text may render the product misbranded and an unapproved new drug.

Please submit the FPL electronically according to the guidance for industry titled *Providing Regulatory Submissions in Electronic Format - NDA* (January 1999).  Alternatively, you may submit 20 paper copies of the FPL as soon as it is available but no more than 30 days after it is printed.  Please individually mount ten of the copies on heavy-weight paper or similar material.  For administrative purposes, this submission should be designated "FPL for approved NDA 21-223."  Approval of this submission by FDA is not required before the labeling is used.

We remind you of your postmarketing study commitment in your submission dated August 17, 2001, in which you agree to conduct a pharmacokinetics and pharmacodynamic study of Zometa in patients with impaired renal function.  The study may be either single- or multiple-dose.  The final study report

NDA 21-223
Page 2

should be submitted within one month of the date of this letter.

Submit clinical protocols to your IND for this product. Submit study final reports to this NDA. In addition, under 21 CFR 314.81(b)(2)(vii) and 314.81(b)(2)(viii), you should include a status summary of the commitment in your annual report to this NDA. The status summary should include expected study completion and final report submission dates, any changes in plans since the last annual report, and, the number of patients entered into each study. All submissions, including supplements, relating to this postmarketing study commitment must be prominently labeled **"Postmarketing Study Protocol", "Postmarketing Study Final Report", or "Postmarketing Study Correspondence."**

Validation of the regulatory methods has not been completed. At the present time, it is the policy of the Center not to withhold approval because the methods are being validated. Nevertheless, we expect your continued cooperation to resolve any problems that may be identified.

As of April 1, 1999, all applications for new active ingredients, new dosage forms, new indications, new routes of administration, and new dosing regimens are required to contain an assessment of the safety and effectiveness of the product in pediatric patients unless this requirement is waived or deferred (63 *FR* 66632). On November 30, 1999, you requested a waiver from conducting pediatric studies for the indication, treatment of hypercalcemia of malignancy. The waiver was granted for patients ages 0 – 16 years on February 25, 2000.

Please submit three copies of the introductory promotional materials that you propose to use for this product. All proposed materials should be submitted in draft or mock-up form, not final print. Please send one copy to the Division of Metabolic and Endocrine Drug Products and two copies of both the promotional materials and the package insert directly to:

> Division of Drug Marketing, Advertising, and Communications, HFD-42
> Food and Drug Administration
> 5600 Fishers Lane
> Rockville, Maryland 20857

Please submit one market package of the drug product when it is available.

We remind you that you must comply with the requirements for an approved NDA set forth under 21 CFR 314.80 and 314.81.

In addition we have concluded that the proposal to recommend an 8-mg intravenous dose for patients requiring retreatment of hypercalcemia of malignancy is approvable. The similar response rates following single infusions of 4-mg and 8-mg, the lack of a comparison arm in the retreatment portion of the two controlled, multicenter studies, and the increased risk of renal toxicity with the 8-mg dose compared to the 4-mg dose, do not support the safety and efficacy of the 8-mg dose for retreatment. A study demonstrating that the 8-mg dose is superior to the 4-mg dose in patients requiring retreatment and data to support the safety of the 8-mg dose would be necessary to support approval of the 8-mg dose for patients who require retreatment for hypercalcemia of malignancy.

Within 10 days after the date of this letter, you are required to amend the application, notify us of your

NDA 21-223
Page 3

intent to file an amendment, or follow one of your other options under 21 CFR 314.110.  Any amendment should respond to all the deficiencies listed.  We will not process a partial reply as a major amendment nor will the review clock be reactivated until all deficiences have been addressed.

If you have any questions, call Randy Hedin, R.Ph., Senior Regulatory Management Officer, at (301) 827-6392.

Sincerely,

*{See appended electronic signature page}*

John K. Jenkins, M.D.
Director
Office of Drug Evaluation II
Center for Drug Evaluation and Research

# Exhibit F



**MERCK & CO., INC.**
**Whitehouse Station, NJ 08889, USA**

~~7957028~~XXXXXXX

# FOSAMAX®
## (ALENDRONATE SODIUM) TABLETS AND ORAL SOLUTION

### DESCRIPTION

FOSAMAX\* (alendronate sodium) is a bisphosphonate that acts as a specific inhibitor of osteoclast-mediated bone resorption. Bisphosphonates are synthetic analogs of pyrophosphate that bind to the hydroxyapatite found in bone.

Alendronate sodium is chemically described as (4-amino-1-hydroxybutylidene) bisphosphonic acid monosodium salt trihydrate.

The empirical formula of alendronate sodium is $C_4H_{12}NNaO_7P_2 \cdot 3H_2O$ and its formula weight is 325.12. The structural formula is:

$$
\begin{array}{c}
NH_2 \\
| \\
CH_2 \\
| \\
CH_2 \\
| \\
\quad\quad O \quad\; CH_2 \;\; O \\
\quad\quad \| \quad\quad | \quad\quad \| \\
HO-P-C-P-ONa \cdot 3H_2O \\
\quad\quad | \quad\quad | \quad\quad | \\
\quad\quad OH \quad OH \quad OH
\end{array}
$$

Alendronate sodium is a white, crystalline, nonhygroscopic powder. It is soluble in water, very slightly soluble in alcohol, and practically insoluble in chloroform.

Tablets FOSAMAX for oral administration contain 6.53, 13.05, 45.68, 52.21 or 91.37 mg of alendronate monosodium salt trihydrate, which is the molar equivalent of 5, 10, 35, 40 and 70 mg, respectively, of free acid, and the following inactive ingredients: microcrystalline cellulose, anhydrous lactose, croscarmellose sodium, and magnesium stearate. Tablets FOSAMAX 10 mg also contain carnauba wax.

Each bottle of the oral solution contains 91.35 mg of alendronate monosodium salt trihydrate, which is the molar equivalent to 70 mg of free acid. Each bottle also contains the following inactive ingredients: sodium citrate dihydrate and citric acid anhydrous as buffering agents, sodium saccharin, artificial raspberry flavor, and purified water. Added as preservatives are sodium propylparaben 0.0225% and sodium butylparaben 0.0075%.

### CLINICAL PHARMACOLOGY

*Mechanism of Action*

Animal studies have indicated the following mode of action. At the cellular level, alendronate shows preferential localization to sites of bone resorption, specifically under osteoclasts. The osteoclasts adhere normally to the bone surface but lack the ruffled border that is indicative of active resorption. Alendronate

---

\* Registered trademark of MERCK & CO., Inc.
COPYRIGHT ©1995, 1997, 2000 MERCK & CO., Inc.
All rights reserved

FOSAMAX®                                                            ~~7957028~~XXXXXXX
(alendronate sodium) Tablets and Oral Solution

does not interfere with osteoclast recruitment or attachment, but it does inhibit osteoclast activity. Studies in mice on the localization of radioactive [3H]alendronate in bone showed about 10-fold higher uptake on osteoclast surfaces than on osteoblast surfaces. Bones examined 6 and 49 days after [3H]alendronate administration in rats and mice, respectively, showed that normal bone was formed on top of the alendronate, which was incorporated inside the matrix. While incorporated in bone matrix, alendronate is not pharmacologically active. Thus, alendronate must be continuously administered to suppress osteoclasts on newly formed resorption surfaces. Histomorphometry in baboons and rats showed that alendronate treatment reduces bone turnover (i.e., the number of sites at which bone is remodeled). In addition, bone formation exceeds bone resorption at these remodeling sites, leading to progressive gains in bone mass.

*Pharmacokinetics*

*Absorption*

Relative to an intravenous (IV) reference dose, the mean oral bioavailability of alendronate in women was 0.64% for doses ranging from 5 to 70 mg when administered after an overnight fast and two hours before a standardized breakfast. Oral bioavailability of the 10 mg tablet in men (0.59%) was similar to that in women when administered after an overnight fast and 2 hours before breakfast.

FOSAMAX 70 mg oral solution and FOSAMAX 70 mg tablet are equally bioavailable.

A study examining the effect of timing of a meal on the bioavailability of alendronate was performed in 49 postmenopausal women. Bioavailability was decreased (by approximately 40%) when 10 mg alendronate was administered either 0.5 or 1 hour before a standardized breakfast, when compared to dosing 2 hours before eating. In studies of treatment and prevention of osteoporosis, alendronate was effective when administered at least 30 minutes before breakfast.

Bioavailability was negligible whether alendronate was administered with or up to two hours after a standardized breakfast. Concomitant administration of alendronate with coffee or orange juice reduced bioavailability by approximately 60%.

*Distribution*

Preclinical studies (in male rats) show that alendronate transiently distributes to soft tissues following 1 mg/kg IV administration but is then rapidly redistributed to bone or excreted in the urine. The mean steady-state volume of distribution, exclusive of bone, is at least 28 L in humans. Concentrations of drug in plasma following therapeutic oral doses are too low (less than 5 ng/mL) for analytical detection. Protein binding in human plasma is approximately 78%.

*Metabolism*

There is no evidence that alendronate is metabolized in animals or humans.

*Excretion*

Following a single IV dose of [14C]alendronate, approximately 50% of the radioactivity was excreted in the urine within 72 hours and little or no radioactivity was recovered in the feces. Following a single 10 mg IV dose, the renal clearance of alendronate was 71 mL/min (64, 78; 90% confidence interval [CI]), and systemic clearance did not exceed 200 mL/min. Plasma concentrations fell by more than 95% within 6 hours following IV administration. The terminal half-life in humans is estimated to exceed 10 years, probably reflecting release of alendronate from the skeleton. Based on the above, it is estimated that after 10 years of oral treatment with FOSAMAX (10 mg daily) the amount of alendronate released daily from the skeleton is approximately 25% of that absorbed from the gastrointestinal tract.

*Special Populations*

*Pediatric:* The oral bioavailability in children was similar to that observed in adults; however, FOSAMAX is not indicated for use in children (see PRECAUTIONS, *Pediatric Use*).

*Gender:* Bioavailability and the fraction of an IV dose excreted in urine were similar in men and women.

*Geriatric:* Bioavailability and disposition (urinary excretion) were similar in elderly and younger patients. No dosage adjustment is necessary (see DOSAGE AND ADMINISTRATION).

*Race:* Pharmacokinetic differences due to race have not been studied.

*Renal Insufficiency:* Preclinical studies show that, in rats with kidney failure, increasing amounts of drug are present in plasma, kidney, spleen, and tibia. In healthy controls, drug that is not deposited in bone is rapidly excreted in the urine. No evidence of saturation of bone uptake was found after 3 weeks dosing with cumulative IV doses of 35 mg/kg in young male rats. Although no clinical information is available, it is likely that, as in animals, elimination of alendronate via the kidney will be reduced in

2

FOSAMAX®                                                    ~~7957028~~XXXXXXX
(alendronate sodium) Tablets and Oral Solution

patients with impaired renal function. Therefore, somewhat greater accumulation of alendronate in bone might be expected in patients with impaired renal function.

No dosage adjustment is necessary for patients with mild-to-moderate renal insufficiency (creatinine clearance 35 to 60 mL/min). **FOSAMAX is not recommended for patients with more severe renal insufficiency (creatinine clearance <35 mL/min) due to lack of experience with alendronate in renal failure.**

*Hepatic Insufficiency:* As there is evidence that alendronate is not metabolized or excreted in the bile, no studies were conducted in patients with hepatic insufficiency. No dosage adjustment is necessary.
*Drug Interactions* (also see PRECAUTIONS, *Drug Interactions*)

Intravenous ranitidine was shown to double the bioavailability of oral alendronate. The clinical significance of this increased bioavailability and whether similar increases will occur in patients given oral $H_2$-antagonists is unknown.

In healthy subjects, oral prednisone (20 mg three times daily for five days) did not produce a clinically meaningful change in the oral bioavailability of alendronate (a mean increase ranging from 20 to 44%).

Products containing calcium and other multivalent cations are likely to interfere with absorption of alendronate.
*Pharmacodynamics*

Alendronate is a bisphosphonate that binds to bone hydroxyapatite and specifically inhibits the activity of osteoclasts, the bone-resorbing cells. Alendronate reduces bone resorption with no direct effect on bone formation, although the latter process is ultimately reduced because bone resorption and formation are coupled during bone turnover.
*Osteoporosis in postmenopausal women*

Osteoporosis is characterized by low bone mass that leads to an increased risk of fracture. The diagnosis can be confirmed by the finding of low bone mass, evidence of fracture on x-ray, a history of osteoporotic fracture, or height loss or kyphosis, indicative of vertebral (spinal) fracture. Osteoporosis occurs in both males and females but is most common among women following the menopause, when bone turnover increases and the rate of bone resorption exceeds that of bone formation. These changes result in progressive bone loss and lead to osteoporosis in a significant proportion of women over age 50. Fractures, usually of the spine, hip, and wrist, are the common consequences. From age 50 to age 90, the risk of hip fracture in white women increases 50-fold and the risk of vertebral fracture 15- to 30-fold. It is estimated that approximately 40% of 50-year-old women will sustain one or more osteoporosis-related fractures of the spine, hip, or wrist during their remaining lifetimes. Hip fractures, in particular, are associated with substantial morbidity, disability, and mortality.

Daily oral doses of alendronate (5, 20, and 40 mg for six weeks) in postmenopausal women produced biochemical changes indicative of dose-dependent inhibition of bone resorption, including decreases in urinary calcium and urinary markers of bone collagen degradation (such as deoxypyridinoline and cross-linked N-telopeptides of type I collagen). These biochemical changes tended to return toward baseline values as early as 3 weeks following the discontinuation of therapy with alendronate and did not differ from placebo after 7 months.

Long-term treatment of osteoporosis with FOSAMAX 10 mg/day (for up to five years) reduced urinary excretion of markers of bone resorption, deoxypyridinoline and cross-linked N-telopeptides of type I collagen, by approximately 50% and 70%, respectively, to reach levels similar to those seen in healthy premenopausal women. Similar decreases were seen in patients in osteoporosis prevention studies who received FOSAMAX 5 mg/day. The decrease in the rate of bone resorption indicated by these markers was evident as early as one month and at three to six months reached a plateau that was maintained for the entire duration of treatment with FOSAMAX. In osteoporosis treatment studies FOSAMAX 10 mg/day decreased the markers of bone formation, osteocalcin and bone specific alkaline phosphatase by approximately 50%, and total serum alkaline phosphatase by approximately 25 to 30% to reach a plateau after 6 to 12 months. In osteoporosis prevention studies FOSAMAX 5 mg/day decreased osteocalcin and total serum alkaline phosphatase by approximately 40% and 15%, respectively. Similar reductions in the rate of bone turnover were observed in postmenopausal women during one-year studies with once weekly FOSAMAX 70 mg for the treatment of osteoporosis and once weekly FOSAMAX 35 mg for the prevention of osteoporosis. These data indicate that the rate of bone turnover reached a new steady-state, despite the progressive increase in the total amount of alendronate deposited within bone.

As a result of inhibition of bone resorption, asymptomatic reductions in serum calcium and phosphate concentrations were also observed following treatment with FOSAMAX. In the long-term studies,

3

FOSAMAX®                                                      ~~7957028~~XXXXXXX
(alendronate sodium) Tablets and Oral Solution

reductions from baseline in serum calcium (approximately 2%) and phosphate (approximately 4 to 6%) were evident the first month after the initiation of FOSAMAX 10 mg. No further decreases in serum calcium were observed for the five-year duration of treatment; however, serum phosphate returned toward prestudy levels during years three through five. Similar reductions were observed with FOSAMAX 5 mg/day. In one-year studies with once weekly FOSAMAX 35 and 70 mg, similar reductions were observed at 6 and 12 months. The reduction in serum phosphate may reflect not only the positive bone mineral balance due to FOSAMAX but also a decrease in renal phosphate reabsorption.

*Osteoporosis in men*

Treatment of men with osteoporosis with FOSAMAX 10 mg/day for two years reduced urinary excretion of cross-linked N-telopeptides of type I collagen by approximately 60% and bone-specific alkaline phosphatase by approximately 40%. Similar reductions were observed in a one-year study in men with osteoporosis receiving once weekly FOSAMAX 70 mg.

*Glucocorticoid-induced Osteoporosis*

Sustained use of glucocorticoids is commonly associated with development of osteoporosis and resulting fractures (especially vertebral, hip, and rib). It occurs both in males and females of all ages. Osteoporosis occurs as a result of inhibited bone formation and increased bone resorption resulting in net bone loss. Alendronate decreases bone resorption without directly inhibiting bone formation.

In clinical studies of up to two years' duration, FOSAMAX 5 and 10 mg/day reduced cross-linked N-telopeptides of type I collagen (a marker of bone resorption) by approximately 60% and reduced bone-specific alkaline phosphatase and total serum alkaline phosphatase (markers of bone formation) by approximately 15 to 30% and 8 to 18%, respectively. As a result of inhibition of bone resorption, FOSAMAX 5 and 10 mg/day induced asymptomatic decreases in serum calcium (approximately 1 to 2%) and serum phosphate (approximately 1 to 8%).

*Paget's disease of bone*

Paget's disease of bone is a chronic, focal skeletal disorder characterized by greatly increased and disorderly bone remodeling. Excessive osteoclastic bone resorption is followed by osteoblastic new bone formation, leading to the replacement of the normal bone architecture by disorganized, enlarged, and weakened bone structure.

Clinical manifestations of Paget's disease range from no symptoms to severe morbidity due to bone pain, bone deformity, pathological fractures, and neurological and other complications. Serum alkaline phosphatase, the most frequently used biochemical index of disease activity, provides an objective measure of disease severity and response to therapy.

FOSAMAX decreases the rate of bone resorption directly, which leads to an indirect decrease in bone formation. In clinical trials, FOSAMAX 40 mg once daily for six months produced significant decreases in serum alkaline phosphatase as well as in urinary markers of bone collagen degradation. As a result of the inhibition of bone resorption, FOSAMAX induced generally mild, transient, and asymptomatic decreases in serum calcium and phosphate.

*Clinical Studies*

*Treatment of osteoporosis*

*Postmenopausal women*

*Effect on bone mineral density*

The efficacy of FOSAMAX 10 mg once daily in postmenopausal women, 44 to 84 years of age, with osteoporosis (lumbar spine bone mineral density [BMD] of at least 2 standard deviations below the premenopausal mean) was demonstrated in four double-blind, placebo-controlled clinical studies of two or three years' duration. These included two three-year, multicenter studies of virtually identical design, one performed in the United States (U.S.) and the other in 15 different countries (Multinational), which enrolled 478 and 516 patients, respectively. The following graph shows the mean increases in BMD of the lumbar spine, femoral neck, and trochanter in patients receiving FOSAMAX 10 mg/day relative to placebo-treated patients at three years for each of these studies.

4

FOSAMAX®                                                           7957028XXXXXXX
(alendronate sodium) Tablets and Oral Solution





At three years significant increases in BMD, relative both to baseline and placebo, were seen at each measurement site in each study in patients who received FOSAMAX 10 mg/day. Total body BMD also increased significantly in each study, suggesting that the increases in bone mass of the spine and hip did not occur at the expense of other skeletal sites. Increases in BMD were evident as early as three months and continued throughout the three years of treatment. (See figures below for lumbar spine results.) In the two-year extension of these studies, treatment of 147 patients with FOSAMAX 10 mg/day resulted in continued increases in BMD at the lumbar spine and trochanter (absolute additional increases between years 3 and 5: lumbar spine, 0.94%; trochanter, 0.88%). BMD at the femoral neck, forearm and total body were maintained. FOSAMAX was similarly effective regardless of age, race, baseline rate of bone turnover, and baseline BMD in the range studied (at least 2 standard deviations below the premenopausal mean). Thus, overall FOSAMAX reverses the loss of bone mineral density, a central factor in the progression of osteoporosis.

Osteoporosis Treatment Studies in Postmenopausal Women

Time Course of Effect of FOSAMAX 10 mg/day Versus Placebo:
Lumbar Spine BMD Percent Change From Baseline




In patients with postmenopausal osteoporosis treated with FOSAMAX 10 mg/day for one or two years, the effects of treatment withdrawal were assessed. Following discontinuation, there were no further increases in bone mass and the rates of bone loss were similar to those of the placebo groups. These data indicate that continued treatment with FOSAMAX is required to maintain the effect of the drug.

The therapeutic equivalence of once weekly FOSAMAX 70 mg (n=519) and FOSAMAX 10 mg daily (n=370) was demonstrated in a one-year, double-blind, multicenter study of postmenopausal women with osteoporosis. In the primary analysis of completers, the mean increases from baseline in lumbar spine BMD at one year were 5.1% (4.8, 5.4%; 95% CI) in the 70-mg once-weekly group (n=440) and 5.4% (5.0, 5.8%; 95% CI) in the 10-mg daily group (n=330). The two treatment groups were also similar with regard

FOSAMAX®
(alendronate sodium) Tablets and Oral Solution

7957028XXXXXXX

to BMD increases at other skeletal sites. The results of the intention-to-treat analysis were consistent with
the primary analysis of completers.
*Effect on fracture incidence*

Data on the effects of FOSAMAX on fracture incidence are derived from three clinical studies: 1) U.S.
and Multinational combined: a study of patients with a BMD T-score at or below minus 2.5 with or without
a prior vertebral fracture, 2) Three-Year Study of the Fracture Intervention Trial (FIT): a study of patients
with at least one baseline vertebral fracture, and 3) Four-Year Study of FIT: a study of patients with low
bone mass but without a baseline vertebral fracture.

To assess the effects of FOSAMAX on the incidence of vertebral fractures (detected by digitized
radiography; approximately one third of these were clinically symptomatic), the U.S. and Multinational
studies were combined in an analysis that compared placebo to the pooled dosage groups of FOSAMAX
(5 or 10 mg for three years or 20 mg for two years followed by 5 mg for one year). There was a
statistically significant reduction in the proportion of patients treated with FOSAMAX experiencing one or
more new vertebral fractures relative to those treated with placebo (3.2% vs. 6.2%; a 48% relative risk
reduction). A reduction in the total number of new vertebral fractures (4.2 vs. 11.3 per 100 patients) was
also observed. In the pooled analysis, patients who received FOSAMAX had a loss in stature that was
statistically significantly less than was observed in those who received placebo (-3.0 mm vs. -4.6 mm).

The Fracture Intervention Trial (FIT) consisted of two studies in postmenopausal women: the Three-
Year Study of patients who had at least one baseline radiographic vertebral fracture and the Four-Year
Study of patients with low bone mass but without a baseline vertebral fracture. In both studies of FIT,
96% of randomized patients completed the studies (i.e., had a closeout visit at the scheduled end of the
study); approximately 80% of patients were still taking study medication upon completion.
*Fracture Intervention Trial: Three-Year Study (patients with at least one baseline radiographic vertebral
fracture)*

This randomized, double-blind, placebo-controlled, 2027-patient study (FOSAMAX, n=1022; placebo,
n=1005) demonstrated that treatment with FOSAMAX resulted in statistically significant reductions in
fracture incidence at three years as shown in the table below.

| Effect of FOSAMAX on Fracture Incidence in the Three-Year Study of FIT (patients with vertebral fracture at baseline) | | | | |
|---|---|---|---|---|
| | Percent of Patients | | Absolute Reduction in Fracture Incidence | Relative Reduction in Fracture Risk % |
| | FOSAMAX (n=1022) | Placebo (n=1005) | | |
| Patients with: | | | | |
| Vertebral fractures (diagnosed by X-ray)[†] | | | | |
| ≥ 1 new vertebral fracture | 7.9 | 15.0 | 7.1 | 47*** |
| ≥ 2 new vertebral fractures | 0.5 | 4.9 | 4.4 | 90*** |
| Clinical (symptomatic) fractures | | | | |
| Any clinical (symptomatic) fracture | 13.8 | 18.1 | 4.3 | 26[‡] |
| ≥ 1 clinical (symptomatic) vertebral fracture | 2.3 | 5.0 | 2.7 | 54** |
| Hip fracture | 1.1 | 2.2 | 1.1 | 51* |
| Wrist (forearm) fracture | 2.2 | 4.1 | 1.9 | 48* |

[†]Number evaluable for vertebral fractures: FOSAMAX, n=984; placebo, n=966
*p<0.05, **p<0.01, ***p<0.001, [‡]p=0.007

Furthermore, in this population of patients with baseline vertebral fracture, treatment with FOSAMAX
significantly reduced the incidence of hospitalizations (25.0% vs. 30.7%).

In the Three-Year Study of FIT, fractures of the hip occurred in 22 (2.2%) of 1005 patients on placebo
and 11 (1.1%) of 1022 patients on FOSAMAX, p=0.047. The figure below displays the cumulative
incidence of hip fractures in this study.

Cumulative Incidence of Hip Fractures in the
Three-Year Study of FIT
(patients with radiographic vertebral fracture at baseline)

FOSAMAX®
(alendronate sodium) Tablets and Oral Solution

7957028XXXXXXX



*Fracture Intervention Trial: Four-Year Study (patients with low bone mass but without a baseline radiographic vertebral fracture)*

This randomized, double-blind, placebo-controlled, 4432-patient study (FOSAMAX, n=2214; placebo, n=2218) further investigated the reduction in fracture incidence due to FOSAMAX. The intent of the study was to recruit women with osteoporosis, defined as a baseline femoral neck BMD at least two standard deviations below the mean for young adult women. However, due to subsequent revisions to the normative values for femoral neck BMD, 31% of patients were found not to meet this entry criterion and thus this study included both osteoporotic and non-osteoporotic women. The results are shown in the table below for the patients with osteoporosis.

Effect of FOSAMAX on Fracture Incidence in Osteoporotic[†] Patients in the Four-Year Study of FIT
(patients without vertebral fracture at baseline)

| | Percent of Patients | | | |
| --- | --- | --- | --- | --- |
| | FOSAMAX (n=1545) | Placebo (n=1521) | Absolute Reduction in Fracture Incidence | Relative Reduction in Fracture Risk (%) |
| Patients with:<br>Vertebral fractures (diagnosed by X-ray)[††] | | | | |
| ≥ 1 new vertebral fracture | 2.5 | 4.8 | 2.3 | 48*** |
| ≥ 2 new vertebral fractures | 0.1 | 0.6 | 0.5 | 78* |
| Clinical (symptomatic) fractures | | | | |
| Any clinical (symptomatic) fracture | 12.9 | 16.2 | 3.3 | 22** |
| ≥ 1 clinical (symptomatic) vertebral fracture | 1.0 | 1.6 | 0.6 | 41 (NS)[†††] |
| Hip fracture | 1.0 | 1.4 | 0.4 | 29 (NS)[†††] |
| Wrist (forearm) fracture | 3.9 | 3.8 | -0.1 | NS[†††] |

[†]Baseline femoral neck BMD at least 2 SD below the mean for young adult women
[††]Number evaluable for vertebral fractures: FOSAMAX, n=1426; placebo, n=1428
[†††]Not significant. This study was not powered to detect differences at these sites.
*p=0.035, ** p=0.01, ***p<0.001

*Fracture results across studies*

In the Three-Year Study of FIT, FOSAMAX reduced the percentage of women experiencing at least one new radiographic vertebral fracture from 15.0% to 7.9% (47% relative risk reduction, p<0.001); in the Four-Year Study of FIT, the percentage was reduced from 3.8% to 2.1% (44% relative risk reduction, p=0.001); and in the combined U.S./Multinational studies, from 6.2% to 3.2% (48% relative risk reduction, p=0.034).

FOSAMAX reduced the percentage of women experiencing multiple (two or more) new vertebral fractures from 4.2% to 0.6% (87% relative risk reduction, p<0.001) in the combined U.S./Multinational studies and from 4.9% to 0.5% (90% relative risk reduction, p<0.001) in the Three-Year Study of FIT. In the Four-Year Study of FIT, FOSAMAX reduced the percentage of osteoporotic women experiencing multiple vertebral fractures from 0.6% to 0.1% (78% relative risk reduction, p=0.035).

FOSAMAX®                                                                    7957028XXXXXXX
(alendronate sodium) Tablets and Oral Solution

Thus, FOSAMAX reduced the incidence of radiographic vertebral fractures in osteoporotic women whether or not they had a previous radiographic vertebral fracture.

FOSAMAX, over a three- or four-year period, was associated with statistically significant reductions in loss of height vs. placebo in patients with and without baseline radiographic vertebral fractures. At the end of the FIT studies the between-treatment group differences were 3.2 mm in the Three-Year Study and 1.3 mm in the Four-Year Study.

*Bone histology*

Bone histology in 270 postmenopausal patients with osteoporosis treated with FOSAMAX at doses ranging from 1 to 20 mg/day for one, two, or three years revealed normal mineralization and structure, as well as the expected decrease in bone turnover relative to placebo. These data, together with the normal bone histology and increased bone strength observed in rats and baboons exposed to long-term alendronate treatment, support the conclusion that bone formed during therapy with FOSAMAX is of normal quality.

*Men*

The efficacy of FOSAMAX in men with hypogonadal or idiopathic osteoporosis was demonstrated in two clinical studies.

A two-year, double-blind, placebo-controlled, multicenter study of FOSAMAX 10 mg once daily enrolled a total of 241 men between the ages of 31 and 87 (mean, 63). All patients in the trial had either: 1) a BMD T-score $\leq$-2 at the femoral neck and $\leq$-1 at the lumbar spine, or 2) a baseline osteoporotic fracture and a BMD T-score $\leq$-1 at the femoral neck. At two years, the mean increases relative to placebo in BMD in men receiving FOSAMAX 10 mg/day were significant at the following sites: lumbar spine, 5.3%; femoral neck, 2.6%; trochanter, 3.1%; and total body, 1.6%. Treatment with FOSAMAX also reduced height loss (FOSAMAX, -0.6 mm vs. placebo, -2.4 mm).

A one-year, double-blind, placebo-controlled, multicenter study of once weekly FOSAMAX 70 mg enrolled a total of 167 men between the ages of 38 and 91 (mean, 66). Patients in the study had either: 1) a BMD T-score $\leq$-2 at the femoral neck and $\leq$-1 at the lumbar spine, 2) a BMD T-score $\leq$-2 at the lumbar spine and $\leq$-1 at the femoral neck, or 3) a baseline osteoporotic fracture and a BMD T-score $\leq$-1 at the femoral neck. At one year, the mean increases relative to placebo in BMD in men receiving FOSAMAX 70 mg once weekly were significant at the following sites: lumbar spine, 2.8%; femoral neck, 1.9%; trochanter, 2.0%; and total body, 1.2%. These increases in BMD were similar to those seen at one year in the 10 mg once-daily study.

In both studies, BMD responses were similar regardless of age ($\geq$65 years vs. <65 years), gonadal function (baseline testosterone <9 ng/dL vs. $\geq$9 ng/dL), or baseline BMD (femoral neck and lumbar spine T-score $\leq$-2.5 vs. >-2.5).

*Prevention of osteoporosis in postmenopausal women*

Prevention of bone loss was demonstrated in two double-blind, placebo-controlled studies of postmenopausal women 40-60 years of age. One thousand six hundred nine patients (FOSAMAX 5 mg/day; n=498) who were at least six months postmenopausal were entered into a two-year study without regard to their baseline BMD. In the other study, 447 patients (FOSAMAX 5 mg/day; n=88), who were between six months and three years postmenopausal, were treated for up to three years. In the placebo-treated patients BMD losses of approximately 1% per year were seen at the spine, hip (femoral neck and trochanter) and total body. In contrast, FOSAMAX 5 mg/day prevented bone loss in the majority of patients and induced significant increases in mean bone mass at each of these sites (see figures below). In addition, FOSAMAX 5 mg/day reduced the rate of bone loss at the forearm by approximately half relative to placebo. FOSAMAX 5 mg/day was similarly effective in this population regardless of age, time since menopause, race and baseline rate of bone turnover.

8

FOSAMAX®                                          7957028XXXXXXX
(alendronate sodium) Tablets and Oral Solution



Osteoporosis Prevention Studies in Postmenopausal Women




The therapeutic equivalence of once weekly FOSAMAX 35 mg (n=362) and FOSAMAX 5 mg daily (n=361) was demonstrated in a one-year, double-blind, multicenter study of postmenopausal women without osteoporosis. In the primary analysis of completers, the mean increases from baseline in lumbar spine BMD at one year were 2.9% (2.6, 3.2%; 95% CI) in the 35-mg once-weekly group (n=307) and 3.2% (2.9, 3.5%; 95% CI) in the 5-mg daily group (n=298). The two treatment groups were also similar with regard to BMD increases at other skeletal sites. The results of the intention-to-treat analysis were consistent with the primary analysis of completers.

*Bone histology*

Bone histology was normal in the 28 patients biopsied at the end of three years who received FOSAMAX at doses of up to 10 mg/day.

*Concomitant use with estrogen/hormone replacement therapy (HRT)*

The effects on BMD of treatment with FOSAMAX 10 mg once daily and conjugated estrogen (0.625 mg/day) either alone or in combination were assessed in a two-year, double-blind, placebo-controlled study of hysterectomized postmenopausal osteoporotic women (n=425). At two years, the increases in lumbar spine BMD from baseline were significantly greater with the combination (8.3%) than with either estrogen or FOSAMAX alone (both 6.0%).

The effects on BMD when FOSAMAX was added to stable doses (for at least one year) of HRT (estrogen ± progestin) were assessed in a one-year, double-blind, placebo-controlled study in postmenopausal osteoporotic women (n=428). The addition of FOSAMAX 10 mg once daily to HRT produced, at one year, significantly greater increases in lumbar spine BMD (3.7%) vs. HRT alone (1.1%).

In these studies, significant increases or favorable trends in BMD for combined therapy compared with HRT alone were seen at the total hip, femoral neck, and trochanter. No significant effect was seen for total body BMD.

Histomorphometric studies of transiliac biopsies in 92 subjects showed normal bone architecture. Compared to placebo there was a 98% suppression of bone turnover (as assessed by mineralizing surface) after 18 months of combined treatment with FOSAMAX and HRT, 94% on FOSAMAX alone, and 78% on HRT alone. The long-term effects of combined FOSAMAX and HRT on fracture occurrence and fracture healing have not been studied.

*Glucocorticoid-induced osteoporosis*

The efficacy of FOSAMAX 5 and 10 mg once daily in men and women receiving glucocorticoids (at least 7.5 mg/day of prednisone or equivalent) was demonstrated in two, one-year, double-blind, randomized, placebo-controlled, multicenter studies of virtually identical design, one performed in the United States and the other in 15 different countries (Multinational [which also included FOSAMAX 2.5 mg/day]). These studies enrolled 232 and 328 patients, respectively, between the ages of 17 and 83 with a variety of glucocorticoid-requiring diseases. Patients received supplemental calcium and vitamin D. The following figure shows the mean increases relative to placebo in BMD of the lumbar spine, femoral neck, and trochanter in patients receiving FOSAMAX 5 mg/day for each study.

9

FOSAMAX®                                                                                     7957028XXXXXXX
(alendronate sodium) Tablets and Oral Solution





Studies in Glucocorticoid - Treated Patients
Increase in BMD
FOSAMAX 5 mg/day at One Year

After one year, significant increases relative to placebo in BMD were seen in the combined studies at each of these sites in patients who received FOSAMAX 5 mg/day. In the placebo-treated patients, a significant decrease in BMD occurred at the femoral neck (-1.2%), and smaller decreases were seen at the lumbar spine and trochanter. Total body BMD was maintained with FOSAMAX 5 mg/day. The increases in BMD with FOSAMAX 10 mg/day were similar to those with FOSAMAX 5 mg/day in all patients except for postmenopausal women not receiving estrogen therapy. In these women, the increases (relative to placebo) with FOSAMAX 10 mg/day were greater than those with FOSAMAX 5 and 10 mg/day, respectively.
FOSAMAX 5 mg/day at the lumbar spine (4.1% vs. 1.6%) and trochanter (2.8% vs. 1.7%), but not at other sites. FOSAMAX was effective regardless of dose or duration of glucocorticoid use. In addition, FOSAMAX was similarly effective regardless of age (<65 vs. ≥65 years), race (Caucasian vs. other races), gender, underlying disease, baseline BMD, baseline bone turnover, and use with a variety of common medications.

Bone histology was normal in the 49 patients biopsied at the end of one year who received FOSAMAX at doses of up to 10 mg/day.

Of the original 560 patients in these studies, 208 patients who remained on at least 7.5 mg/day of prednisone or equivalent continued into a one-year double-blind extension. After two years of treatment, spine BMD increased by 3.7% and 5.0% relative to placebo with FOSAMAX 5 and 10 mg/day, respectively. Significant increases in BMD (relative to placebo) were also observed at the femoral neck, trochanter, and total body.

After one year, 2.3% of patients treated with FOSAMAX 5 or 10 mg/day (pooled) vs. 3.7% of those treated with placebo experienced a new vertebral fracture (not significant). However, in the population studied for two years, treatment with FOSAMAX (pooled dosage groups: 5 or 10 mg for two years or 2.5 mg for one year followed by 10 mg for one year) significantly reduced the incidence of patients with a new vertebral fracture (FOSAMAX 0.7% vs. placebo 6.8%).

*Paget's disease of bone*

The efficacy of FOSAMAX 40 mg once daily for six months was demonstrated in two double-blind clinical studies of male and female patients with moderate to severe Paget's disease (alkaline phosphatase at least twice the upper limit of normal): a placebo-controlled, multinational study and a U.S. comparative study with etidronate disodium 400 mg/day. The following figure shows the mean percent changes from baseline in serum alkaline phosphatase for up to six months of randomized treatment.

FOSAMAX®
(alendronate sodium) Tablets and Oral Solution

7957028XXXXXXX



Studies in Paget's Disease of Bone

Effect on Serum Alkaline Phosphatase of FOSAMAX 40 mg/day
Versus Placebo or Etidronate 400 mg/day

At six months the suppression in alkaline phosphatase in patients treated with FOSAMAX was significantly greater than that achieved with etidronate and contrasted with the complete lack of response in placebo-treated patients. Response (defined as either normalization of serum alkaline phosphatase or decrease from baseline ≥60%) occurred in approximately 85% of patients treated with FOSAMAX in the combined studies vs. 30% in the etidronate group and 0% in the placebo group. FOSAMAX was similarly effective regardless of age, gender, race, prior use of other bisphosphonates, or baseline alkaline phosphatase within the range studied (at least twice the upper limit of normal).

Bone histology was evaluated in 33 patients with Paget's disease treated with FOSAMAX 40 mg/day for 6 months. As in patients treated for osteoporosis (see *Clinical Studies, Treatment of osteoporosis in postmenopausal women, Bone histology*), FOSAMAX did not impair mineralization, and the expected decrease in the rate of bone turnover was observed. Normal lamellar bone was produced during treatment with FOSAMAX, even where preexisting bone was woven and disorganized. Overall, bone histology data support the conclusion that bone formed during treatment with FOSAMAX is of normal quality.

## ANIMAL PHARMACOLOGY

The relative inhibitory activities on bone resorption and mineralization of alendronate and etidronate were compared in the Schenk assay, which is based on histological examination of the epiphyses of growing rats. In this assay, the lowest dose of alendronate that interfered with bone mineralization (leading to osteomalacia) was 6000-fold the antiresorptive dose. The corresponding ratio for etidronate was one to one. These data suggest that alendronate administered in therapeutic doses is highly unlikely to induce osteomalacia.

## INDICATIONS AND USAGE

FOSAMAX is indicated for:
- Treatment and prevention of osteoporosis in postmenopausal women

    - For the treatment of osteoporosis, FOSAMAX increases bone mass and reduces the incidence of fractures, including those of the hip and spine (vertebral compression fractures). Osteoporosis may be confirmed by the finding of low bone mass (for example, at least 2 standard deviations below the premenopausal mean) or by the presence or history of osteoporotic fracture. (See CLINICAL PHARMACOLOGY, *Pharmacodynamics*.)

    - For the prevention of osteoporosis, FOSAMAX may be considered in postmenopausal women who are at risk of developing osteoporosis and for whom the desired clinical outcome is to maintain bone mass and to reduce the risk of future fracture.

11

FOSAMAX®                                                                    ~~7957028~~XXXXXXX
(alendronate sodium) Tablets and Oral Solution

> Bone loss is particularly rapid in postmenopausal women younger than age 60. Risk factors often associated with the development of postmenopausal osteoporosis include early menopause; moderately low bone mass (for example, at least 1 standard deviation below the mean for healthy young adult women); thin body build; Caucasian or Asian race; and family history of osteoporosis. The presence of such risk factors may be important when considering the use of FOSAMAX for prevention of osteoporosis.

- Treatment to increase bone mass in men with osteoporosis

- Treatment of glucocorticoid-induced osteoporosis in men and women receiving glucocorticoids in a daily dosage equivalent to 7.5 mg or greater of prednisone and who have low bone mineral density (see PRECAUTIONS, *Glucocorticoid-induced osteoporosis*). Patients treated with glucocorticoids should receive adequate amounts of calcium and vitamin D.

- Treatment of Paget's disease of bone in men and women

  - Treatment is indicated in patients with Paget's disease of bone having alkaline phosphatase at least two times the upper limit of normal, or those who are symptomatic, or those at risk for future complications from their disease.

## CONTRAINDICATIONS

- Abnormalities of the esophagus which delay esophageal emptying such as stricture or achalasia
- Inability to stand or sit upright for at least 30 minutes
- Patients at increased risk of aspiration should not receive FOSAMAX oral solution.
- Hypersensitivity to any component of this product
- Hypocalcemia (see PRECAUTIONS, *General*)

## WARNINGS

FOSAMAX, like other bisphosphonates, may cause local irritation of the upper gastrointestinal mucosa.

Esophageal adverse experiences, such as esophagitis, esophageal ulcers and esophageal erosions, occasionally with bleeding and rarely followed by esophageal stricture or perforation, have been reported in patients receiving treatment with FOSAMAX. In some cases these have been severe and required hospitalization. Physicians should therefore be alert to any signs or symptoms signaling a possible esophageal reaction and patients should be instructed to discontinue FOSAMAX and seek medical attention if they develop dysphagia, odynophagia, retrosternal pain or new or worsening heartburn.

The risk of severe esophageal adverse experiences appears to be greater in patients who lie down after taking FOSAMAX and/or who fail to swallow it with the recommended amount of water, and/or who continue to take FOSAMAX after developing symptoms suggestive of esophageal irritation. Therefore, it is very important that the full dosing instructions are provided to, and understood by, the patient (see DOSAGE AND ADMINISTRATION). In patients who cannot comply with dosing instructions due to mental disability, therapy with FOSAMAX should be used under appropriate supervision.

Because of possible irritant effects of FOSAMAX on the upper gastrointestinal mucosa and a potential for worsening of the underlying disease, caution should be used when FOSAMAX is given to patients with active upper gastrointestinal problems (such as dysphagia, esophageal diseases, gastritis, duodenitis, or ulcers).

There have been post-marketing reports of gastric and duodenal ulcers, some severe and with complications, although no increased risk was observed in controlled clinical trials.

## PRECAUTIONS

*General*

Causes of osteoporosis other than estrogen deficiency, aging, and glucocorticoid use should be considered.

Hypocalcemia must be corrected before initiating therapy with FOSAMAX (see CONTRAINDICATIONS). Other disorders affecting mineral metabolism (such as vitamin D deficiency)

**FOSAMAX®**                                                                          7957028XXXXXXX
(alendronate sodium) Tablets and Oral Solution

should also be effectively treated. In patients with these conditions, serum calcium and symptoms of hypocalcemia should be monitored during therapy with FOSAMAX.

Presumably due to the effects of FOSAMAX on increasing bone mineral, small, asymptomatic decreases in serum calcium and phosphate may occur, especially in patients with Paget's disease, in whom the pretreatment rate of bone turnover may be greatly elevated and in patients receiving glucocorticoids, in whom calcium absorption may be decreased.

Ensuring adequate calcium and vitamin D intake is especially important in patients with Paget's disease of bone and in patients receiving glucocorticoids.

*Musculoskeletal Pain*

In post marketing experience, severe and occasionally incapacitating bone, joint, and/or muscle pain has been reported in patients taking bisphosphonates that are approved for the prevention and treatment of osteoporosis (see ADVERSE REACTIONS). However, such reports have been infrequent. This category of drugs includes FOSAMAX (alendronate). Most of the patients were postmenopausal women. The time to onset of symptoms varied from one day to several months after starting the drug. Most patients had relief of symptoms after stopping. A subset had recurrence of symptoms when rechallenged with the same drug or another bisphosphonate.

In placebo-controlled clinical studies of FOSAMAX, the percentages of patients with these symptoms were similar in the FOSAMAX and placebo groups.

*Dental*

Osteonecrosis of the jaw, generally associated with tooth extraction and/or local infection, often with delayed healing, has been reported in patients taking bisphosphonates. Most reported cases of bisphosphonate-associated osteonecrosis have been in cancer patients treated with intravenous bisphosphonates, but some have occurred in patients with postmenopausal osteoporosis. Known risk factors for osteonecrosis include a diagnosis of cancer, concomitant therapies (e.g., chemotherapy, radiotherapy, corticosteroids), poor oral hygiene, and co-morbid disorders (e.g., pre-existing dental disease, anemia, coagulopathy, infection).

Patients who develop osteonecrosis of the jaw (ONJ) while on bisphosphonate therapy should receive care by an oral surgeon. Dental surgery may exacerbate the condition. For patients requiring dental procedures, there are no data available to suggest whether discontinuation of bisphosphonate treatment reduces the risk for ONJ. Clinical judgment of the treating physician should guide the management plan of each patient based on individual benefit/risk assessment.

*Renal insufficiency*

FOSAMAX is not recommended for patients with renal insufficiency (creatinine clearance <35 mL/min). (See DOSAGE AND ADMINISTRATION.)

*Glucocorticoid-induced osteoporosis*

The risk versus benefit of FOSAMAX for treatment at daily dosages of glucocorticoids less than 7.5 mg of prednisone or equivalent has not been established (see INDICATIONS AND USAGE). Before initiating treatment, the hormonal status of both men and women should be ascertained and appropriate replacement considered.

A bone mineral density measurement should be made at the initiation of therapy and repeated after 6 to 12 months of combined FOSAMAX and glucocorticoid treatment.

The efficacy of FOSAMAX for the treatment of glucocorticoid-induced osteoporosis has been shown in patients with a median bone mineral density which was 1.2 standard deviations below the mean for healthy young adults.

The efficacy of FOSAMAX has been established in studies of two years' duration. The greatest increase in bone mineral density occurred in the first year with maintenance or smaller gains during the second year. Efficacy of FOSAMAX beyond two years has not been studied.

The efficacy of FOSAMAX in respect to fracture prevention has been demonstrated for vertebral fractures. However, this finding was based on very few fractures that occurred primarily in postmenopausal women. The efficacy for prevention of non-vertebral fractures has not been demonstrated.

*Information for Patients*

*General*

Physicians should instruct their patients to read the patient package insert before starting therapy with FOSAMAX and to reread it each time the prescription is renewed.

13

FOSAMAX®                                                            7957028XXXXXXX
(alendronate sodium) Tablets and Oral Solution

Patients should be instructed to take supplemental calcium and vitamin D, if daily dietary intake is inadequate. Weight-bearing exercise should be considered along with the modification of certain behavioral factors, such as cigarette smoking and/or excessive alcohol consumption, if these factors exist.

*Dosing Instructions*

Patients should be instructed that the expected benefits of FOSAMAX may only be obtained when it is taken with plain water the first thing upon arising for the day at least 30 minutes before the first food, beverage, or medication of the day. Even dosing with orange juice or coffee has been shown to markedly reduce the absorption of FOSAMAX (see CLINICAL PHARMACOLOGY, *Pharmacokinetics, Absorption*).

To facilitate delivery to the stomach and thus reduce the potential for esophageal irritation patients should be instructed to swallow each tablet of FOSAMAX with a full glass of water (6-8 oz). To facilitate gastric emptying patients should drink at least 2 oz (a quarter of a cup) of water after taking FOSAMAX oral solution. Patients should be instructed not to lie down for at least 30 minutes <u>and</u> until after their first food of the day. Patients should not chew or suck on the tablet because of a potential for oropharyngeal ulceration. Patients should be specifically instructed not to take FOSAMAX at bedtime or before arising for the day. Patients should be informed that failure to follow these instructions may increase their risk of esophageal problems. Patients should be instructed that if they develop symptoms of esophageal disease (such as difficulty or pain upon swallowing, retrosternal pain or new or worsening heartburn) they should stop taking FOSAMAX and consult their physician.

Patients should be instructed that if they miss a dose of once weekly FOSAMAX, they should take one dose on the morning after they remember. They should not take two doses on the same day but should return to taking one dose once a week, as originally scheduled on their chosen day.

*Drug Interactions* (also see CLINICAL PHARMACOLOGY, *Pharmacokinetics, Drug Interactions*)

*Estrogen/hormone replacement therapy (HRT)*

Concomitant use of HRT (estrogen ± progestin) and FOSAMAX was assessed in two clinical studies of one or two years' duration in postmenopausal osteoporotic women. In these studies, the safety and tolerability profile of the combination was consistent with those of the individual treatments; however, the degree of suppression of bone turnover (as assessed by mineralizing surface) was significantly greater with the combination than with either component alone. The long-term effects of combination FOSAMAX and HRT on fracture occurrence have not been studied (see CLINICAL PHARMACOLOGY, *Clinical Studies, Concomitant use with estrogen/hormone replacement therapy (HRT)* and ADVERSE REACTIONS, *Clinical Studies, Concomitant use with estrogen/hormone replacement therapy*).

*Calcium Supplements/Antacids*

It is likely that calcium supplements, antacids, and some oral medications will interfere with absorption of FOSAMAX. Therefore, patients must wait at least one-half hour after taking FOSAMAX before taking any other oral medications.

*Aspirin*

In clinical studies, the incidence of upper gastrointestinal adverse events was increased in patients receiving concomitant therapy with daily doses of FOSAMAX greater than 10 mg and aspirin-containing products.

*Nonsteroidal Anti-inflammatory Drugs (NSAIDs)*

FOSAMAX may be administered to patients taking NSAIDs. In a 3-year, controlled, clinical study (n=2027) during which a majority of patients received concomitant NSAIDs, the incidence of upper gastrointestinal adverse events was similar in patients taking FOSAMAX 5 or 10 mg/day compared to those taking placebo. However, since NSAID use is associated with gastrointestinal irritation, caution should be used during concomitant use with FOSAMAX.

*Carcinogenesis, Mutagenesis, Impairment of Fertility*

Harderian gland (a retro-orbital gland not present in humans) adenomas were increased in high-dose female mice (p=0.003) in a 92-week oral carcinogenicity study at doses of alendronate of 1, 3, and 10 mg/kg/day (males) or 1, 2, and 5 mg/kg/day (females). These doses are equivalent to 0.12 to 1.2 times a maximum recommended daily dose of 40 mg (Paget's disease) based on surface area, mg/m$^2$. The relevance of this finding to humans is unknown.

Parafollicular cell (thyroid) adenomas were increased in high-dose male rats (p=0.003) in a 2-year oral carcinogenicity study at doses of 1 and 3.75 mg/kg body weight. These doses are equivalent to 0.26 and 1 times a 40 mg human daily dose based on surface area, mg/m$^2$. The relevance of this finding to humans is unknown.

14

FOSAMAX®                                                        7957028XXXXXXX
(alendronate sodium) Tablets and Oral Solution

Alendronate was not genotoxic in the *in vitro* microbial mutagenesis assay with and without metabolic activation, in an *in vitro* mammalian cell mutagenesis assay, in an *in vitro* alkaline elution assay in rat hepatocytes, and in an *in vivo* chromosomal aberration assay in mice. In an *in vitro* chromosomal aberration assay in Chinese hamster ovary cells, however, alendronate gave equivocal results.

Alendronate had no effect on fertility (male or female) in rats at oral doses up to 5 mg/kg/day (1.3 times a 40 mg human daily dose based on surface area, mg/m²).

*Pregnancy*

*Pregnancy Category C:*

Reproduction studies in rats showed decreased postimplantation survival at 2 mg/kg/day and decreased body weight gain in normal pups at 1 mg/kg/day. Sites of incomplete fetal ossification were statistically significantly increased in rats beginning at 10 mg/kg/day in vertebral (cervical, thoracic, and lumbar), skull, and sternebral bones. The above doses ranged from 0.26 times (1 mg/kg) to 2.6 times (10 mg/kg) a maximum recommended daily dose of 40 mg (Paget's disease) based on surface area, mg/m². No similar fetal effects were seen when pregnant rabbits were treated at doses up to 35 mg/kg/day (10.3 times a 40 mg human daily dose based on surface area, mg/m²).

Both total and ionized calcium decreased in pregnant rats at 15 mg/kg/day (3.9 times a 40 mg human daily dose based on surface area, mg/m²) resulting in delays and failures of delivery. Protracted parturition due to maternal hypocalcemia occurred in rats at doses as low as 0.5 mg/kg/day (0.13 times a 40 mg human daily dose based on surface area, mg/m²) when rats were treated from before mating through gestation. Maternotoxicity (late pregnancy deaths) occurred in the female rats treated with 15 mg/kg/day for varying periods of time ranging from treatment only during pre-mating to treatment only during early, middle, or late gestation; these deaths were lessened but not eliminated by cessation of treatment. Calcium supplementation either in the drinking water or by minipump could not ameliorate the hypocalcemia or prevent maternal and neonatal deaths due to delays in delivery; calcium supplementation IV prevented maternal, but not fetal deaths.

Bisphosphonates are incorporated into the bone matrix, from which they are gradually released over a period of years. The amount of bisphosphonate incorporated into adult bone, and hence, the amount available for release back into the systemic circulation, is directly related to the dose and duration of bisphosphonate use. There are no data on fetal risk in humans. However, there is a theoretical risk of fetal harm, predominantly skeletal, if a woman becomes pregnant after completing a course of bisphosphonate therapy. The impact of variables such as time between cessation of bisphosphonate therapy to conception, the particular bisphosphonate used, and the route of administration (intravenous versus oral) on the risk has not been studied.

There are no studies in pregnant women. FOSAMAX should be used during pregnancy only if the potential benefit justifies the potential risk to the mother and fetus.

*Nursing Mothers*

It is not known whether alendronate is excreted in human milk. Because many drugs are excreted in human milk, caution should be exercised when FOSAMAX is administered to nursing women.

FOSAMAX®
(alendronate sodium) Tablets and Oral Solution

~~7957028~~XXXXXXX

*Pediatric Use*

The efficacy and safety of FOSAMAX were examined in a randomized, double-blind, placebo-controlled two-year study of 139 pediatric patients, aged 4-18 years, with severe osteogenesis imperfecta. One-hundred-and-nine patients were randomized to 5 mg FOSAMAX daily (weight < 40 kg) or 10 mg FOSAMAX daily (weight ≥ 40 kg) and 30 patients to placebo. The mean baseline lumbar spine BMD Z-score of the patients was -4.5. The mean change in lumbar spine BMD Z-score from baseline to Month 24 was 1.3 in the FOSAMAX-treated patients and 0.1 in the placebo-treated patients. Treatment with FOSAMAX did not reduce the risk of fracture. Sixteen percent of the FOSAMAX patients who sustained a radiologically-confirmed fracture by Month 12 of the study had delayed fracture healing (callus remodeling) or fracture non-union when assessed radiographically at Month 24 compared with 9% of the placebo-treated patients. In FOSAMAX-treated patients, bone histomorphometry data obtained at Month 24 demonstrated decreased bone turnover and delayed mineralization time; however, there were no mineralization defects. There were no statistically significant differences between the FOSAMAX and placebo groups in reduction of bone pain.

FOSAMAX is not indicated for use in children.

(For clinical adverse experiences in children, see ADVERSE REACTIONS, *Clinical Studies, Osteogenesis Imperfecta*.)

*Geriatric Use*

Of the patients receiving FOSAMAX in the Fracture Intervention Trial (FIT), 71% (n=2302) were ≥65 years of age and 17% (n=550) were ≥75 years of age. Of the patients receiving FOSAMAX in the United States and Multinational osteoporosis treatment studies in women, osteoporosis studies in men, glucocorticoid-induced osteoporosis studies, and Paget's disease studies (see CLINICAL PHARMACOLOGY, *Clinical Studies*), 45%, 54%, 37%, and 70%, respectively, were 65 years of age or over. No overall differences in efficacy or safety were observed between these patients and younger patients, but greater sensitivity of some older individuals cannot be ruled out.

## ADVERSE REACTIONS

*Clinical Studies*

In clinical studies of up to five years in duration adverse experiences associated with FOSAMAX usually were mild, and generally did not require discontinuation of therapy.

FOSAMAX has been evaluated for safety in approximately 8000 postmenopausal women in clinical studies.

*Treatment of osteoporosis*

*Postmenopausal women*

In two identically designed, three-year, placebo-controlled, double-blind, multicenter studies (United States and Multinational; n=994), discontinuation of therapy due to any clinical adverse experience occurred in 4.1% of 196 patients treated with FOSAMAX 10 mg/day and 6.0% of 397 patients treated with placebo. In the Fracture Intervention Trial (n=6459), discontinuation of therapy due to any clinical adverse experience occurred in 9.1% of 3236 patients treated with FOSAMAX 5 mg/day for 2 years and 10 mg/day for either one or two additional years and 10.1% of 3223 patients treated with placebo. Discontinuations due to upper gastrointestinal adverse experiences were: FOSAMAX, 3.2%; placebo, 2.7%. In these study populations, 49-54% had a history of gastrointestinal disorders at baseline and 54-89% used nonsteroidal anti-inflammatory drugs or aspirin at some time during the studies. Adverse experiences from these studies considered by the investigators as possibly, probably, or definitely drug related in ≥1% of patients treated with either FOSAMAX or placebo are presented in the following table.

FOSAMAX®
(alendronate sodium) Tablets and Oral Solution

7957028XXXXXXX

| | United States/Multinational Studies | | Fracture Intervention Trial | |
|---|---|---|---|---|
| Osteoporosis Treatment Studies in Postmenopausal Women — Adverse Experiences Considered Possibly, Probably, or Definitely Drug Related by the Investigators and Reported in ≥1% of Patients | FOSAMAX* % (n=196) | Placebo % (n=397) | FOSAMAX** % (n=3236) | Placebo % (n=3223) |
| **Gastrointestinal** | | | | |
| abdominal pain | 6.6 | 4.8 | 1.5 | 1.5 |
| nausea | 3.6 | 4.0 | 1.1 | 1.5 |
| dyspepsia | 3.6 | 3.5 | 1.1 | 1.2 |
| constipation | 3.1 | 1.8 | 0.0 | 0.2 |
| diarrhea | 3.1 | 1.8 | 0.6 | 0.3 |
| flatulence | 2.6 | 0.5 | 0.2 | 0.3 |
| acid regurgitation | 2.0 | 4.3 | 1.1 | 0.9 |
| esophageal ulcer | 1.5 | 0.0 | 0.1 | 0.1 |
| vomiting | 1.0 | 1.5 | 0.2 | 0.3 |
| dysphagia | 1.0 | 0.0 | 0.1 | 0.1 |
| abdominal distention | 1.0 | 0.8 | 0.0 | 0.0 |
| gastritis | 0.5 | 1.3 | 0.6 | 0.7 |
| **Musculoskeletal** | | | | |
| musculoskeletal (bone, muscle or joint) pain | 4.1 | 2.5 | 0.4 | 0.3 |
| muscle cramp | 0.0 | 1.0 | 0.2 | 0.1 |
| **Nervous System/Psychiatric** | | | | |
| headache | 2.6 | 1.5 | 0.2 | 0.2 |
| dizziness | 0.0 | 1.0 | 0.0 | 0.1 |
| **Special Senses** | | | | |
| taste perversion | 0.5 | 1.0 | 0.1 | 0.0 |

* 10 mg/day for three years
** 5 mg/day for 2 years and 10 mg/day for either 1 or 2 additional years

Rarely, rash and erythema have occurred.

One patient treated with FOSAMAX (10 mg/day), who had a history of peptic ulcer disease and gastrectomy and who was taking concomitant aspirin developed an anastomotic ulcer with mild hemorrhage, which was considered drug related. Aspirin and FOSAMAX were discontinued and the patient recovered.

The adverse experience profile was similar for the 401 patients treated with either 5 or 20 mg doses of FOSAMAX in the United States and Multinational studies. The adverse experience profile for the 296 patients who received continued treatment with either 5 or 10 mg doses of FOSAMAX in the two-year extension of these studies (treatment years 4 and 5) was similar to that observed during the three-year placebo-controlled period. During the extension period, of the 151 patients treated with FOSAMAX 10 mg/day, the proportion of patients who discontinued therapy due to any clinical adverse experience was similar to that during the first three years of the study.

In a one-year, double-blind, multicenter study, the overall safety and tolerability profiles of once weekly FOSAMAX 70 mg and FOSAMAX 10 mg daily were similar. The adverse experiences considered by the investigators as possibly, probably, or definitely drug related in ≥1% of patients in either treatment group are presented in the following table.

FOSAMAX®
(alendronate sodium) Tablets and Oral Solution

7957028XXXXXXX

| Osteoporosis Treatment Studies in Postmenopausal Women  Adverse Experiences Considered Possibly, Probably, or Definitely Drug Related  by the Investigators and Reported in ≥1% of Patients | | |
|---|---|---|
| | Once Weekly FOSAMAX 70 mg  %  (n=519) | FOSAMAX 10 mg/day  %  (n=370) |
| *Gastrointestinal* | | |
| abdominal pain | 3.7 | 3.0 |
| dyspepsia | 2.7 | 2.2 |
| acid regurgitation | 1.9 | 2.4 |
| nausea | 1.9 | 2.4 |
| abdominal distention | 1.0 | 1.4 |
| constipation | 0.8 | 1.6 |
| flatulence | 0.4 | 1.6 |
| gastritis | 0.2 | 1.1 |
| gastric ulcer | 0.0 | 1.1 |
| *Musculoskeletal* | | |
| musculoskeletal (bone, muscle, joint) pain | 2.9 | 3.2 |
| muscle cramp | 0.2 | 1.1 |

*Men*

In two placebo-controlled, double-blind, multicenter studies in men (a two-year study of FOSAMAX 10 mg/day and a one-year study of once weekly FOSAMAX 70 mg) the rates of discontinuation of therapy due to any clinical adverse experience were 2.7% for FOSAMAX 10 mg/day vs. 10.5% for placebo, and 6.4% for once weekly FOSAMAX 70 mg vs. 8.6% for placebo. The adverse experiences considered by the investigators as possibly, probably, or definitely drug related in ≥2% of patients treated with either FOSAMAX or placebo are presented in the following table.

| Osteoporosis Studies in Men  Adverse Experiences Considered Possibly, Probably, or  Definitely Drug Related by the Investigators and  Reported in ≥2% of Patients | | | | |
|---|---|---|---|---|
| | Two-year Study | | One-year Study | |
| | FOSAMAX 10 mg/day  %  (n=146) | Placebo  %  (n=95) | Once Weekly FOSAMAX 70 mg  %  (n=109) | Placebo  %  (n=58) |
| *Gastrointestinal* | | | | |
| acid regurgitation | 4.1 | 3.2 | 0.0 | 0.0 |
| flatulence | 4.1 | 1.1 | 0.0 | 0.0 |
| gastroesophageal reflux disease | 0.7 | 3.2 | 2.8 | 0.0 |
| dyspepsia | 3.4 | 0.0 | 2.8 | 1.7 |
| diarrhea | 1.4 | 1.1 | 2.8 | 0.0 |
| abdominal pain | 2.1 | 1.1 | 0.9 | 3.4 |
| nausea | 2.1 | 0.0 | 0.0 | 0.0 |

*Prevention of osteoporosis in postmenopausal women*

The safety of FOSAMAX 5 mg/day in postmenopausal women 40-60 years of age has been evaluated in three double-blind, placebo-controlled studies involving over 1,400 patients randomized to receive FOSAMAX for either two or three years. In these studies the overall safety profiles of FOSAMAX 5 mg/day and placebo were similar. Discontinuation of therapy due to any clinical adverse experience occurred in 7.5% of 642 patients treated with FOSAMAX 5 mg/day and 5.7% of 648 patients treated with placebo.

In a one-year, double-blind, multicenter study, the overall safety and tolerability profiles of once weekly FOSAMAX 35 mg and FOSAMAX 5 mg daily were similar.

The adverse experiences from these studies considered by the investigators as possibly, probably, or definitely drug related in ≥1% of patients treated with either once weekly FOSAMAX 35 mg, FOSAMAX 5 mg/day or placebo are presented in the following table.

18

FOSAMAX®
(alendronate sodium) Tablets and Oral Solution

7957028XXXXXXX

| | Osteoporosis Prevention Studies in Postmenopausal Women Adverse Experiences Considered Possibly, Probably, or Definitely Drug Related by the Investigators and Reported in ≥1% of Patients | | | |
|---|---|---|---|---|
| | Two/Three-Year Studies | | One-Year Study | |
| | FOSAMAX 5 mg/day % (n=642) | Placebo % (n=648) | FOSAMAX 5 mg/day % (n=361) | Once Weekly FOSAMAX 35 mg % (n=362) |
| *Gastrointestinal* | | | | |
| dyspepsia | 1.9 | 1.4 | 2.2 | 1.7 |
| abdominal pain | 1.7 | 3.4 | 4.2 | 2.2 |
| acid regurgitation | 1.4 | 2.5 | 4.2 | 4.7 |
| nausea | 1.4 | 1.4 | 2.5 | 1.4 |
| diarrhea | 1.1 | 1.7 | 1.1 | 0.6 |
| constipation | 0.9 | 0.5 | 1.7 | 0.3 |
| abdominal distention | 0.2 | 0.3 | 1.4 | 1.1 |
| *Musculoskeletal* | | | | |
| musculoskeletal (bone, muscle or joint) pain | 0.8 | 0.9 | 1.9 | 2.2 |

*Concomitant use with estrogen/hormone replacement therapy*

In two studies (of one and two years' duration) of postmenopausal osteoporotic women (total: n=853), the safety and tolerability profile of combined treatment with FOSAMAX 10 mg once daily and estrogen ± progestin (n=354) was consistent with those of the individual treatments.

*Treatment of glucocorticoid-induced osteoporosis*

In two, one-year, placebo-controlled, double-blind, multicenter studies in patients receiving glucocorticoid treatment, the overall safety and tolerability profiles of FOSAMAX 5 and 10 mg/day were generally similar to that of placebo. The adverse experiences considered by the investigators as possibly, probably, or definitely drug related in ≥1% of patients treated with either FOSAMAX 5 or 10 mg/day or placebo are presented in the following table.

| | One-Year Studies in Glucocorticoid-Treated Patients Adverse Experiences Considered Possibly, Probably, or Definitely Drug Related by the Investigators and Reported in ≥1% of Patients | | |
|---|---|---|---|
| | FOSAMAX 10 mg/day % (n=157) | FOSAMAX 5 mg/day % (n=161) | Placebo % (n=159) |
| *Gastrointestinal* | | | |
| abdominal pain | 3.2 | 1.9 | 0.0 |
| acid regurgitation | 2.5 | 1.9 | 1.3 |
| constipation | 1.3 | 0.6 | 0.0 |
| melena | 1.3 | 0.0 | 0.0 |
| nausea | 0.6 | 1.2 | 0.6 |
| diarrhea | 0.0 | 0.0 | 1.3 |
| *Nervous System/Psychiatric* | | | |
| headache | 0.6 | 0.0 | 1.3 |

The overall safety and tolerability profile in the glucocorticoid-induced osteoporosis population that continued therapy for the second year of the studies (FOSAMAX: n=147) was consistent with that observed in the first year.

*Paget's disease of bone*

In clinical studies (osteoporosis and Paget's disease), adverse experiences reported in 175 patients taking FOSAMAX 40 mg/day for 3-12 months were similar to those in postmenopausal women treated with FOSAMAX 10 mg/day. However, there was an apparent increased incidence of upper gastrointestinal adverse experiences in patients taking FOSAMAX 40 mg/day (17.7% FOSAMAX vs. 10.2% placebo). One case of esophagitis and two cases of gastritis resulted in discontinuation of treatment.

Additionally, musculoskeletal (bone, muscle or joint) pain, which has been described in patients with Paget's disease treated with other bisphosphonates, was considered by the investigators as possibly, probably, or definitely drug related in approximately 6% of patients treated with FOSAMAX 40 mg/day

19

FOSAMAX®                                                          ~~7957028~~XXXXXXX
(alendronate sodium) Tablets and Oral Solution

versus approximately 1% of patients treated with placebo, but rarely resulted in discontinuation of therapy. Discontinuation of therapy due to any clinical adverse experience occurred in 6.4% of patients with Paget's disease treated with FOSAMAX 40 mg/day and 2.4% of patients treated with placebo.

*Osteogenesis Imperfecta*

FOSAMAX is not indicated for use in children.

The overall safety profile of FOSAMAX in OI patients treated for up to 24 months was generally similar to that of adults with osteoporosis treated with FOSAMAX. However, there was an increased occurrence of vomiting in OI patients treated with FOSAMAX compared to placebo. During the 24-month treatment period, vomiting was observed in 32 of 109 (29.4%) patients treated with FOSAMAX and 3 of 30 (10%) patients treated with placebo.

In a pharmacokinetic study, 6 of 24 pediatric OI patients who received a single oral dose of FOSAMAX 35 or 70 mg developed fever, flu-like symptoms, and/or mild lymphocytopenia within 24 to 48 hours after administration. These events, lasting no more than 2 to 3 days and responding to acetaminophen, are consistent with an acute-phase response that has been reported in patients receiving bisphosphonates, including FOSAMAX. See ADVERSE REACTIONS, *Post-Marketing Experience, Body as a Whole*.

*Laboratory Test Findings*

In double-blind, multicenter, controlled studies, asymptomatic, mild, and transient decreases in serum calcium and phosphate were observed in approximately 18% and 10%, respectively, of patients taking FOSAMAX versus approximately 12% and 3% of those taking placebo. However, the incidences of decreases in serum calcium to <8.0 mg/dL (2.0 mM) and serum phosphate to ≤2.0 mg/dL (0.65 mM) were similar in both treatment groups.

*Post-Marketing Experience*

The following adverse reactions have been reported in post-marketing use:

*Body as a Whole:* hypersensitivity reactions including urticaria and rarely angioedema. Transient symptoms of myalgia, malaise and rarely, fever have been reported with FOSAMAX, typically in association with initiation of treatment. Rarely, symptomatic hypocalcemia has occurred, generally in association with predisposing conditions.

*Gastrointestinal:* esophagitis, esophageal erosions, esophageal ulcers, rarely esophageal stricture or perforation, and oropharyngeal ulceration. Gastric or duodenal ulcers, some severe and with complications have also been reported (see WARNINGS, PRECAUTIONS, *Information for Patients*, and DOSAGE AND ADMINISTRATION).

Localized osteonecrosis of the jaw, generally associated with tooth extraction and/or local infection, often with delayed healing, has been reported rarely (see PRECAUTIONS, *Dental*).

*Musculoskeletal:* bone, joint, and/or muscle pain, occasionally severe, and rarely incapacitating (see PRECAUTIONS, *Musculoskeletal Pain*).

*Skin:* rash (occasionally with photosensitivity), pruritus, rarely severe skin reactions, including Stevens-Johnson syndrome and toxic epidermal necrolysis.

*Special Senses:* rarely uveitis, scleritis or episcleritis.

## OVERDOSAGE

Significant lethality after single oral doses was seen in female rats and mice at 552 mg/kg (3256 mg/m²) and 966 mg/kg (2898 mg/m²), respectively. In males, these values were slightly higher, 626 and 1280 mg/kg, respectively. There was no lethality in dogs at oral doses up to 200 mg/kg (4000 mg/m²).

No specific information is available on the treatment of overdosage with FOSAMAX. Hypocalcemia, hypophosphatemia, and upper gastrointestinal adverse events, such as upset stomach, heartburn, esophagitis, gastritis, or ulcer, may result from oral overdosage. Milk or antacids should be given to bind alendronate. Due to the risk of esophageal irritation, vomiting should not be induced and the patient should remain fully upright.

Dialysis would not be beneficial.

## DOSAGE AND ADMINISTRATION

FOSAMAX must be taken *at least* one-half hour before the first food, beverage, or medication of the day with plain water only (see PRECAUTIONS, *Information for Patients*). Other beverages (including

**FOSAMAX®**                                                          ~~7957028~~XXXXXXX
(alendronate sodium) Tablets and Oral Solution

mineral water), food, and some medications are likely to reduce the absorption of FOSAMAX (see PRECAUTIONS, *Drug Interactions*). Waiting less than 30 minutes, or taking FOSAMAX with food, beverages (other than plain water) or other medications will lessen the effect of FOSAMAX by decreasing its absorption into the body.

FOSAMAX should only be taken upon arising for the day. To facilitate delivery to the stomach and thus reduce the potential for esophageal irritation, a FOSAMAX tablet should be swallowed with a full glass of water (6-8 oz). To facilitate gastric emptying FOSAMAX oral solution should be followed by at least 2 oz (a quarter of a cup) of water. Patients should not lie down for at least 30 minutes and until after their first food of the day. FOSAMAX should not be taken at bedtime or before arising for the day. Failure to follow these instructions may increase the risk of esophageal adverse experiences (see WARNINGS, PRECAUTIONS, *Information for Patients*).

Patients should receive supplemental calcium and vitamin D, if dietary intake is inadequate (see PRECAUTIONS, *General*).

No dosage adjustment is necessary for the elderly or for patients with mild-to-moderate renal insufficiency (creatinine clearance 35 to 60 mL/min). FOSAMAX is not recommended for patients with more severe renal insufficiency (creatinine clearance <35 mL/min) due to lack of experience.

*Treatment of osteoporosis in postmenopausal women* (see INDICATIONS AND USAGE)
    The recommended dosage is:
- one 70 mg tablet once weekly
  - or
- one bottle of 70 mg oral solution once weekly
  - or
- one 10 mg tablet once daily

*Treatment to increase bone mass in men with osteoporosis*
    The recommended dosage is:
- one 70 mg tablet once weekly
  - or
- one bottle of 70 mg oral solution once weekly
  - or
- one 10 mg tablet once daily

*Prevention of osteoporosis in postmenopausal women* (see INDICATIONS AND USAGE)
    The recommended dosage is:
- one 35 mg tablet once weekly
  - or
- one 5 mg tablet once daily

The safety of treatment and prevention of osteoporosis with FOSAMAX has been studied for up to 7 years.

*Treatment of glucocorticoid-induced osteoporosis in men and women*
    The recommended dosage is one 5 mg tablet once daily, except for postmenopausal women not receiving estrogen, for whom the recommended dosage is one 10 mg tablet once daily.

*Paget's disease of bone in men and women*
    The recommended treatment regimen is 40 mg once a day for six months.

*Retreatment of Paget's disease*
    In clinical studies in which patients were followed every six months, relapses during the 12 months following therapy occurred in 9% (3 out of 32) of patients who responded to treatment with FOSAMAX. Specific retreatment data are not available, although responses to FOSAMAX were similar in patients who had received prior bisphosphonate therapy and those who had not. Retreatment with FOSAMAX may be considered, following a six-month post-treatment evaluation period in patients who have relapsed, based on increases in serum alkaline phosphatase, which should be measured periodically. Retreatment may also be considered in those who failed to normalize their serum alkaline phosphatase.


**HOW SUPPLIED**

    No. 3759 — Tablets FOSAMAX, 5 mg, are white, round, uncoated tablets with an outline of a bone image on one side and code MRK 925 on the other. They are supplied as follows:
    **NDC** 0006-0925-31 unit-of-use bottles of 30

**FOSAMAX®**
(alendronate sodium) Tablets and Oral Solution

<div style="text-align: right;">7957028<u>XXXXXXX</u></div>

    **NDC** 0006-0925-58 unit-of-use bottles of 100.

    No. 3797 — Tablets FOSAMAX, 10 mg, are white, oval, wax-polished tablets with code MRK on one side and 936 on the other. They are supplied as follows:

    **NDC** 0006-0936-31 unit-of-use bottles of 30

    **NDC** 0006-0936-58 unit-of-use bottles of 100

    **NDC** 0006-0936-28 unit dose packages of 100

    **NDC** 0006-0936-82 bottles of 1,000.

    No. 3813 — Tablets FOSAMAX, 35 mg, are white, oval, uncoated tablets with code 77 on one side and a bone image on the other. They are supplied as follows:

    **NDC** 0006-0077-44 unit-of-use blister package of 4

    **NDC** 0006-0077-21 unit dose packages of 20.

    No. 3592 — Tablets FOSAMAX, 40 mg, are white, triangular-shaped, uncoated tablets with code MRK 212 on one side and FOSAMAX on the other. They are supplied as follows:

    **NDC** 0006-0212-31 unit-of-use bottles of 30.

    No. 3814 — Tablets FOSAMAX, 70 mg, are white, oval, uncoated tablets with code 31 on one side and an outline of a bone image on the other. They are supplied as follows:

    **NDC** 0006-0031-44 unit-of-use blister package of 4

    **NDC** 0006-0031-21 unit dose packages of 20.

    No. 3833 — Oral Solution FOSAMAX, 70 mg, is a clear, colorless solution with a raspberry flavor and is supplied as follows:

    **NDC** 0006-3833-34 unit-of-use cartons of 4 single-dose bottles containing 75 mL each.

*Storage*
*FOSAMAX Tablets:*

    Store in a well-closed container at room temperature, 15-30°C (59-86°F).

*FOSAMAX Oral Solution:*

    Store at 25°C (77°F), excursions permitted to 15-30°C (59-86°F). [See USP Controlled Room Temperature.] Do not freeze.

---

**♦ MERCK & CO., INC.,** Whitehouse Station, NJ 08889, USA

Issued ~~July 2005~~<u>Month XXXX</u>
Printed in USA

# Exhibit G

**ACTONEL®**
(risedronate sodium tablets)

## DESCRIPTION

ACTONEL (risedronate sodium tablets) is a pyridinyl bisphosphonate that inhibits osteoclast-mediated bone resorption and modulates bone metabolism. Each ACTONEL tablet for oral administration contains the equivalent of 5, 30, or 35 mg of anhydrous risedronate sodium in the form of the hemi-pentahydrate with small amounts of monohydrate. The empirical formula for risedronate sodium hemi-pentahydrate is $C_7H_{10}NO_7P_2Na \cdot 2.5\ H_2O$. The chemical name of risedronate sodium is [1-hydroxy-2-(3-pyridinyl)ethylidene]bis[phosphonic acid] monosodium salt. The chemical structure of risedronate sodium hemi-pentahydrate is the following:



Molecular Weight:
Anhydrous:        305.10
Hemi-pentahydrate:   350.13

Risedronate sodium is a fine, white to off-white, odorless, crystalline powder. It is soluble in water and in aqueous solutions, and essentially insoluble in common organic solvents.

### Inactive Ingredients:

Crospovidone, ferric oxide red (35-mg tablets only), ferric oxide yellow (5 and 35-mg tablets only), hydroxypropyl cellulose, hydroxypropyl methylcellulose, lactose monohydrate, magnesium stearate, microcrystalline cellulose, polyethylene glycol, silicon dioxide, titanium dioxide.

## CLINICAL PHARMACOLOGY

### Mechanism of Action:

ACTONEL has an affinity for hydroxyapatite crystals in bone and acts as an antiresorptive agent. At the cellular level, ACTONEL inhibits osteoclasts. The osteoclasts adhere normally to the bone surface, but show evidence of reduced active resorption (e.g., lack of ruffled border). Histomorphometry in rats, dogs, and minipigs showed that ACTONEL treatment reduces bone turnover (activation frequency, i.e., the rate at which bone remodeling sites are activated) and bone resorption at remodeling sites.

### Pharmacokinetics:

Absorption:

Absorption after an oral dose is relatively rapid ($t_{max}$ ~1 hour) and occurs throughout the upper gastrointestinal tract. The fraction of the dose absorbed is independent of dose over the range

studied (single dose, 2.5 to 30 mg; multiple dose, 2.5 to 5 mg). Steady-state conditions in the serum are observed within 57 days of daily dosing. Mean absolute oral bioavailability of the 30-mg tablet is 0.63% (90% CI: 0.54% to 0.75%) and is comparable to a solution. The extent of absorption of a 30-mg dose (three 10-mg tablets) when administered 0.5 hours before breakfast is reduced by 55% compared to dosing in the fasting state (no food or drink for 10 hours prior to or 4 hours after dosing). Dosing 1 hour prior to breakfast reduces the extent of absorption by 30% compared to dosing in the fasting state. Dosing either 0.5 hours prior to breakfast or 2 hours after dinner (evening meal) results in a similar extent of absorption. ACTONEL is effective when administered at least 30 minutes before breakfast.

### Distribution:
The mean steady-state volume of distribution is 6.3 L/kg in humans. Human plasma protein binding of drug is about 24%. Preclinical studies in rats and dogs dosed intravenously with single doses of [$^{14}$C] risedronate indicate that approximately 60% of the dose is distributed to bone. The remainder of the dose is excreted in the urine. After multiple oral dosing in rats, the uptake of risedronate in soft tissues was in the range of 0.001% to 0.01%.

### Metabolism:
There is no evidence of systemic metabolism of risedronate.

### Elimination:
Approximately half of the absorbed dose is excreted in urine within 24 hours, and 85% of an intravenous dose is recovered in the urine over 28 days. Mean renal clearance is 105 mL/min (CV = 34%) and mean total clearance is 122 mL/min (CV = 19%), with the difference primarily reflecting nonrenal clearance or clearance due to adsorption to bone. The renal clearance is not concentration dependent, and there is a linear relationship between renal clearance and creatinine clearance. Unabsorbed drug is eliminated unchanged in feces. Once risedronate is absorbed, the serum concentration-time profile is multi-phasic, with an initial half-life of about 1.5 hours and a terminal exponential half-life of 480 hours. This terminal half-life is hypothesized to represent the dissociation of risedronate from the surface of bone.

### Special Populations:
#### Pediatric:
Risedronate pharmacokinetics have not been studied in patients <18 years of age.

#### Gender:
Bioavailability and pharmacokinetics following oral administration are similar in men and women.

#### Geriatric:
Bioavailability and disposition are similar in elderly (>60 years of age) and younger subjects. No dosage adjustment is necessary.

#### Race:
Pharmacokinetic differences due to race have not been studied.

Renal Insufficiency:
Risedronate is excreted unchanged primarily via the kidney. As compared to persons with normal renal function, the renal clearance of risedronate was decreased by about 70% in patients with creatinine clearance of approximately 30 mL/min. ACTONEL is not recommended for use in patients with severe renal impairment (creatinine clearance <30 mL/min) because of lack of clinical experience. No dosage adjustment is necessary in patients with a creatinine clearance ≥30 mL/min.

Hepatic Insufficiency:
No studies have been performed to assess risedronate's safety or efficacy in patients with hepatic impairment. Risedronate is not metabolized in rat, dog, and human liver preparations. Insignificant amounts (<0.1% of intravenous dose) of drug are excreted in the bile in rats. Therefore, dosage adjustment is unlikely to be needed in patients with hepatic impairment.

**Pharmacodynamics:**
Treatment and Prevention of Osteoporosis in Postmenopausal Women:
Osteoporosis is characterized by decreased bone mass and increased fracture risk, most commonly at the spine, hip, and wrist.

The diagnosis can be confirmed by the finding of low bone mass, evidence of fracture on x-ray, a history of osteoporotic fracture, or height loss or kyphosis indicative of vertebral fracture. Osteoporosis occurs in both men and women but is more common among women following menopause. In healthy humans, bone formation and resorption are closely linked; old bone is resorbed and replaced by newly-formed bone. In postmenopausal osteoporosis, bone resorption exceeds bone formation, leading to bone loss and increased risk of bone fracture. After menopause, the risk of fractures of the spine and hip increases; approximately 40% of 50 year-old women will experience an osteoporosis-related fracture during their remaining lifetimes. After experiencing 1 osteoporosis-related fracture, the risk of future fracture increases 5-fold compared to the risk among a non-fractured population.

ACTONEL treatment decreases the elevated rate of bone turnover that is typically seen in postmenopausal osteoporosis. In clinical trials, administration of ACTONEL to postmenopausal women resulted in decreases in biochemical markers of bone turnover, including urinary deoxypyridinoline/creatinine and urinary collagen cross-linked N-telopeptide (markers of bone resorption) and serum bone specific alkaline phosphatase (a marker of bone formation). At the 5-mg dose, decreases in deoxypyridinoline/creatinine were evident within 14 days of treatment. Changes in bone formation markers were observed later than changes in resorption markers, as expected, due to the coupled nature of bone resorption and bone formation; decreases in bone specific alkaline phosphatase of about 20% were evident within 3 months of treatment. Bone turnover markers reached a nadir of about 40% below baseline values by the sixth month of treatment and remained stable with continued treatment for up to 3 years. Bone turnover is decreased as early as 14 days and maximally within about 6 months of treatment, with achievement of a new steady-state that more nearly approximates the rate of bone turnover seen in premenopausal women. In a 1-year study comparing daily versus weekly oral dosing regimens of ACTONEL for the treatment of osteoporosis in postmenopausal women, ACTONEL 5-mg daily and ACTONEL 35-mg once a week decreased urinary collagen cross-linked N-telopeptide

3

by 60% and 61%, respectively. In addition, serum bone-specific alkaline phosphatase was also reduced by 42% and 41% in the ACTONEL 5-mg daily and ACTONEL 35-mg once a week groups, respectively. ACTONEL is not an estrogen and does not have the benefits and risks of estrogen therapy.

As a result of the inhibition of bone resorption, asymptomatic and usually transient decreases from baseline in serum calcium (<1%) and serum phosphate (<3%) and compensatory increases in serum PTH levels (<30%) were observed within 6 months in patients in osteoporosis clinical trials. There were no significant differences in serum calcium, phosphate, or PTH levels between the ACTONEL and placebo groups at 3 years. In a 1-year study comparing daily versus weekly oral dosing regimens of ACTONEL in postmenopausal women, the mean changes from baseline at 12 months were similar between the ACTONEL 5-mg daily and ACTONEL 35-mg once a week groups, respectively, for serum calcium (0.4% and 0.7%), phosphate (-3.8% and -2.6%) and PTH (6.4% and 4.2%).

Glucocorticoid-Induced Osteoporosis:
Sustained use of glucocorticoids is commonly associated with development of osteoporosis and resulting fractures (especially vertebral, hip, and rib). It occurs in both males and females of all ages. The relative risk of a hip fracture in patients on >7.5 mg/day prednisone is more than doubled (RR = 2.27); the relative risk of vertebral fracture is increased 5-fold (RR = 5.18). Bone loss occurs most rapidly during the first 6 months of therapy with persistent but slowing bone loss for as long as glucocorticoid therapy continues. Osteoporosis occurs as a result of inhibited bone formation and increased bone resorption resulting in net bone loss. ACTONEL decreases bone resorption without directly inhibiting bone formation.

In two 1-year clinical trials in the treatment and prevention of glucocorticoid-induced osteoporosis, ACTONEL 5 mg decreased urinary collagen cross-linked N-telopeptide (a marker of bone resorption), and serum bone specific alkaline phosphatase (a marker of bone formation) by 50% to 55% and 25% to 30%, respectively, within 3 to 6 months after initiation of therapy.

Paget's Disease:
Paget's disease of bone is a chronic, focal skeletal disorder characterized by greatly increased and disordered bone remodeling. Excessive osteoclastic bone resorption is followed by osteoblastic new bone formation, leading to the replacement of the normal bone architecture by disorganized, enlarged, and weakened bone structure.

Clinical manifestations of Paget's disease range from no symptoms to severe bone pain, bone deformity, pathological fractures, and neurological disorders. Serum alkaline phosphatase, the most frequently used biochemical marker of disease activity, provides an objective measure of disease severity and response to therapy.

In pagetic patients treated with ACTONEL 30 mg/day for 2 months, bone turnover returned to normal in a majority of patients as evidenced by significant reductions in serum alkaline phosphatase (a marker of bone formation), and in urinary hydroxyproline/creatinine and deoxypyridinoline/creatinine (markers of bone resorption). Radiographic structural changes of bone lesions, especially improvement of a majority of lesions with an osteolytic front in weight-

bearing bones, were also observed after ACTONEL treatment. In addition, histomorphometric data provide further support that ACTONEL can lead to a more normal bone structure in these patients.

Radiographs taken at baseline and after 6 months from patients treated with ACTONEL 30 mg daily demonstrate that ACTONEL decreases the extent of osteolysis in both the appendicular and axial skeleton. Osteolytic lesions in the lower extremities improved or were unchanged in 15/16 (94%) of assessed patients; 9/16 (56%) patients showed clear improvement in osteolytic lesions. No evidence of new fractures was observed.

## CLINICAL STUDIES
### Treatment of Osteoporosis in Postmenopausal Women:
The fracture efficacy of ACTONEL 5 mg daily in the treatment of postmenopausal osteoporosis was demonstrated in 2 large, randomized, placebo-controlled, double-blind studies that enrolled a total of almost 4000 postmenopausal women under similar protocols. The Multinational study (VERT MN) (ACTONEL 5 mg, n = 408) was conducted primarily in Europe and Australia; a second study was conducted in North America (VERT NA) (ACTONEL 5 mg, n = 821). Patients were selected on the basis of radiographic evidence of previous vertebral fracture, and therefore, had established disease. The average number of prevalent vertebral fractures per patient at study entry was 4 in VERT MN, and 2.5 in VERT NA, with a broad range of baseline bone mineral density (BMD) levels. All patients in these studies received supplemental calcium 1000 mg/day. Patients with low vitamin D levels (approximately 40 nmol/L or less) also received supplemental vitamin D 500 IU/day.

Positive effects of ACTONEL treatment on BMD were also demonstrated in each of 2 large, randomized, placebo-controlled trials (BMD MN and BMD NA) in which almost 1200 postmenopausal women (ACTONEL 5 mg, n = 394) were recruited on the basis of low lumbar spine bone mass (more than 2 SD below the premenopausal mean) rather than a history of vertebral fracture.

ACTONEL 35-mg once a week (n = 485) was shown to be therapeutically equivalent to ACTONEL 5-mg daily (n = 480) in a 1-year, double-blind, multicenter study of postmenopausal women with osteoporosis. In the primary efficacy analysis of completers, the mean increases from baseline in lumbar spine BMD at 1 year were 4.0% (3.7, 4.3; 95% confidence interval [CI]) in the 5-mg daily group (n = 391) and 3.9% (3.6, 4.3; 95% CI) in the 35-mg once a week group (n = 387) and the mean difference between 5 mg daily and 35 mg weekly was 0.1%(-0.42, 0.55; 95% CI). The results of the intent-to-treat analysis with the last observation carried forward were consistent with the primary efficacy analysis of completers. The 2 treatment groups were also similar with regard to BMD increases at other skeletal sites.

### Effect on Vertebral Fractures:
Fractures of previously undeformed vertebrae (new fractures) and worsening of pre-existing vertebral fractures were diagnosed radiographically; some of these fractures were also associated with symptoms (i.e., clinical fractures). Spinal radiographs were scheduled annually and prospectively planned analyses were based on the time to a patient's first diagnosed fracture. The primary endpoint for these studies was the incidence of new and worsening vertebral

fractures across the period of 0 to 3 years. ACTONEL 5 mg daily significantly reduced the incidence of new and worsening vertebral fractures and of new vertebral fractures in both VERT NA and VERT MN at all time points (Table 1). The reduction in risk seen in the subgroup of patients who had 2 or more vertebral fractures at study entry was similar to that seen in the overall study population.

| Table 1 The Effect of ACTONEL on the Risk of Vertebral Fractures | | | | |
|---|---|---|---|---|
| | Proportion of Patients with Fracture (%)[a] | | | |
| **VERT NA** | Placebo n = 678 | ACTONEL 5 mg n = 696 | Absolute Risk Reduction (%) | Relative Risk Reduction (%) |
| New and Worsening | | | | |
| 0 - 1 Year | 7.2 | 3.9 | 3.3 | 49 |
| 0 - 2 Years | 12.8 | 8.0 | 4.8 | 42 |
| 0 - 3 Years | 18.5 | 13.9 | 4.6 | 33 |
| New | | | | |
| 0 - 1 Year | 6.4 | 2.4 | 4.0 | 65 |
| 0 - 2 Years | 11.7 | 5.8 | 5.9 | 55 |
| 0 - 3 Years | 16.3 | 11.3 | 5.0 | 41 |
| **VERT MN** | Placebo n = 346 | ACTONEL 5 mg n = 344 | Absolute Risk Reduction (%) | Relative Risk Reduction (%) |
| New and Worsening | | | | |
| 0 - 1 Year | 15.3 | 8.2 | 7.1 | 50 |
| 0 - 2 Years | 28.3 | 13.9 | 14.4 | 56 |
| 0 - 3 Years | 34.0 | 21.8 | 12.2 | 46 |
| New | | | | |
| 0 - 1 Year | 13.3 | 5.6 | 7.7 | 61 |
| 0 - 2 Years | 24.7 | 11.6 | 13.1 | 59 |
| 0 - 3 Years | 29.0 | 18.1 | 10.9 | 49 |
| [a] Calculated by Kaplan-Meier methodology. | | | | |

## Effect on Osteoporosis-Related Nonvertebral Fractures:

In VERT MN and VERT NA, a prospectively planned efficacy endpoint was defined consisting of all radiographically confirmed fractures of skeletal sites accepted as associated with osteoporosis. Fractures at these sites were collectively referred to as osteoporosis-related nonvertebral fractures. ACTONEL 5 mg daily significantly reduced the incidence of nonvertebral osteoporosis-related fractures over 3 years in VERT NA (8% vs. 5%; relative risk reduction 39%) and reduced the fracture incidence in VERT MN from 16% to 11%. There was a significant reduction from 11% to 7% when the studies were combined, with a corresponding 36% reduction in relative risk. Figure 1 shows the overall results as well as the results at the individual skeletal sites for the combined studies.





Figure 1
Nonvertebral Osteoporosis-Related Fractures
Cumulative Incidence Over 3 Years
Combined VERT MN and VERT NA

### Effect on Height:

In the two 3-year osteoporosis treatment studies, standing height was measured yearly by stadiometer. Both ACTONEL and placebo-treated groups lost height during the studies. Patients who received ACTONEL had a statistically significantly smaller loss of height than those who received placebo. In VERT MN, the median annual height change was -1.3 mm/yr in the ACTONEL 5-mg daily group compared to -2.4 mm/yr in the placebo group. In VERT NA, the median annual height change was -0.7 mm/yr in the ACTONEL 5-mg daily group compared to -1.1 mm/yr in the placebo group.

### Effect on Bone Mineral Density:

The results of 4 randomized, placebo-controlled trials in women with postmenopausal osteoporosis (VERT MN, VERT NA, BMD MN, BMD NA) demonstrate that ACTONEL 5 mg daily increases BMD at the spine, hip, and wrist compared to the effects seen with placebo. Table 2 displays the significant increases in BMD seen at the lumbar spine, femoral neck, femoral trochanter, and midshaft radius in these trials compared to placebo. Thus, overall ACTONEL reverses the loss of BMD, a central factor in the progression of osteoporosis. In both VERT studies (VERT MN and VERT NA), ACTONEL 5 mg daily produced increases in lumbar spine BMD that were progressive over the 3 years of treatment, and were statistically significant relative to baseline and to placebo at 6 months and at all later time points.

| | VERT MN[b] | | VERT NA[b] | | BMD MN[c] | | BMD NA[c] | |
|---|---|---|---|---|---|---|---|---|
| | Placebo n = 323 | 5 mg n = 323 | Placebo n = 599 | 5 mg n = 606 | Placebo n = 161 | 5 mg n = 148 | Placebo n = 191 | 5 mg n = 193 |
| Lumbar Spine | 1.0 | 6.6 | 0.8 | 5.0 | 0.0 | 4.0 | 0.2 | 4.8 |
| Femoral Neck | -1.4 | 1.6 | -1.0 | 1.4 | -1.1 | 1.3 | 0.1 | 2.4 |
| Femoral Trochanter | -1.9 | 3.9 | -0.5 | 3.0 | -0.6 | 2.5 | 1.3 | 4.0 |
| Midshaft Radius | -1.5* | 0.2* | -1.2* | 0.1* | ND | | ND | |

**Table 2**
**Mean Percent Increase in BMD from Baseline in Patients**
**Taking ACTONEL 5 mg or Placebo at Endpoint[a]**

[a]  The endpoint value is the value at the study's last time point for all patients who had BMD measured at that time; otherwise the last postbaseline BMD value prior to the study's last time point is used.
[b]  The duration of the studies was 3 years.
[c]  The duration of the studies was 1.5 to 2 years.
*  BMD of the midshaft radius was measured in a subset of centers in VERT MN (placebo, n = 222; 5 mg, n = 214) and VERT NA (placebo, n = 310; 5 mg, n = 306)
ND = analysis not done

Histology/Histomorphometry:
Bone biopsies from 110 postmenopausal women were obtained at endpoint. Patients had received daily ACTONEL (2.5 mg or 5 mg) or placebo for 2 to 3 years. Histologic evaluation (n = 103) showed no osteomalacia, impaired bone mineralization, or other adverse effects on bone in ACTONEL-treated women. These findings demonstrate that bone formed during ACTONEL administration is of normal quality. The histomorphometric parameter mineralizing surface, an index of bone turnover, was assessed based upon baseline and post-treatment biopsy samples from 23 patients treated with ACTONEL 5 mg and 21 treated with placebo. Mineralizing surface decreased moderately in ACTONEL-treated patients (median percent change: ACTONEL 5 mg, -74%; placebo, -21%), consistent with the known effects of treatment on bone turnover.

**Prevention of Osteoporosis in Postmenopausal Women:**
ACTONEL 5 mg daily prevented bone loss in a majority of postmenopausal women (age range 42 to 63 years) within 3 years of menopause in a 2-year, double-blind, placebo-controlled study in 383 patients (ACTONEL 5 mg, n = 129). All patients in this study received supplemental calcium 1000 mg/day. Increases in BMD were observed as early as 3 months following initiation of ACTONEL treatment. ACTONEL 5 mg produced significant mean increases in BMD at the lumbar spine, femoral neck, and trochanter compared to placebo at the end of the study (Figure 2). ACTONEL 5 mg daily was also effective in patients with lower baseline lumbar spine BMD (more than 1 SD below the premenopausal mean) and in those with normal baseline lumbar spine BMD. Bone mineral density at the distal radius decreased in both ACTONEL and placebo-treated women following 1 year of treatment.



**Figure 2**
**Change in BMD from Baseline**
**2-Year Prevention Study**

ACTONEL 35 mg once a week prevented bone loss in postmenopausal women (age range 44 to 64 years) without osteoporosis in a 1-year, double-blind, placebo-controlled study in 278 patients (ACTONEL 35 mg, n = 136). All patients were supplemented with 1000 mg elemental calcium and 400 IU vitamin D per day. The primary efficacy measure was the percent change in lumbar spine BMD from baseline after 1 year of treatment using LOCF (last observation carried forward). ACTONEL 35 mg once a week resulted in a statistically significant mean difference from placebo in lumbar spine BMD of +2.9% (least square mean for risedronate +1.83%; placebo -1.05%). ACTONEL 35 mg once a week also showed a statistically significant mean difference from placebo in BMD at the total proximal femur of +1.5% (risedronate +1.01%; placebo -0.53%), femoral neck of +1.2% (risedronate +0.22%; placebo -1.00%), and trochanter of +1.8% (risedronate +1.07%; placebo -0.74%).

Combined Administration with Hormone Replacement Therapy:
The effects of combining ACTONEL 5 mg daily with conjugated estrogen 0.625 mg daily (n = 263) were compared to the effects of conjugated estrogen alone (n = 261) in a 1-year, randomized, double-blind study of women ages 37 to 82 years, who were on average 14 years postmenopausal. The BMD results for this study are presented in Table 3.

| Table 3 Percent Change from Baseline in BMD After 1 Year of Treatment | | |
|---|---|---|
| | Estrogen 0.625 mg n = 261 | ACTONEL 5 mg + Estrogen 0.625 mg n = 263 |
| Lumbar Spine | 4.6 ± 0.20 | 5.2 ± 0.23 |
| Femoral Neck | 1.8 ± 0.25 | 2.7 ± 0.25 |
| Femoral Trochanter | 3.2 ± 0.28 | 3.7 ± 0.25 |
| Midshaft Radius | 0.4 ± 0.14 | 0.7 ± 0.17 |
| Distal Radius | 1.7 ± 0.24 | 1.6 ± 0.28 |

9

| Values shown are mean (+ SEM) percent change from baseline. |
| --- |

### Histology/Histomorphometry:

Bone biopsies from 53 postmenopausal women were obtained at endpoint. Patients had received ACTONEL 5 mg plus estrogen or estrogen alone once daily for 1 year. Histologic evaluation (n = 47) demonstrated that the bone of patients treated with ACTONEL plus estrogen was of normal lamellar structure and normal mineralization. The histomorphometric parameter mineralizing surface, a measure of bone turnover, was assessed based upon baseline and post-treatment biopsy samples from 12 patients treated with ACTONEL plus estrogen and 12 treated with estrogen alone. Mineralizing surface decreased in both treatment groups (median percent change: ACTONEL plus estrogen, -79%; estrogen alone, -50%), consistent with the known effects of these agents on bone turnover.

### Glucocorticoid-Induced Osteoporosis:

**Bone Mineral Density:**

Two 1-year, double-blind, placebo-controlled trials in patients who were taking $\geq 7.5$ mg/day of prednisone or equivalent demonstrated that ACTONEL 5 mg once daily was effective in the prevention and treatment of glucocorticoid-induced osteoporosis in men and women who were either initiating or continuing glucocorticoid therapy.

The prevention study enrolled 228 patients (ACTONEL 5 mg, n = 76) (18 to 85 years of age), each of whom had initiated glucocorticoid therapy (mean daily dose of prednisone 21 mg) within the previous 3 months (mean duration of use prior to study 1.8 months) for rheumatic, skin, and pulmonary diseases. The mean lumbar spine BMD was normal at baseline (average T score 0.684). All patients in this study received supplemental calcium 500 mg/day. By the third month of treatment, and continuing through the year-long treatment, the placebo group experienced losses in BMD at the lumbar spine, femoral neck, and trochanter, while BMD was maintained or increased in the ACTONEL 5-mg group. At each skeletal site there were statistically significant differences between the ACTONEL 5-mg group and the placebo group at all timepoints (Months 3, 6, 9, and 12). The treatment differences increased with continued treatment. Although BMD increased at the distal radius in the ACTONEL 5-mg group compared to the placebo group, the difference was not statistically significant. The differences between placebo and ACTONEL 5 mg after 1 year were 3.8% at the lumbar spine, 4.1% at the femoral neck, and 4.6% at the trochanter, as shown in Figure 3. The results at these skeletal sites were similar to the overall results when the subgroups of men and postmenopausal women, but not premenopausal women, were analyzed separately. ACTONEL was effective at the lumbar spine, femoral neck, and trochanter regardless of age (<65 vs. $\geq 65$), gender, prior and concomitant glucocorticoid dose, or baseline BMD. Positive treatment effects were also observed in patients taking glucocorticoids for a broad range of rheumatologic disorders, the most common of which were rheumatoid arthritis, temporal arteritis, and polymyalgia rheumatica.

The treatment study of similar design enrolled 290 patients (ACTONEL 5 mg, n = 100) (19 to 85 years of age) with continuing, long-term ($\geq 6$ months) use of glucocorticoids (mean duration of use prior to study 60 months; mean daily dose of prednisone 15 mg) for rheumatic, skin, and pulmonary diseases. The baseline mean lumbar spine BMD was low (1.63 SD below the young healthy population mean), with 28% of the patients more than 2.5 SD below the mean. All patients in this study received supplemental calcium 1000 mg/day and vitamin D 400 IU/day.

10

After 1 year of treatment, the BMD of the placebo group was within ±1% of baseline levels at the lumbar spine, femoral neck, and trochanter. ACTONEL 5 mg increased BMD at the lumbar spine (2.9%), femoral neck (1.8%), and trochanter (2.4%). The differences between ACTONEL and placebo were 2.7% at the lumbar spine, 1.9% at the femoral neck, and 1.6% at the trochanter as shown in Figure 4. The differences were statistically significant for the lumbar spine and femoral neck, but not at the femoral trochanter. ACTONEL was similarly effective on lumbar spine BMD regardless of age (<65 vs. ≥65), gender, or pre-study glucocorticoid dose. Positive treatment effects were also observed in patients taking glucocorticoids for a broad range of rheumatologic disorders, the most common of which were rheumatoid arthritis, temporal arteritis, and polymyalgia rheumatica.



**Figure 3**
**Change in BMD from Baseline**
**Patients Recently Initiating**
**Glucocorticoid Therapy**





**Figure 4**
**Change in BMD from Baseline**
**Patients on Long-Term**
**Glucocorticoid Therapy**



## Vertebral Fractures:

In the prevention study of patients initiating glucocorticoids, the incidence of vertebral fractures at 1 year was reduced from 17% in the placebo group to 6% in the ACTONEL group. In the treatment study of patients continuing glucocorticoids, the incidence of vertebral fractures was reduced from 15% in the placebo group to 5% in the ACTONEL group (Figure 5). The statistically significant reduction in vertebral fracture incidence in the analysis of the combined studies corresponded to an absolute risk reduction of 11% and a relative risk reduction of 70%. All vertebral fractures were diagnosed radiographically; some of these fractures also were associated with symptoms (i.e., clinical fractures).

**Figure 5**
**Incidence of Vertebral Fractures in Patients**
**Initiating or Continuing Glucocorticoid Therapy**



**Histology/Histomorphometry:**
Bone biopsies from 40 patients on glucocorticoid therapy were obtained at endpoint. Patients had received daily ACTONEL (2.5 mg or 5 mg) or placebo for 1 year. Histologic evaluation (n = 33) showed that bone formed during treatment with ACTONEL was of normal lamellar structure and normal mineralization, with no bone or marrow abnormalities observed. The histomorphometric parameter mineralizing surface, a measure of bone turnover, was assessed based upon baseline and post-treatment biopsy samples from 10 patients treated with ACTONEL 5 mg. Mineralizing surface decreased 24% (median percent change) in these patients. Only a small number of placebo-treated patients had both baseline and post-treatment biopsy samples, precluding a meaningful quantitative assessment.

## Treatment of Paget's Disease:

The efficacy of ACTONEL was demonstrated in 2 clinical studies involving 120 men and 65 women. In a double-blind, active-controlled study of patients with moderate-to-severe Paget's disease (serum alkaline phosphatase levels of at least 2 times the upper limit of normal), patients were treated with ACTONEL 30 mg daily for 2 months or Didronel[®] (etidronate disodium) 400 mg/day for 6 months. At Day 180, 77% (43/56) of ACTONEL-treated patients achieved normalization of serum alkaline phosphatase levels, compared to 10.5% (6/57) of patients treated with Didronel ($p<0.001$). At Day 540, 16 months after discontinuation of therapy, 53% (17/32) of ACTONEL-treated patients and 14% (4/29) of Didronel-treated patients with available data remained in biochemical remission.

During the first 180 days of the active-controlled study, 85% (51/60) of ACTONEL-treated patients demonstrated a $\geq$75% reduction from baseline in serum alkaline phosphatase excess (difference between measured level and midpoint of the normal range) with 2 months of treatment compared to 20% (12/60) in the Didronel-treated group with 6 months of treatment ($p<0.001$). Changes in serum alkaline phosphatase excess over time (shown in Figure 6) were significant following only 30 days of treatment, with a 36% reduction in serum alkaline phosphatase excess at that time compared to only a 6% reduction seen with Didronel treatment at the same time point ($p<0.01$).



**Figure 6**
**Mean Percent Change from Baseline in**
**Serum Alkaline Phosphatase Excess by Visit**

Response to ACTONEL therapy was similar in patients with mild to very severe Paget's disease. Table 4 shows the mean percent reduction from baseline at Day 180 in excess serum alkaline phosphatase in patients with mild, moderate, or severe disease.

| Table 4 |||||||
|---|---|---|---|---|---|---|
| **Mean Percent Reduction from Baseline at Day 180 in** |||||||
| **Total Serum Alkaline Phosphatase Excess by Disease Severity** |||||||
| | ACTONEL 30 mg ||| DIDRONEL 400 mg |||
| Subgroup: Baseline Disease Severity (AP) | n | Baseline Serum AP (U/L)* | Mean % Reduction | n | Baseline Serum AP (U/L)* | Mean % Reduction |
| >2, <3x ULN | 32 | 271.6 ± 5.3 | -88.1 | 22 | 277.9 ± 7.45 | -44.6 |
| ≥3, <7x ULN | 14 | 475.3 ± 28.8 | -87.5 | 25 | 480.5 ± 26.44 | -35.0 |
| ≥7x ULN | 8 | 1336.5 ± 134.19 | -81.8 | 6 | 1331.5 ± 167.58 | -47.2 |
| *Values shown are mean ± SEM; ULN = upper limit of normal. |||||||

Response to ACTONEL therapy was similar between patients who had previously received anti-pagetic therapy and those who had not.  In the active-controlled study, 4 patients previously non-responsive to 1 or more courses of anti-pagetic therapy (calcitonin, Didronel) responded to treatment with ACTONEL 30 mg daily (defined by at least a 30% change from baseline).  Each of these patients achieved at least 90% reduction from baseline in serum alkaline phosphatase excess, with 3 patients achieving normalization of serum alkaline phosphatase levels.

Histomorphometry of the bone was studied in 14 patients with bone biopsies:  9 patients had biopsies from pagetic bone lesions and 5 patients from non-pagetic bone.  Bone biopsy results in non-pagetic bone did not reveal osteomalacia, impairment of bone remodeling, or induction of a significant decline in bone turnover in patients treated with ACTONEL.

## ANIMAL PHARMACOLOGY AND/OR TOXICOLOGY

Risedronate demonstrated potent anti-osteoclast, antiresorptive activity in ovariectomized rats and minipigs. Bone mass and biomechanical strength were increased dose-dependently at oral doses up to 4 and 25 times the human recommended oral dose of 5 mg based on surface area, (mg/m$^2$) for rats and minipigs, respectively. Risedronate treatment maintained the positive correlation between BMD and bone strength and did not have a negative effect on bone structure or mineralization. In intact dogs, risedronate induced positive bone balance at the level of the bone remodeling unit at oral doses ranging from 0.35 to 1.4 times the human 5-mg dose based on surface area (mg/m$^2$).

In dogs treated with an oral dose of 1 mg/kg/day (approximately 5 times the human 5-mg dose based on surface area, mg/m$^2$), risedronate caused a delay in fracture healing of the radius. The observed delay in fracture healing is similar to other bisphosphonates. This effect did not occur at a dose of 0.1 mg/kg/day (approximately 0.5 times the human 5-mg dose based on surface area, mg/m$^2$).

The Schenk rat assay, based on histologic examination of the epiphyses of growing rats after drug treatment, demonstrated that risedronate did not interfere with bone mineralization even at the highest dose tested (5 mg/kg/day, subcutaneously), which was approximately 3500 times the lowest antiresorptive dose (1.5 mcg/kg/day in this model) and approximately 8 times the human 5-mg dose based on surface area (mg/m$^2$). This indicates that ACTONEL administered at the therapeutic dose is unlikely to induce osteomalacia.

## INDICATIONS AND USAGE
### Postmenopausal Osteoporosis:

ACTONEL is indicated for the treatment and prevention of osteoporosis in postmenopausal women.

Treatment of Osteoporosis:
In postmenopausal women with osteoporosis, ACTONEL increases BMD and reduces the incidence of vertebral fractures and a composite endpoint of nonvertebral osteoporosis-related fractures (see **CLINICAL STUDIES**). Osteoporosis may be confirmed by the presence or history of osteoporotic fracture, or by the finding of low bone mass (for example, at least 2 SD below the premenopausal mean).

Prevention of Osteoporosis:
ACTONEL may be considered in postmenopausal women who are at risk of developing osteoporosis and for whom the desired clinical outcome is to maintain bone mass and to reduce the risk of fracture.

Factors such as family history of osteoporosis, previous fracture, smoking, BMD (at least 1 SD below the premenopausal mean), high bone turnover, thin body frame, Caucasian or Asian race, and early menopause are associated with an increased risk of developing osteoporosis and fractures. The presence of these risk factors may be important when considering the use of ACTONEL for prevention of osteoporosis.

**Glucocorticoid-Induced Osteoporosis:**

ACTONEL is indicated for the prevention and treatment of glucocorticoid-induced osteoporosis in men and women who are either initiating or continuing systemic glucocorticoid treatment (daily dosage equivalent to 7.5 mg or greater of prednisone) for chronic diseases. Patients treated with glucocorticoids should receive adequate amounts of calcium and vitamin D.

**Paget's Disease:**

ACTONEL is indicated for treatment of Paget's disease of bone (osteitis deformans). Treatment is indicated in patients with Paget's disease of bone (1) who have a level of serum alkaline phosphatase at least 2 times the upper limit of normal, or (2) who are symptomatic, or (3) who are at risk for future complications from their disease, to induce remission (normalization of serum alkaline phosphatase).

**CONTRAINDICATIONS**
- Hypocalcemia (see **PRECAUTIONS, General**)
- Known hypersensitivity to any component of this product
- Inability to stand or sit upright for at least 30 minutes

**WARNINGS**

Bisphosphonates may cause upper gastrointestinal disorders such as dysphagia, esophagitis, and esophageal or gastric ulcer (see **PRECAUTIONS**).

**PRECAUTIONS**
**General:**

Hypocalcemia and other disturbances of bone and mineral metabolism should be effectively treated before starting ACTONEL therapy. Adequate intake of calcium and vitamin D is important in all patients, especially in patients with Paget's disease in whom bone turnover is significantly elevated. ACTONEL is not recommended for use in patients with severe renal impairment (creatinine clearance <30 mL/min).

Bisphosphonates have been associated with gastrointestinal disorders such as dysphagia, esophagitis, and esophageal or gastric ulcers. This association has been reported for bisphosphonates in postmarketing experience, but has not been found in most pre-approval clinical trials, including those conducted with ACTONEL. Patients should be advised that taking the medication according to the instructions is important to minimize the risk of these events. They should take ACTONEL with sufficient plain water (6 to 8 oz) to facilitate delivery to the stomach, and should not lie down for 30 minutes after taking the drug.

Osteonecrosis, primarily in the jaw, has been reported in patients treated with bisphosphonates. Most cases have been in cancer patients undergoing dental procedures such as tooth extraction, but some have occurred in patients with postmenopausal osteoporosis or other diagnoses. Most reported cases have been in patients treated with bisphosphonates intravenously but some have been in patients treated orally.

For patients requiring dental procedures, there are no data available to suggest whether discontinuation of bisphosphonate treatment, prior to the procedure, reduces the risk of

16

osteonecrosis of the jaw.  Clinical judgment should guide the management plan of each patient based on individual benefit/risk assessment.

## Musculoskeletal Pain:

In postmarketing experience, there have been infrequent reports of severe and occasionally incapacitating bone, joint, and/or muscle pain in patients taking bisphosphonates (see ADVERSE REACTIONS).  The time to onset of symptoms varied from one day to several months after starting the drug.  Most patients had relief of symptoms after stopping medication.  A subset had recurrence of symptoms when rechallenged with the same drug or another bisphosphonate.

### Glucocorticoid-Induced Osteoporosis:

The risk versus benefit of ACTONEL for the prevention and treatment of glucocorticoid-induced osteoporosis at daily doses of glucocorticoids <7.5 mg of prednisone or equivalent has not been established.  Before initiating treatment, the hormonal status of both men and women should be ascertained and appropriate replacement considered.

The efficacy of ACTONEL for this indication has been established in studies of 1-year duration. The efficacy of ACTONEL beyond 1 year has not been studied.

### Information for Patients:

The patient should be informed to pay particular attention to the dosing instructions as clinical benefits may be compromised by failure to take the drug according to instructions.  Specifically, ACTONEL should be taken at least 30 minutes before the first food or drink of the day other than water.

To facilitate delivery to the stomach, and thus reduce the potential for esophageal irritation, patients should take ACTONEL while in an upright position (sitting or standing) with a full glass of plain water (6 to 8 oz).  Patients should not lie down for 30 minutes after taking the medication (see **PRECAUTIONS, General**).  Patients should not chew or suck on the tablet because of a potential for oropharyngeal irritation.

Patients should be instructed that if they develop symptoms of esophageal disease (such as difficulty or pain upon swallowing, retrosternal pain or severe persistent or worsening heartburn) they should consult their physician before continuing ACTONEL.

Patients should be instructed that if they miss a dose of ACTONEL 35-mg once a week, they should take 1 tablet on the morning after they remember and return to taking 1 tablet once a week, as originally scheduled on their chosen day.  Patients should not take 2 tablets on the same day.

Patients should receive supplemental calcium and vitamin D if dietary intake is inadequate (see **PRECAUTIONS, General**).  Calcium supplements or calcium-, aluminum-, and magnesium-containing medications may interfere with the absorption of ACTONEL and should be taken at a different time of the day, as with food.

Weight-bearing exercise should be considered along with the modification of certain behavioral factors, such as excessive cigarette smoking, and/or alcohol consumption, if these factors exist.

Physicians should instruct their patients to read the Patient Information before starting therapy with ACTONEL 5 mg or 35 mg and to re-read it each time the prescription is renewed.

Patients should be reminded to give all of their health care providers an accurate medication history. Instruct patients to tell all of their health care providers that they are taking ACTONEL. Patients should be instructed that any time they have a medical problem they think may be from ACTONEL, they should talk to their doctor.

**Drug Interactions:**
No specific drug-drug interaction studies were performed. Risedronate is not metabolized and does not induce or inhibit hepatic microsomal drug-metabolizing enzymes (Cytochrome P450).

Calcium Supplements/Antacids:
Co-administration of ACTONEL and calcium, antacids, or oral medications containing divalent cations will interfere with the absorption of ACTONEL.

Hormone Replacement Therapy:
One study of about 500 early postmenopausal women has been conducted to date in which treatment with ACTONEL (5 mg/day) plus estrogen replacement therapy was compared to estrogen replacement therapy alone. Exposure to study drugs was approximately 12 to 18 months and the primary endpoint was change in BMD. If considered appropriate, ACTONEL may be used concomitantly with hormone replacement therapy.

Aspirin/Nonsteroidal Anti-Inflammatory Drugs (NSAIDs):
Of over 5700 patients enrolled in the ACTONEL Phase 3 osteoporosis studies, aspirin use was reported by 31% of patients, 24% of whom were regular users (3 or more days per week). Forty-eight percent of patients reported NSAID use, 21% of whom were regular users. Among regular aspirin or NSAID users, the incidence of upper gastrointestinal adverse experiences in ACTONEL-treated patients (24.5%) was similar to that in placebo-treated patients (24.8%).

$H_2$ Blockers and Proton Pump Inhibitors (PPIs):
Of over 5700 patients enrolled in the ACTONEL Phase 3 osteoporosis studies, 21% used $H_2$ blockers and/or PPIs. Among these patients, the incidence of upper gastrointestinal adverse experiences in the ACTONEL-treated patients was similar to that in placebo-treated patients.

**Drug/Laboratory Test Interactions:**
Bisphosphonates are known to interfere with the use of bone-imaging agents. Specific studies with ACTONEL have not been performed.

**Carcinogenesis, Mutagenesis, Impairment of Fertility:**
Carcinogenesis:
In a 104-week carcinogenicity study, rats were administered daily oral doses up to 24 mg/kg/day (approximately 7.7 times the maximum recommended human daily dose of 30 mg based on

18

surface area, mg/m$^2$). There were no significant drug-induced tumor findings in male or female rats. The high dose male group of 24 mg/kg/day was terminated early in the study (Week 93) due to excessive toxicity, and data from this group were not included in the statistical evaluation of the study results. In an 80-week carcinogenicity study, mice were administered daily oral doses up to 32 mg/kg/day (approximately 6.4 times the 30-mg/day human dose based on surface area, mg/m$^2$). There were no significant drug-induced tumor findings in male or female mice.

## Mutagenesis:
Risedronate did not exhibit genetic toxicity in the following assays: *In vitro* bacterial mutagenesis in *Salmonella* and *E. coli* (Ames assay), mammalian cell mutagenesis in CHO/HGPRT assay, unscheduled DNA synthesis in rat hepatocytes and an assessment of chromosomal aberrations *in vivo* in rat bone marrow. Risedronate was positive in a chromosomal aberration assay in CHO cells at highly cytotoxic concentrations (>675 mcg/mL, survival of 6% to 7%). When the assay was repeated at doses exhibiting appropriate cell survival (29%), there was no evidence of chromosomal damage.

## Impairment of Fertility:
In female rats, ovulation was inhibited at an oral dose of 16 mg/kg/day (approximately 5.2 times the 30-mg/day human dose based on surface area, mg/m$^2$). Decreased implantation was noted in female rats treated with doses $\geq$7 mg/kg/day (approximately 2.3 times the 30-mg/day human dose based on surface area, mg/m$^2$). In male rats, testicular and epididymal atrophy and inflammation were noted at 40 mg/kg/day (approximately 13 times the 30-mg/day human dose based on surface area, mg/m$^2$). Testicular atrophy was also noted in male rats after 13 weeks of treatment at oral doses of 16 mg/kg/day (approximately 5.2 times the 30-mg/day human dose based on surface area, mg/m$^2$). There was moderate-to-severe spermatid maturation block after 13 weeks in male dogs at an oral dose of 8 mg/kg/day (approximately 8 times the 30-mg/day human dose based on surface area, mg/m$^2$). These findings tended to increase in severity with increased dose and exposure time.

## Pregnancy:
Pregnancy Category C: Survival of neonates was decreased in rats treated during gestation with oral doses $\geq$16 mg/kg/day (approximately 5.2 times the 30-mg/day human dose based on surface area, mg/m$^2$). Body weight was decreased in neonates from dams treated with 80 mg/kg (approximately 26 times the 30-mg/day human dose based on surface area, mg/m$^2$). In rats treated during gestation, the number of fetuses exhibiting incomplete ossification of sternebrae or skull was statistically significantly increased at 7.1 mg/kg/day (approximately 2.3 times the 30-mg/day human dose based on surface area, mg/m$^2$). Both incomplete ossification and unossified sternebrae were increased in rats treated with oral doses $\geq$16 mg/kg/day (approximately 5.2 times the 30-mg/day human dose based on surface area, mg/m$^2$). A low incidence of cleft palate was observed in fetuses from female rats treated with oral doses $\geq$3.2 mg/kg/day (approximately 1 time the 30-mg/day human dose based on surface area, mg/m$^2$). The relevance of this finding to human use of ACTONEL is unclear. No significant fetal ossification effects were seen in rabbits treated with oral doses up to 10 mg/kg/day during gestation (approximately 6.7 times the 30-mg/day human dose based on surface area, mg/m$^2$). However, in rabbits treated with 10 mg/kg/day, 1 of 14 litters were aborted and 1 of 14 litters were delivered prematurely.

Similar to other bisphosphonates, treatment during mating and gestation with doses as low as 3.2 mg/kg/day (approximately 1 time the 30-mg/day human dose based on surface area, mg/m$^2$) has resulted in periparturient hypocalcemia and mortality in pregnant rats allowed to deliver.

Bisphosphonates are incorporated into the bone matrix, from which they are gradually released over periods of weeks to years. The amount of bisphosphonate incorporation into adult bone, and hence, the amount available for release back into the systemic circulation, is directly related to the dose and duration of bisphosphonate use. There are no data on fetal risk in humans. However, there is a theoretical risk of fetal harm, predominantly skeletal, if a woman becomes pregnant after completing a course of bisphosphonate therapy. The impact of variables such as time between cessation of bisphosphonate therapy to conception, the particular bisphosphonate used, and the route of administration (intravenous versus oral) on this risk has not been studied.

There are no adequate and well-controlled studies of ACTONEL in pregnant women. ACTONEL should be used during pregnancy only if the potential benefit justifies the potential risk to the mother and fetus.

**Nursing Women:**
Risedronate was detected in feeding pups exposed to lactating rats for a 24-hour period post-dosing, indicating a small degree of lacteal transfer. It is not known whether risedronate is excreted in human milk. Because many drugs are excreted in human milk and because of the potential for serious adverse reactions in nursing infants from bisphosphonates, a decision should be made whether to discontinue nursing or to discontinue the drug, taking into account the importance of the drug to the mother.

**Pediatric Use:**
Safety and effectiveness in pediatric patients have not been established.

**Geriatric Use:**
Of the patients receiving ACTONEL in postmenopausal osteoporosis studies (see **CLINICAL STUDIES**), 47% were between 65 and 75 years of age, and 17% were over 75. The corresponding proportions were 26% and 11% in glucocorticoid-induced osteoporosis trials, and 40% and 26% in Paget's disease trials. No overall differences in efficacy or safety were observed between these patients and younger patients but greater sensitivity of some older individuals cannot be ruled out.

**Use in Men:**
Safety and effectiveness have been demonstrated in clinical studies in men receiving ACTONEL both for Paget's disease and for treatment and prevention of glucocorticoid-induced osteoporosis. However, the safety and effectiveness in men for osteoporosis due to other causes have not been established.

**ADVERSE REACTIONS**
**Osteoporosis:**
ACTONEL has been studied in over 5700 patients enrolled in the Phase 3 glucocorticoid-induced osteoporosis clinical trials and in postmenopausal osteoporosis trials of up to 3-years

duration.  The overall adverse event profile of ACTONEL 5 mg in these studies was similar to that of placebo.  Most adverse events were either mild or moderate and did not lead to discontinuation from the study.  The incidence of serious adverse events in the placebo group was 24.9% and in the ACTONEL 5-mg group was 26.3%.  The percentage of patients who withdrew from the study due to adverse events was 14.4% and 13.5% for the placebo and ACTONEL 5-mg groups, respectively.  Table 5 lists adverse events from the Phase 3 osteoporosis trials reported in ≥2% of patients and in more ACTONEL-treated patients than placebo-treated patients.  Adverse events are shown without attribution of causality.

| Table 5 Adverse Events Occurring at a Frequency ≥2% and in More ACTONEL-Treated Patients than Placebo-Treated Patients Combined Phase 3 Osteoporosis Trials | | |
|---|---|---|
| **Body System** | Placebo % (N = 1914) | ACTONEL 5 mg % (N = 1916) |
| Body as a Whole | | |
|   Infection | 29.7 | 29.9 |
|   Back Pain | 23.6 | 26.1 |
|   Pain | 13.1 | 13.6 |
|   Abdominal Pain | 9.4 | 11.6 |
|   Neck Pain | 4.5 | 5.3 |
|   Asthenia | 4.3 | 5.1 |
|   Chest Pain | 4.9 | 5.0 |
|   Neoplasm | 3.0 | 3.3 |
|   Hernia | 2.5 | 2.9 |
| Cardiovascular | | |
|   Hypertension | 9.0 | 10.0 |
|   Cardiovascular Disorder | 1.7 | 2.5 |
|   Angina Pectoris | 2.4 | 2.5 |
| Digestive | | |
|   Nausea | 10.7 | 10.9 |
|   Diarrhea | 9.6 | 10.6 |
|   Flatulence | 4.2 | 4.6 |
|   Gastritis | 2.3 | 2.5 |
|   Gastrointestinal Disorder | 2.1 | 2.3 |
|   Rectal Disorder | 1.9 | 2.2 |
|   Tooth Disorder | 2.0 | 2.1 |
| Hemic and Lymphatic | | |
|   Ecchymosis | 4.0 | 4.3 |
|   Anemia | 1.9 | 2.4 |
| Musculoskeletal | | |
|   Arthralgia | 21.1 | 23.7 |
|   Joint Disorder | 5.4 | 6.8 |
|   Myalgia | 6.3 | 6.6 |
|   Bone Pain | 4.3 | 4.6 |
|   Bone Disorder | 3.2 | 4.0 |
|   Leg Cramps | 2.6 | 3.5 |
|   Bursitis | 2.9 | 3.0 |
|   Tendon Disorder | 2.5 | 3.0 |
| Nervous | | |

21

| Table 5 Adverse Events Occurring at a Frequency ≥2% and in More ACTONEL-Treated Patients than Placebo-Treated Patients Combined Phase 3 Osteoporosis Trials | | |
|---|---|---|
| Body System | Placebo % (N = 1914) | ACTONEL 5 mg % (N = 1916) |
| Depression | 6.2 | 6.8 |
| Dizziness | 5.4 | 6.4 |
| Insomnia | 4.5 | 4.7 |
| Anxiety | 3.0 | 4.3 |
| Neuralgia | 3.5 | 3.8 |
| Vertigo | 3.2 | 3.3 |
| Hypertonia | 2.1 | 2.2 |
| Paresthesia | 1.8 | 2.1 |
| Respiratory | | |
| Pharyngitis | 5.0 | 5.8 |
| Rhinitis | 5.0 | 5.7 |
| Dyspnea | 3.2 | 3.8 |
| Pneumonia | 2.6 | 3.1 |
| Skin and Appendages | | |
| Rash | 7.2 | 7.7 |
| Pruritus | 2.2 | 3.0 |
| Skin Carcinoma | 1.8 | 2.0 |
| Special Senses | | |
| Cataract | 5.4 | 5.9 |
| Conjunctivitis | 2.8 | 3.1 |
| Otitis Media | 2.4 | 2.5 |
| Urogenital | | |
| Urinary Tract Infection | 9.7 | 10.9 |
| Cystitis | 3.5 | 4.1 |

Duodenitis and glossitis have been reported uncommonly (0.1% to 1%). There have been rare reports (<0.1%) of abnormal liver function tests.

Laboratory Test Findings:
Asymptomatic and small decreases were observed in serum calcium and phosphorus levels. Overall, mean decreases of 0.8% in serum calcium and of 2.7% in phosphorus were observed at 6 months in patients receiving ACTONEL. Throughout the Phase 3 studies, serum calcium levels below 8 mg/dL were observed in 18 patients, 9 (0.5%) in each treatment arm (ACTONEL and placebo). Serum phosphorus levels below 2 mg/dL were observed in 14 patients, 11 (0.6%) treated with ACTONEL and 3 (0.2%) treated with placebo.

Endoscopic Findings:
ACTONEL clinical studies enrolled over 5700 patients, many with pre-existing gastrointestinal disease and concomitant use of NSAIDs or aspirin. Investigators were encouraged to perform endoscopies in any patients with moderate-to-severe gastrointestinal complaints, while maintaining the blind. These endoscopies were ultimately performed on equal numbers of patients between the treated and placebo groups [75 (14.5%) placebo; 75 (11.9%) ACTONEL]. Across treatment groups, the percentage of patients with normal esophageal, gastric, and duodenal mucosa on endoscopy was similar (20% placebo, 21% ACTONEL). The number of

patients who withdrew from the studies due to the event prompting endoscopy was similar across treatment groups. Positive findings on endoscopy were also generally comparable across treatment groups. There was a higher number of reports of mild duodenitis in the ACTONEL group, however there were more duodenal ulcers in the placebo group. Clinically important findings (perforations, ulcers, or bleeding) among this symptomatic population were similar between groups (51% placebo; 39% ACTONEL).

**Once-a-week Dosing:**
In a 1-year, double-blind, multicenter study comparing ACTONEL 5-mg daily and ACTONEL 35-mg once a week in postmenopausal women, the overall safety and tolerability profiles of the 2 oral dosing regimens were similar. Table 6 lists the adverse events in ≥2% of patients from this trial. Events are shown without attribution of causality.

**Table 6**
**Adverse Events Occurring in ≥ 2% of Patients of Either Treatment Group in the Daily vs. Weekly Osteoporosis Treatment Study in Postmenopausal Women**

| Body System | 5 mg Daily ACTONEL % (N = 480) | 35 mg Weekly ACTONEL % (N = 485) |
|---|---|---|
| Body as a Whole | | |
| Infection | 19.0 | 20.6 |
| Accidental Injury | 10.6 | 10.7 |
| Pain | 7.7 | 9.9 |
| Back Pain | 9.2 | 8.7 |
| Flu Syndrome | 7.1 | 8.5 |
| Abdominal Pain | 7.3 | 7.6 |
| Headache | 7.3 | 7.2 |
| Overdose | 6.9 | 6.8 |
| Asthenia | 3.5 | 5.4 |
| Chest Pain | 2.3 | 2.7 |
| Allergic Reaction | 1.9 | 2.5 |
| Neoplasm | 0.8 | 2.1 |
| Neck Pain | 2.7 | 1.2 |
| Cardiovascular System | | |
| Hypertension | 5.8 | 4.9 |
| Syncope | 0.6 | 2.1 |
| Vasodilatation | 2.3 | 1.4 |
| Digestive System | | |
| Constipation | 12.5 | 12.2 |
| Dyspepsia | 6.9 | 7.6 |
| Nausea | 8.5 | 6.2 |

| Table 6 | | |
|---|---|---|
| Adverse Events Occurring in ≥ 2% of Patients of Either Treatment Group in the Daily vs. Weekly Osteoporosis Treatment Study in Postmenopausal Women | | |
| Body System | 5 mg Daily ACTONEL % (N = 480) | 35 mg Weekly ACTONEL % (N = 485) |
| Diarrhea | 6.3 | 4.9 |
| Gastroenteritis | 3.8 | 3.5 |
| Flatulence | 3.3 | 3.1 |
| Colitis | 0.8 | 2.5 |
| Gastrointestinal Disorder | 1.9 | 2.5 |
| Vomiting | 1.9 | 2.5 |
| Dry Mouth | 2.5 | 1.4 |
| Metabolic and Nutritional Disorders | | |
| Peripheral Edema | 4.2 | 1.6 |
| Musculoskeletal System | | |
| Arthralgia | 11.5 | 14.2 |
| Traumatic Bone Fracture | 5.0 | 6.4 |
| Myalgia | 4.6 | 6.2 |
| Arthritis | 4.8 | 4.1 |
| Bursitis | 1.3 | 2.5 |
| Bone Pain | 2.9 | 1.4 |
| Nervous System | | |
| Dizziness | 5.8 | 4.9 |
| Anxiety | 0.6 | 2.7 |
| Depression | 2.3 | 2.3 |
| Vertigo | 2.1 | 1.6 |
| Respiratory System | | |
| Bronchitis | 2.3 | 4.9 |
| Sinusitis | 4.6 | 4.5 |
| Pharyngitis | 4.6 | 2.9 |
| Cough Increased | 3.1 | 2.5 |
| Pneumonia | 0.8 | 2.5 |
| Rhinitis | 2.3 | 2.1 |
| Skin and Appendages | | |
| Rash | 3.1 | 4.1 |
| Pruritus | 1.9 | 2.3 |
| Special Senses | | |
| Cataract | 2.9 | 1.9 |
| Urogenital System | | |
| Urinary Tract Infection | 2.9 | 5.2 |

24

**Osteoporosis Prevention:**

There were no deaths in a 1-year, double-blind, placebo-controlled study of ACTONEL 35 mg once a week for prevention of bone loss in 278 postmenopausal women without osteoporosis. More treated subjects on risedronate experienced arthralgia (risedronate 13.9%; placebo 7.8%), myalgia (risedronate 5.1%; placebo 2.1%), and nausea (risedronate 7.3%; placebo 4.3%) than subjects on placebo.

**Paget's Disease:**

ACTONEL has been studied in 392 patients with Paget's disease of bone.  As in trials of ACTONEL for other indications, the adverse experiences reported in the Paget's disease trials have generally been mild or moderate, have not required discontinuation of treatment, and have not appeared to be related to patient age, gender, or race.

In a double-blind, active-controlled study, the adverse event profile was similar for ACTONEL and Didronel:  6.6% (4/61) of patients treated with ACTONEL 30 mg/day for 2 months discontinued treatment due to adverse events, compared to 8.2% (5/61) of patients treated with Didronel 400 mg/day for 6 months.

| Table 7 Adverse Events Reported in ≥2% of ACTONEL-Treated Patients* in Phase 3 Paget's Disease Trials | | |
|---|---|---|
| Body System | 30 mg/day x 2 months ACTONEL % (n = 61) | 400 mg/day x 6 months DIDRONEL % (n = 61) |
| Body as a Whole | | |
| Flu Syndrome | 9.8 | 1.6 |
| Chest Pain | 6.6 | 3.3 |
| Asthenia | 4.9 | 0.0 |
| Neoplasm | 3.3 | 1.6 |
| Gastrointestinal | | |
| Diarrhea | 19.7 | 14.8 |
| Abdominal Pain | 11.5 | 8.2 |
| Nausea | 9.8 | 9.8 |
| Constipation | 6.6 | 8.2 |
| Belching | 3.3 | 1.6 |
| Colitis | 3.3 | 3.3 |
| Metabolic and Nutritional Disorders | | |
| Peripheral Edema | 8.2 | 6.6 |
| Musculoskeletal | | |
| Arthralgia | 32.8 | 29.5 |
| Bone Pain | 4.9 | 4.9 |
| Leg Cramps | 3.3 | 3.3 |
| Myasthenia | 3.3 | 0.0 |
| Nervous | | |
| Headache | 18.0 | 16.4 |
| Dizziness | 6.6 | 4.9 |
| Respiratory | | |
| Bronchitis | 3.3 | 4.9 |
| Sinusitis | 4.9 | 1.6 |

25

| Skin and Appendages | | |
|---|---|---|
| Rash | 11.5 | 8.2 |
| Special Senses | | |
| Amblyopia | 3.3 | 3.3 |
| Tinnitus | 3.3 | 3.3 |
| Dry Eye | 3.3 | 0.0 |
| *Considered to be possibly or probably causally related in at least one patient. | | |

Three patients who received ACTONEL 30 mg/day experienced acute iritis in 1 supportive study. All 3 patients recovered from their events; however, in 1 of these patients, the event recurred during ACTONEL treatment and again during treatment with pamidronate. All patients were effectively treated with topical steroids.

**Post-marketing Experience:**
Very rare hypersensitivity and skin reactions have been reported, including angioedema, generalized rash and bullous skin reactions, some severe.
Musculoskeletal: bone, joint, or muscle pain, rarely described as severe or incapacitating (see PRECAUTIONS, Musculoskeletal Pain).

## OVERDOSAGE
Decreases in serum calcium and phosphorus following substantial overdose may be expected in some patients. Signs and symptoms of hypocalcemia may also occur in some of these patients. Milk or antacids containing calcium should be given to bind ACTONEL and reduce absorption of the drug.

In cases of substantial overdose, gastric lavage may be considered to remove unabsorbed drug. Standard procedures that are effective for treating hypocalcemia, including the administration of calcium intravenously, would be expected to restore physiologic amounts of ionized calcium and to relieve signs and symptoms of hypocalcemia.

Lethality after single oral doses was seen in female rats at 903 mg/kg and male rats at 1703 mg/kg. The minimum lethal dose in mice and rabbits was 4000 mg/kg and 1000 mg/kg. These values represent 320 to 620 times the 30-mg human dose based on surface area (mg/m$^2$).

## DOSAGE AND ADMINISTRATION
ACTONEL should be taken at least 30 minutes before the first food or drink of the day other than water.

To facilitate delivery to the stomach, ACTONEL should be swallowed while the patient is in an upright position and with a full glass of plain water (6 to 8 oz). Patients should not lie down for 30 minutes after taking the medication (see **PRECAUTIONS, General**).

Patients should receive supplemental calcium and vitamin D if dietary intake is inadequate (see **PRECAUTIONS, General**). Calcium supplements and calcium-, aluminum-, and magnesium-containing medications may interfere with the absorption of ACTONEL and should be taken at a different time of the day. ACTONEL is not recommended for use in patients with severe renal

impairment (creatinine clearance <30 mL/min).  No dosage adjustment is necessary in patients with a creatinine clearance ≥30 mL/min or in the elderly.

## Treatment and Prevention of Postmenopausal Osteoporosis (see INDICATIONS AND USAGE):
The recommended regimen is:
- one 35-mg tablet orally, taken once a week
        or
- one 5-mg tablet orally, taken daily

## Treatment and Prevention of Glucocorticoid-Induced Osteoporosis (see INDICATIONS AND USAGE):
The recommended regimen is:
- one 5-mg tablet orally, taken daily

## Paget's Disease (see INDICATIONS AND USAGE):
The recommended treatment regimen is 30 mg orally once daily for 2 months.  Retreatment may be considered (following post-treatment observation of at least 2 months) if relapse occurs, or if treatment fails to normalize serum alkaline phosphatase.  For retreatment, the dose and duration of therapy are the same as for initial treatment.  No data are available on more than 1 course of retreatment.

## HOW SUPPLIED
ACTONEL is available as follows:
5-mg film-coated, oval, yellow tablets with RSN on 1 face and 5 mg on the other.
NDC 0149-0471-01    bottle of 30

5-mg film-coated, oval, yellow tablets with RSN on 1 face and 5 mg on the other.
NDC 0149-0471-03    bottle of 2000

30-mg film-coated, oval, white tablets with RSN on 1 face and 30 mg on the other.
NDC 0149-0470-01    bottle of 30

35-mg film-coated, oval, orange tablets with RSN on 1 face and 35 mg on the other.
NDC 0149-0472-01    dose pack of 4

Store at controlled room temperature 20°-25°C (68°-77°F) [See USP].

Sold under U.S. patent No. 5,583,122; 6,096,342 and 6,165,513

Mfg. by: Procter & Gamble Pharmaceuticals, Inc.
Cincinnati, OH 45202, or
OSG Norwich Pharmaceuticals, Inc.
North Norwich, NY  13814

Dist. by: Procter & Gamble Pharmaceuticals, Inc., TM Owner

Cincinnati, OH  45202

Marketed with:
Aventis Pharmaceuticals Inc.
Kansas City, MO  64137

JANUARY 2006

# Exhibit H

NDA 20-835

MAR 2 7 1998

Procter and Gamble Pharmaceuticals
Attention: Dr. Hina Wu
Senior Scientist, Regulatory Affairs
11450 Grooms Road
Cincinnati, OH 45242

APPEARS THIS WAY
ON ORIGINAL

Dear Dr. Wu:

Please refer to your new drug application dated March 31, 1997, received April 1, 1997,
submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act for Actonel
(risedronate sodium) 30 mg Tablets.

We acknowledge receipt of your submissions dated April 16, July 25 and 31, September 26,
October 14 and 16, and December 5, 10, 12, 18, and 19, 1997; and January 6, 7, and 16,
February 10, 13, 18, 20, 23, and 24, and March 2, 4, and 12, 1998. The User Fee goal date
for this application is April 1, 1998.

This new drug application provides for the treatment of Paget's disease of bone.

We have completed the review of this application, including the submitted draft labeling, and
have concluded that adequate information has been presented to demonstrate that the drug
product is safe and effective for use as recommended in the draft labeling in the submission
dated March 12, 1998. Accordingly, the application is approved effective on the date of this
letter.

The final printed labeling (FPL) must be identical to the draft patient package insert submitted
on March 12, 1998, and draft packaging labeling dated March 10, 1998. Marketing the
product with FPL that is not identical to this draft labeling may render the product misbranded
and an unapproved new drug.

Please submit 20 copies of the FPL as soon as it is available, in no case more than 30 days
after it is printed. Please individually mount ten of the copies on heavy-weight paper or
similar material. For administrative purposes, this submission should be designated "FINAL
PRINTED LABELING for approved NDA 20-835." Approval of this submission by FDA is
not required before the labeling is used.

Should additional information relating to the safety and effectiveness of the drug become
available, revision of that labeling may be required.

NDA 20-835
Page 2

In addition, please submit three copies of the introductory promotional material that you propose to use for this product. All proposed materials should be submitted in draft or mock-up form, not final print. Please submit one copy to the Division of Metabolic and Endocrine Drug Products and two copies of both the promotional material and the package insert directly to:

APPEARS THIS WAY
ON ORIGINAL

> Food and Drug Administration
> Division of Drug Marketing, Advertising and Communications, HFD-40
> 5600 Fishers Lane
> Rockville, Maryland   20857

Validation of the regulatory methods has not been completed. At the present time, it is the policy of the Center not to withhold approval because the methods are being validated. Nevertheless, we expect your continued cooperation to resolve any problems that may be identified.

Please submit one market package of the drug product when it is available.

We remind you that you must comply with the requirements for an approved NDA set forth under 21 CFR 314.80 and 314.81.

If you have any questions, please contact Randy Hedin, R.Ph., Senior Regulatory Management Officer, at (301)827-6392.

Sincerely yours,

APPEARS THIS WAY
ON ORIGINAL

James Bilstad, M.D.
Director
Office of Drug Evaluation II
Center for Drug Evaluation and Research

APPEARS THIS WAY
ON ORIGINAL

cc:
  Original NDA 20-835
  HFD-510/Div. files
  HFD-510/CSO/R.Hedin
  HFD-510/GTroendle/GKuijpers/DColeman/RSteigerwalt/CJones/HAhn

NDA 20-835
Page 3

/SMarkofsky/DWu/JMele
HFD-002/ORM (with labeling)
HFD-102/Office Director
HFD-101/L.Carter
HFD-820/ONDC Division Director
DISTRICT OFFICE
HF-2/Medwatch  (with labeling)
HFD-92/DDM-DIAB (with labeling)
HFD-40/DDMAC (with labeling)
HFD-613/OGD (with labeling)
HFD-715/JMele
HFD 870/CJones/HAhn
HFD-735/DPE (with labeling) - for all NDAs and supplements for adverse reaction changes.
HFI-20/Press Office (with labeling)

APPEARS THIS WAY
ON ORIGINAL

Drafted by: RH/February 26, 1998/N20835AP.LT1
Initialed by: Gtroendle3.3/DColeman3.2/GKuijpers/Rsteigerwalt/SMarkofsky
/DWu/3.6/RShore/CJones/3.4/HAhn3.5/LPian/EGalliers3.9/SSobel3.15.98
final:

APPEARS THIS WAY
ON ORIGINAL

FINAL PRINTED LABELING HAS NOT BEEN SUBMITTED TO THE FDA.

DRAFT LABELING IS NO LONGER BEING SUPPLIED SO AS TO ENSURE
ONLY CORRECT AND CURRENT INFORMATION IS DISSEMINATED TO THE
PUBLIC.

# Exhibit
# I

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

|  |  |  |
|---|---|---|
| IN RE: BISPHOSPHONATE DRUGS<br>PRODUCTS LIABILITY LITIGATION | )<br>)<br>)<br>)<br>) | MDL Docket No. 1760 |

**DECLARATION OF KATHARINE R. LATIMER IN SUPPORT OF**
**NOVARTIS PHARMACEUTICALS CORPORATION'S**
**MEMORANDUM OF LAW**
**IN OPPOSITION TO MOTION FOR MULTIDISTRICT TRANSFER**

I, Katharine R. Latimer, declare under penalty of perjury that the following is true and correct.

1.      I, Katharine R. Latimer, am a partner at the law firm of Spriggs & Hollingsworth, located at 1350 I St., NW; Washington, D.C. 20005, and have been an employee at Spriggs & Hollingsworth since 1987.  I am a citizen of the United States and am over the age of eighteen, and I have personal knowledge of the facts set forth in this Affidavit.  I represent Novartis Pharmaceuticals Corporation ("NPC") in this matter.

2.      I make this Affidavit in support of NPC's Memorandum of Law in Opposition to Plaintiff's Motion for Multi-District Litigation.

3.      Written discovery, document review and medical records collection is underway in the following putative class actions filed in the Middle District of Tennessee: *Anderson, et. al v. Novartis Pharmaceuticals Corporation*, No. 3:05-CV-00718; *Becker, et. al v. Novartis Pharmaceuticals Corporation*, No. 3:05-CV-00719; and *Wood, et. al v. Novartis Pharmaceuticals Corporation*, No. 3:05-CV-00716.  The parties exchanged Initial Disclosures on November 30, 2005.  NPC served its first sets of Interrogatories and Requests for the Production of Documents on Plaintiff on November 22, 2005 and received plaintiff's responses on January 23, 2006.  Plaintiffs served their first set of Interrogatories on November 18, 2005 and their first set of Requests for the Production of Documents on NPC on September 26, 2005.  Requests for medical records have been

sent to various treating physicians based on the information garnered from this discovery. NPC has begun receiving copies of plaintiffs' medical records in response to these requests. Plaintiffs' counsel have also begun their review of documents made available by NPC in response to discovery requests. The court has heard motions involving factual issues. On November 10, 2005, the Court entered scheduling orders setting trial dates in these cases. Trial is currently set in *Anderson* for December 11, 2007, in *Becker* for December 18, 2007 and in *Wood* for November 27, 2007.

4.    Written discovery, document review and medical records collection is underway in the case captioned *Ingram v. Novartis Pharmaceuticals Corporation,* CIV-05-913-L, which was filed in the Western District of Oklahoma. NPC filed its Initial Disclosures on November 28, 2005 and received plaintiff's Initial Disclosures on November 29, 2005. Plaintiff identified twenty individual treating physicians in these disclosures. NPC served its first sets of Interrogatories and Requests for the Production of Documents on Plaintiff on December 2, 2005 and received plaintiff's responses on February 3, 2006. Plaintiff served her first set of Requests for the Production of Documents on NPC on January 19, 2006. Requests for medical records have been sent to various treating physicians based on the information garnered from this discovery. NPC has begun receiving copies of plaintiff's medical records in response to these requests. On December 2, 2005, the Court entered a scheduling order setting a trial date in this case for June 2007.

5.    Robert G. Germany of Pittman, Germany, Roberts & Welsh, L.L.P. and other attorneys are handling as a group the four putative class actions in the Middle District of Tennessee. Jeffrey Hightower of Windle Turley, P.C. is handling the Western District of Oklahoma case. All of the remaining actions identified by Movant are pending in the Southern and Eastern Districts of New York and are being handled by a group of attorneys headed by Movant's counsel, Mr. Beatie. NPC is aware of ten potential "tag-along" actions currently pending against it in federal court: *Brown v. Novartis Pharm. Corp.*, No. 06-cv-977 (S.D.N.Y.), *Herring v. Novartis Pharm. Corp.*, No. 06-cv-556 (E.D.N.Y.), *Hillcoat v. Novartis Pharm. Corp.*, No. 06-cv-554 (E.D.N.Y.), *Romero v. Novartis Pharm. Corp.*, No. 06-cv-550 (E.D.N.Y.), *Schirripa v. Novartis Pharm. Corp.*, No. 06-cv-978 (S.D.N.Y.), *Frick v. Novartis Pharm. Corp.*, No. 05-cv-05429 (D.N.J.) (motion to remand to state court currently pending), *Krause v. Novartis Pharm. Corp.*, No. 06-cv-0012 (N.D. Fla.), *Chiles, et ux. v. Novartis Pharm. Corp.*, No. 06-cv-00096 (M.D. Fla.), *Davids, et al. v. Novartis Pharm. Corp.*, No. 06-cv-00431 (E.D.N.Y.), and *Fussman, et al. v. Novartis Pharm. Corp.*, 06-cv-149 (M.D.N.C.). The *Brown, Herring, Hillcoat, Romero* and *Schirripa* cases are being handled by Movant's attorneys. The *Krause* suit is being handled by a group of plaintiffs' attorneys that includes Pittman Germany. The *Chiles, Davids* and *Fussman* suits are being handled by a group of attorneys that includes Bart Valad of The Valad Law Firm, P.C. of Fairfax, Virginia. The *Frick* suit is being handled by Gregory S. Spizer of Anapol, Schwartz, Weiss, Cohan, Feldman & Smalley, P.C. of Cherry Hill, New Jersey. In short, all plaintiffs in all potentially relevant federal cases are represented by *five* groups of plaintiffs' counsel. Mr. Germany's group now represents about thirty-six of the eighty-eight plaintiffs in five of the forty-six now-pending cases. Movant's counsel represents about forty-two of the eighty-eight plaintiffs in thirty-six of the forty-six now-pending cases. Mr. Germany

represents almost all of the plaintiffs who had suits pending prior to the filing of Movant's complaint.

6.   On December 10, 2004, an action captioned *Thorn et al. v. Novartis Pharmaceuticals Corporation,* No. 3:04-cv-586 (E.D. Tenn.) was filed in the Eastern District of Tennessee.  The court entertained multiple motions regarding discovery and factual issues during the ten months the case was proceeding before Senior Judge Leon Jordan. On October 24, 2005, over NPC's opposition, the Court granted plaintiffs' motion for voluntary dismissal.

Executed:      February 16, 2006

Katharine R. Latimer

3

# Exhibit
# J

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| LINDA INGRAM, Individually and as Surviving Spouse of RICK INGRAM Deceased, | § § § § | |
| Plaintiff, | § § | Case No. CIV-05-913 L |
| v. | § § | The Honorable Tim Leonard |
| NOVARTIS PHARMACEUTICAL CORPORATION, | § § § | |
| Defendant. | § § | |

## PLAINTIFF'S INITIAL DISCLOSURES

TO:   Novartis Pharmaceuticals Corporation, by and through its attorney of record, Robert
       E. Johnston, Spriggs & Hollingsworth, 1350 I Street, NW, Washington, DC 20005.

Plaintiff Linda Ingram makes these initial disclosures, as required by Federal Rule of

Civil Procedure 26(a)(1).

1.       The names, addresses, and telephone numbers of individuals likely to have

discoverable information that may be used to support their claims or defenses are:

See  Exhibit "A."

2.       The following is a list of documents, data compilations, and tangible things in the

PLAINTIFF'S INITIAL DISCLOSURES - Page 1

26a1disclosures.wpd

Plaintiff's possession, custody or control, described by category and location, that may be used to

support their claims:

> Medical bills and medical records.  See Exhibit B.
> Documents relied on or to be relied on by the experts retained and designated in this case.
> Documents from the FDA Adverse Reporting System.
> All documents, from whatever source, discussing or in any way relating to the drugs
> Aredia/Zometa.

3. Attached as Exhibit C is a computation of the Plaintiff's known past medical

damages. All non-privileged documents on which this computation is based are available for

inspection and copying.

> Plaintiff will supplement any additional economic damages.

4 All insurance agreements required to be disclosed.

None known at this time.

> Respectfully submitted,
>
> LAW OFFICES OF WINDLE TURLEY, P.C.
>
>
> Jeffrey W. Hightower, Jr.
> State Bar No. 00793951
> 6440 North Central Expressway
> 1000 Turley Law Center
> Dallas, Texas 75206
> Telephone No. 214/691-4025
> Telecopier No. 214/361-5802
>
> ATTORNEY FOR PLAINTIFF

PLAINTIFF'S INITIAL DISCLOSURES - Page 2

26a1disclosures.wpd

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Plaintiff's Initial Disclosures has been served upon all counsel listed below via certified mail, return receipt requested on this 21th day of November, 2005.

Robert E. Johnston
Spriggs & Hollingsworth
1350 I Street, NW
Washington, DC 20005

Jeffrey W. Hightower, Jr.

PLAINTIFF'S INITIAL DISCLOSURES - Page 3

26a1disclosures.wpd

# TAB A

# EXHIBIT "A"

## PLAINTIFF'S WITNESS LIST

In addition to those persons disclosed by Defendant, Plaintiff identifies individuals likely to have discoverable information relevant to disputed facts in this cause of action. Plaintiff reserves the right to disclose additional fact and expert witnesses as discovered or retained.

**Designated representatives, employees and or other staff of:**
**Advanced Dental**
6002 S. Western
Oklahoma City, OK 73139
405/562-2524
405/-631-4672 (fax)
Treated Rick Ingram's jaw condition.

**Richard H. Bottomley, M.D.**
Central Oklahoma Cancer Center
4401 South Western
Oklahoma City, OK 73143
405/631-0919
Partner of Dr. Hussein. Treated Rick Ingram on 02/01/01.

**Lisa A. Bradley**
Radiology Consultants, Inc.
1625 South Western
Oklahoma City, OK 73113
405/632-2323
Worked in the Radiology Department. Performed MRI on Rick Ingram 08/06/03

**Frank Dingwerth, M.D.**
14 Twin Springs Drive
Arlington, TX 75246
817/467-2133
Treated Rick Ingram's condition.

**Dr. Joseph W. Fay, MD**
Transplant Coordinator
Baylor University Medical Center
5th Floor Collins
3535 Worth Street
Dallas, TX 75246
214/370-1500
Treated Rick Ingram's condition.

**Designated representatives, employees and or other staff of:**
**Food & Drug Administration**
5600 Fishers Lane
Rockville, Maryland 20857
301/443-1726
Will testify to the design, manufacture, testing and marking of the drug Aredia/Zometa.

**Amy Ford, RN, BSN**
BMT Outpatient Clinic
5th Floor Collins
3535 Worth St.
Dallas, TX 75246
214/370-1500
214/370-1585 (fax)
RN working with Dr. Fay.

**Amy Gumman, BAMS, Dac, ND, Ph.D., MPH**
**Janice**
Harmony Healing Center, Inc.
3535 N.W. 58th St, Ste. 750
Oklahoma, OK 73112
405/947-4325
Rick Ingram went to this facility for acupuncture treatment.

**Leslie B. Hardy, Jr. D.D.S., MS**
Endodontic Associates
4500 W. Memorial Circle
Oklahoma City, OK 73142
405/748-6000
Dentist that treated Rick Ingram's condition.

**Jay A. Harlan, D.D.S.**
South Highland Medical Center
1016 SW 44th Street, Suite 400
Oklahoma City, OK 73109
405/632-9726
Dentists that treated Rick Ingram's condition.

**Tommy Hewitt, M.D.**
Diagnostic Laboratory of Oklahoma
1001 Cornell Parkway
Oklahoma City, OK 73108
800/891-2917
Laboratory Director.  Can testify about results from laboratory tests pertaining to Rick Ingram.

**Khader Hussein, MD**
Cancer Care Associates
4301 South Western Ave
Oklahoma City, OK 73109
450/637-0919
Treated Rick Ingram's condition.

**Linda Ingram**
P.O. Box 891101
Oklahoma City, OK 73189
405/895-6442
Will testify about the treatment, pain and suffering that Rick Ingam endured.

**David M. Lewis, DDS, MS**
College of Dentistry
The University of Oklahoma Health Science Center
P.O. Box 26901
Oklahoma City, OK 26901
405/271-4533
Pathologist

**Stephen Linn, MD.**
**William Robertson, M.D.**
American Radiology Consultants, Inc.
P.O. Box 678253
Dallas, Texas 75267
Radiologist that interpreted radiological tests done on Rick Ingram.

**Robert E. Marx, DDS**
Deering Medical Plaza
9380 SW 150 St., Ste 190
Miami, FL 33157
305/256-5270
Surgeon that treated Rick Ingram and will testify that Mr. Ingram had an obvious diagnosis of drug induced avascular necrosis of bone.

**Linda L. Miner, DMD**
145-D S.W. 74th
Oklahoma City, OK 73139
Dentist that treated Rick Ingram.

**Charles Morgan, M.D.**
1817 Ne 11th Street
Oklahoma City, OK 73160-7907
405/759-2095
Referred Rick Ingram to to Khader Hussein

**Designated representatives, employees and or other staff of:**
**Novartis Pharmaceuticals Corporation**
One Heath Plaza
East Hanover, NJ 07936-1080
862/-778-8300
Will testify to the design, manufacture, testing and marking of the drug Aredia/Zometa.

**Dr. John C. O'Brien, J., M.D**
Surgical Oncology
1004 N. Washington
Dallas, TX 75204
214/823-1550
Treated Rick Ingram's condition.

**Ms. Jana Quattlebaum, LPN, RN**
3905 Coventry Lane
Norman, OK 73072-3648
405/579-8808
Friend of the Ingrams and has knowledge of Rick's jaw problem.

**Salvatore Ruggio, M.D.**
Long Island Jewish Medical Center
Long Island
Knowledge of Rick Ingram

**Ralph O. Shadid, M.D.**
425 Northwest 42nd St.
Oklahoma City, OK 73118
405/843-5255
Treated Rick Ingrma's condition.

**Cynthia Stevens**
Radiology Consultants, Inc.
1625 South Western
Oklahoma City, OK 73113
405/632-2323
Worked in the Radiology Department.  Assisted with a  MRI on Rick Ingram 08/06/03

# Exhibit K

# Practical Guidelines for the Prevention, Diagnosis, and Treatment of Osteonecrosis of the Jaw in Patients With Cancer

*By Salvatore Ruggiero, DMD, MD, Julie Gralow, MD, Robert E. Marx, DDS, Ana O. Hoff, MD, Mark M. Schubert, DDS, MDS, Joseph M. Huryn, DDS, Bela Toth, DDS, MS, Kathryn Damato, RDH, MS, CCRP, and Vicente Valero, MD, FACP*

Long Island Jewish Medical Center, New Hyde Park; Memorial Sloan-Kettering Cancer Center, New York, NY; University of Washington Medical Center; Seattle Cancer Care Alliance, Seattle, WA; University of Miami School of Medicine, Miami, FL; The University of Texas M.D. Anderson Cancer Center, Houston, TX; and University of Connecticut Health Center, Farmington, CT

## Abstract

**Purpose:** This article discusses osteonecrosis of the jaw (ONJ) and offers health care professionals practical guidelines and recommendations for the prevention, diagnosis, and management of ONJ in cancer patients receiving bisphosphonate treatment.

**Methods:** A panel of experts representing oral and maxillofacial surgery, oral medicine, endocrinology, and medical oncology was convened to review the literature and clinical evidence, identify risk factors for ONJ, and develop clinical guidelines for the prevention, early diagnosis, and multidisciplinary treatment of ONJ in patients with cancer. The guidelines are based on experience and have not been evaluated within the context of controlled clinical trials.

**Results:** ONJ is a clinical entity with many possible etiologies; historically identified risk factors include corticosteroids, chemotherapy, radiotherapy, trauma, infection, and cancer. With emerging concern for potential development of ONJ in patients

receiving bisphosphonates, the panel recommends a dental examination before patients begin therapy with intravenous bisphosphonates. Dental treatments and procedures that require bone healing should be completed before initiating intravenous bisphosphonate therapy. Patients should be instructed on the importance of maintaining good oral hygiene and having regular dental assessments. For patients currently receiving bisphosphonates who require dental procedures, there is no evidence to suggest that interrupting bisphosphonate therapy will prevent or lower the risk of ONJ. Frequent clinical assessments and conservative dental management are suggested for these patients. For treatment of patients who develop ONJ, a conservative, nonsurgical approach is strongly recommended.

**Conclusion:** An increased awareness of the potential risk of ONJ in patients receiving bisphosphonate therapy is needed. Close coordination between the treating physician and oral surgeon and/or a dental specialist is strongly recommended in making treatment decisions.

## Introduction

### Background

Osteonecrosis of the jaw (ONJ) is a site-specific, osseous pathology that has been reported in the literature since the 19th century. Nonetheless, there is still no consensus definition for ONJ. It is very likely that ONJ is a clinical entity with many possible etiologies, and its pathogenesis is not well understood. Similar risk factors for osteonecrosis from other sites were suggested for ONJ (see sidebar "Historical Risk Factors for Osteonecrosis").[1-5] Risk factors specific to ONJ include head and neck radiotherapy, periodontal disease, dental procedures involving bone surgery, edentulous regions, and trauma from poorly fitting dentures.[2-6]

Additional risk factors in cancer patients include the underlying malignancy, chemotherapy, corticosteroids, and systemic or regional infection.[1] Pancytopenia secondary to cancer and/or cancer treatment increases risk for infection and the potential for development of osteomyelitis.[3,7] Vascular insufficiency due to thrombosis has been associated mechanistically with the development of ONJ.[8] This event is a consequence of diminished arterial flow, increased intraosseous venous pressure, and osse-

ous hypoxia.[9] Coagulopathies, typically manifested as thrombophilia or hypofibrinolysis, have been implicated as contributory factors,[10] as has impaired blood flow secondary to edema or osteomyelitis.[7,11,12] Potential pathogenic mechanisms for ONJ are detailed in Figure 1.[1-4,8,35]

ONJ is most frequently linked with radiation-induced damage in patients with head and neck cancer or oral cancer. This condition is sometimes described as osteoradionecrosis.[27,29,30] Osteonecrosis of the jaw in this setting may result from loss of osseous cellular elements as well as vascular damage that results in relative ischemia of the bone. The incidence and severity of radiation-induced osteonecrosis are dose, field, and fraction dependent; the incidence has been reported in a range from 0.4% to 8.2% in these patients, but can vary significantly among centers and among patients with multiple baseline risk factors.[27,30]

Additionally, the jaws are subjected to risk factors for ONJ such as trauma from repeated dental procedures or infection. Whereas a single risk factor or condition may be associated with ONJ in a particular patient, studies have shown that coexistence

### Historical Risk Factors for Osteonecrosis

| | |
|---|---|
| Chemotherapy | Storage diseases |
| Cancer | Corticosteroids |
| Immunotherapy | Hypertension |
| Female sex/estrogen | Arthritis |
| Coagulation | Blood dyscrasias |
|   abnormalities | Vascular disorders |
| Infections | Alcohol abuse |
| Smoking | Malnutrition |
| Edentulous regions | Advanced age |
| Sickle-cell disease | Gaucher's disease |
| Systemic lupus | Human immunodeficiency |
|   erythematosus |   virus infection |
| Atmospheric pressure | Chronic inactivity |
|   variations | Hyperlipidemia and |
| Hemodialysis |   embolic fat |
| Hypersensitivity | Osteoporosis |
|   reactions | Neurologic damage |
| Hypothyroidism | |

*Data from Assouline-Dayan et al.[1]*

of multiple risk factors is associated with a significantly higher incidence of ONJ.[2,3,5]

There is as yet no consensus definition of ONJ, and this is complicated by the lack of understanding of pathobiologic mechanisms. The clinical diagnosis of ONJ is usually made on the basis of visual inspection (e.g., presence of exposed bone) and/or radiographic appearance. The bone lesions of ONJ may appear less or more radiodense than unaffected bone, providing a radiographic appearance similar to that observed in bone metastasis. The location of the lesion(s) tends to favor the mandible over the maxilla; the reason for this is not clear.

### Reports of ONJ in Patients Treated With Bisphosphonates

Reports of ONJ in cancer patients treated with both oral and intravenous (IV) bisphosphonates have recently been published (Table 1).[15,16,31,32,36-45] As of December 2004, more than 200 cases of ONJ have been reported. The majority of publications are letters to the editor or case report series. The first report of a series of ONJ cases associated with bisphosphonates was published in a letter by Marx in 2003, which described 36 cases of ONJ.[32] The largest number of cases was reported by Ruggiero et al,[31] who described 63 cases of ONJ from their oral surgery practice between February 2001 and November 2003. These patients were predominantly female (71%) and typically presented with bone pain, nonhealing extraction sockets, or exposed bone, primarily in the mandible (63%). Nearly all patients (86%) had had previous dental procedures. In the majority of cases, pain associated with exposed bone was controlled successfully using a nonsurgical approach consisting of oral sys-

temic antibiotics and 0.12% chlorhexidine gluconate antiseptic-containing oral rinses. Aggressive surgical intervention was counterproductive and often exacerbated bone exposure. ONJ has been reported in patients with a variety of tumor types, including multiple myeloma and breast, prostate, and thyroid cancer. Overall, reports of ONJ have been most common in patients with multiple myeloma. Although the majority of ONJ cases were reported in patients with cancer, 11% of patients were receiving oral bisphosphonates for osteoporosis.[31]

In the cases reported to date, most patients were receiving long-term chemotherapy and many were receiving short-term intermittent corticosteroid therapy with concomitant bisphosphonate therapy for cancer and symptom management. However, given the growing number of cases of ONJ in patients treated with bisphosphonates, it is important to recognize the potential risk that this class of drugs may present in the development of ONJ.

The potential mechanism by which bisphosphonates may be associated with the development of ONJ is unknown. It is clear that several issues need further clarification regarding ONJ in cancer patients treated with bisphosphonates. These include a clear case definition of ONJ with consensus diagnostic criteria and staging/severity measures. Additionally, further information is needed to provide a better understanding of the natural history of the disease, the impact of multiple risk factors on disease onset and time of onset, and appropriate treatment algorithms. Finally, the development of effective preventative measures and treatment algorithms would provide great clinical benefit for patients and health care providers. However, in the absence of further information on these issues, a multidisciplinary expert panel was convened to provide guidance to physicians on the identification, prevention, and treatment of ONJ based on current experience and understanding of ONJ in clinical practice.

### Development of Practical Guidelines

To better understand the pathogenesis of ONJ and clinical management of patients with ONJ, an expert multidisciplinary panel representing oral and maxillofacial surgery, oral medicine/oncology, endocrinology, and medical oncology convened in March 2004. The panel reviewed published literature and clinical evidence to identify risk factors for ONJ and to develop clinical guidelines for the prevention, early diagnosis, management, and multidisciplinary treatment of ONJ in patients with cancer receiving bisphosphonates. The following guidelines are the result of these deliberations.

The treatment guidelines developed by the panel were designed to apply to specific subsets of cancer patients. These include (1) patients initiating bisphosphonate therapy, (2) patients currently receiving bisphosphonate therapy who require dental intervention, and (3) patients with established ONJ. The panel's recommendations are presented to help guide health care providers in patient treatment. These recommendations are based

Figure 1. Potential mechanisms for the development of osteonecrosis of the jaw.[1–4,8–35]



on expert opinion and experience in clinical practice and have not yet been evaluated in controlled clinical trials.

The benefit of bisphosphonates for the treatment of hypercalcemia of malignancy and the prevention of skeletal complications from bone metastases has been well established in several randomized, placebo-controlled trials.[46-52] Evidence linking bisphosphonates to ONJ consists primarily of spontaneous case reports from the Novartis (Basel, Switzerland) safety database, published case reports, and retrospective chart reviews. The panel found that it is not possible to accurately determine the incidence of ONJ from these reports because of inconsistencies across publications. Moreover, the evidence linking bisphosphonates to ONJ must be considered to rate as level V evidence (using ASCO level of evidence ratings). This is defined as evidence that is provided only from case reports and clinical examples.[53-55] Prospective trials will be needed to evaluate the true incidence and clearly establish the causal factors related to ONJ in cancer patients.

## Recommendations

### Clinical Presentation and Diagnosis of ONJ

ONJ may remain asymptomatic for many weeks or months and is usually identified by its unique clinical presentation of exposed bone in the oral cavity. These lesions typically become symptomatic when sites become secondarily infected or if there is trauma to adjacent and/or opposing healthy soft tissues from irregular surfaces of the exposed bone. Signs and symptoms of ONJ include localized pain, soft-tissue swelling and inflammation, loosening of previously stable teeth, drainage, and exposed bone. These symptoms most commonly occur at the site of previous tooth extraction or other dental surgical interventions, but may occur spontaneously. Some patients may present with atypical complaints such as "numbness," the feeling of a "heavy jaw," and various dysesthesias. Objective signs that may occur before frank clinical presentation of ONJ include a sudden change in the health of periodontal or mucosal tissues, failure of the oral mucosa to heal, undiagnosed oral pain, loose teeth, or soft-tissue infection. The clinical presentation of ONJ represents a spectrum of symptoms, signs, and severities, from relatively asymptomatic to more severe lesions.

If osteonecrosis is suspected, panoramic and tomographic imaging may be performed to rule out other causes (e.g., cysts, impacted teeth, or metastatic disease). The radiographic signs suggestive of ONJ most often involve osteolysis consistent with bone loss. Intraoral films can also be used to provide better detail and demonstrate more subtle bone changes. However, radiographic alterations seen in patients with ONJ treated with bisphosphonates are often subtle in earlier stages of the disease and may be difficult to detect. Initially, minimal detectable radiographic changes are observed. Over time, as surface bone breaks down, radiographs eventually show radiolucent changes.

Tissue biopsy should be performed only if metastatic disease is suspected. If a biopsy is warranted, microbial cultures (aerobic and anaerobic) are suggested to identify pathogens with the

**Table 1. Cases of osteonecrosis of the jaw\* in cancer patients treated with bisphosphonates reported in the literature**

| Author | Year | No. of Patients | Publication Type | Underlying Disease(s) | Bisphosphonate(s) | Risk Factor(s) |
|---|---|---|---|---|---|---|
| Marx[32] | 2003 | 36 | Letter to the editor | HCM/multiple myeloma, n = 18<br>HCM/breast cancer, n = 17<br>Osteoporosis, n = 1 | IV pamidronate, n = 24<br>IV zoledronic acid, n = 6<br>IV both zoledronic acid and pamidronate, n = 6 | Dexamethasone, n = 22<br>Chemotherapy, n = 24<br>Radiotherapy, n = 4 |
| Migliorati[36] | 2003 | 5 | Letter to the editor | Not reported | Pamidronate†<br>IV zoledronic acid | Not reported |
| Ruggiero et al[31] | 2004 | 63 | Article | Breast cancer, n = 20<br>Multiple myeloma, n = 28<br>Prostate cancer, n = 3<br>Other cancers, n = 4<br>Osteoporosis, n = 7 | IV pamidronate, n = 34<br>IV zoledronic acid, n = 9<br>IV both zoledronic acid and pamidronate, n = 13<br>PO alendronate,‡ n = 6<br>PO risedronate, n = 1 | Chemotherapy, n = 56 |
| Estilo et al[37] | 2004 | 13 | Abstract | Breast cancer<br>Multiple myeloma | Intravenous | Malignancy<br>Corticosteroids, n = 9<br>Tobacco smoking, n = 6 |
| Wang et al[16] | 2004 | 3 | Case report | Breast cancer | IV pamidronate | Chemotherapy, n = 3<br>Diabetes mellitus and thalassemia, n = 1 |
| Durie et al[38] | 2004 | 46 | Abstract | Multiple myeloma | IV zoledronic acid<br>IV pamidronate | Corticosteroid use |
| Thakkar et al[39] | 2004 | 14 | Abstract | Multiple myeloma | IV zoledronic acid, n = 6<br>IV pamidronate, n = 8 | Not reported |
| Schuster and Dymek[40] | 2004 | 2 | Abstract | Multiple myeloma | IV both zoledronic acid and pamidronate | Chemotherapy, n = 2<br>Thalidomide, n = 2<br>Autologous stem-cell transplantation, n = 1 |
| Kut et al[41] | 2004 | 7 | Abstract | Multiple myeloma | IV pamidronate and/or IV zoledronic acid | Corticosteroids, n = 7<br>Thalidomide, n = 3<br>Radiation, n = 2 |
| Van Poznack et al[42] | 2004 | 6 | Abstract | Breast cancer | IV pamidronate or IV zoledronic acid | Not reported |
| Carter et al[43] | 2005 | 5 | Case report | Multiple myeloma, n = 2<br>Paget's disease, n = 3 | IV pamidronate, n = 4<br>PO alendronate, n = 1 | Tooth extraction, n = 4<br>Corticosteroids, n = 2<br>Chemotherapy, n = 1 |
| Bagan et al[15] | 2005 | 10 | Case report | Breast cancer, n = 6<br>Multiple Myeloma, n = 4 | IV pamidronate, n = 4<br>IV zoledronic acid, n = 2<br>IV both zoledronic acid and pamidronate, n = 4 | Chemotherapy, n = 10<br>Dexamethasone, n = 4<br>Thalidomide, n = 2 |
| Melo and Obeid[44] | 2005 | 1 | Case report | Breast cancer | IV zoledronic acid | Malignancy, chemotherapy, hypertension |
| Purcell and Boyd[45] | 2005 | 13 | ADRAC report | Breast cancer, n = 5<br>Prostate cancer, n = 4<br>Multiple myeloma, n = 3<br>Osteoporosis, n = 1 | IV pamidronate, n = 2<br>IV zoledronic acid, n = 10<br>PO alendronate, n = 1 | Corticosteroids, n = 6<br>Chemotherapy, n = 4<br>Thalidomide, n = 1<br>Radiotherapy, n = 1 |

Abbreviations: HCM, hypercalcemia of malignancy; IV, intravenous; PO, oral; ADRAC, adverse drug reactions advisory committee (Australia).

\* Some cases may be reported in more than one publication.

† Authors did not specify whether oral or IV pamidronate was used.

‡ One patient also received zoledronic acid.



potential to cause secondary infections. It is important to note that *Actinomyces* organisms are often seen microscopically or identified upon culture.

## Potential Risk Factors for the Development of ONJ

Although this article focuses specifically on ONJ in cancer patients receiving bisphosphonate therapy, the precise inciting events that precipitate ONJ have not been clearly identified and probably vary. On the basis of reports from the literature, potential factors that may increase the risk of ONJ in patients receiving bisphosphonates include radiation injury, dental extraction, infectious disease, dental trauma, concomitant therapy with corticosteroids, and chemotherapy. Occasionally, other concomitant risk factors may not be apparent. Further study of the potential relationship between ONJ and bisphosphonates is clearly needed.

### Potential Preventive Measures Before Initiating IV Bisphosphonate Therapy

Before initiating IV bisphosphonate therapy, the panel recommends that all patients undergo a routine clinical dental exam including a panoramic jaw radiograph to detect potential dental and periodontal infections (Table 2). In general, as part of conservative preventative measures before initiating treatment, patients should be instructed to avoid any elective dental or surgical procedure that results in compromise of mucosal surfaces over bone or that results in exposure of bone that cannot completely heal before commencement of bisphosphonate therapy. If bisphosphonate therapy can be delayed briefly without the risk of a skeletal-related complication or complications secondary to hypercalcemia, teeth with a poor prognosis or in need of extraction should be extracted, other dental surgeries finished, and tissues allowed to heal completely before beginning bisphosphonate therapy. The benefits or risks of postponing bisphosphonate therapy in these clinical circumstances have not been systematically evaluated to date. Therefore, the decision to defer bisphosphonate treatment must be made by the treating oncologist in consultation with an oral maxillofacial surgeon or other dental specialist.

Prophylactic antibiotics are not indicated for routine dentistry before initiation of bisphosphonate therapy. However, antibiotics may be required for bacterial prophylaxis in patients at risk (e.g., those with an indwelling venous catheter or history of endocarditis, heart murmurs, artificial heart valves, etc.).

It is particularly important to educate patients regarding the necessity of excellent dental hygiene and timely symptom reporting. Patients who have begun bisphosphonate and antineoplastic therapy should have regularly scheduled hard- and soft-tissue oral assessments. The frequency of these assessments is left at the discretion of the treating physician or dentist, but could be as frequent as every 3 to 4 months, depending on the number of concomitant risk factors and general dental health.

**Table 2. Anti-infective pharmacologic treatments recommended for patients with osteonecrosis of the jaw***

| Treatment | Dose and Schedule |
| --- | --- |
| Antibacterials | |
| Penicillin VK | 500 mg every 6 to 8 hours for 7 to 10 days, then bid for maintenance |
| Amoxicillin | 500 mg every 8 hours for 7 to 10 days, then bid for maintenance |
| Patients with penicillin allergy | |
| Clindamycin | 150 to 300 mg qid |
| Vibramycin | 100 mg qd |
| Erythromycin ethylsuccinate | 400 mg tid |
| Azithromycin | 500 mg PO × 1 on day 1; 250 mg PO qd on days 2 to 5 |
| Antifungals† (when required) | |
| Nystatin oral suspension | 5 to 15 mL qid or 100,000 IU/mL |
| Mycelex troches (clotrimazole) | 10 mg tid 5×/day for 7 to 10 days |
| Fluconazole | 200 mg initially, then 100 mg qd |
| Antivirals‡ | |
| Acyclovir | 400 mg bid |
| Valacyclovir hydrochloride | 500 mg to 2 g bid |

Abbreviations: qid, four times daily; bid, twice daily; qd, once daily; tid, three times daily.
* Novartis (Basel, Switzerland), data on file.
† Other potential systemic antifungals include itraconazole or ketoconazole.
‡ Role of antivirals in the treatment of osteonecrosis of the jaw has not yet been established.

At a minimum, oncologists should perform a brief visual inspection of the oral cavity at baseline and at each follow-up visit to look for the presence of necrotic or exposed bone.

### Recommended Dental Treatment for Patients Currently Receiving Bisphosphonate Therapy

The importance of maintaining excellent oral hygiene to reduce the risk of dental and periodontal infections should be emphasized to patients (see sidebar "Summary Guidelines"). Strategies for patient-specific oral care should be reviewed, reinforced, and modified according to existing clinical circumstances. Removable dentures should be examined for their potential to induce soft-tissue injury, especially tissue overlying bone, and adjusted if required. Routine dental cleanings should be performed carefully, with emphasis on avoiding soft-tissue injuries.

Endodontic (root canal) therapy is preferable to extractions when possible. It may be necessary to carry out coronal ampu-

tation with subsequent root canal therapy on retained roots to avoid the need for tooth extraction and the potential development of osteonecrosis. Elective jaw surgery, including dental implants, should be avoided during IV bisphosphonate therapy.

## Treatment of Patients With ONJ

A consultation with an oral maxillofacial surgeon or dental oncologist is strongly recommended for the treatment of cancer patients who have developed ONJ (see "Summary Guidelines," available online at www.jopasco.org). Close coordination between dental care and oncologic care is critical for optimal treatment of both ONJ and the underlying neoplastic disease.

Given that impaired wound healing has been reported in patients with ONJ, a nonsurgical approach may prevent further osseous involvement and expansion of established lesions. Only minimal surface bony debridement should be performed to reduce sharp or rough bone surfaces and thus decrease trauma to surrounding or opposing tissues (e.g., the lateral tongue when lingual mandibular bone is exposed). Biopsies are not recommended unless metastasis to the jaw is suspected. The benefit of a confirmed biopsy does not outweigh the risk of inducing further bone damage that could exacerbate the ONJ. If a biopsy is performed, both a portion of the area biopsied and a culture from the biopsy site should be submitted for microbial analysis because infection has been reported as a common complication of ONJ.

A removable appliance may be considered to cover and protect the exposed bone. Additionally, a protective stent may be of benefit for patients with exposed bone that causes trauma to adjacent soft tissues and for patients in whom the osteonecrotic site is traumatized repeatedly during normal oral function. Either a thin, vinyl, vacuformed mouth guard or thin acrylic stent may be used, provided that the device does not further traumatize the osteonecrotic site and that it can be maintained hygienically by the patient.

Well-fitting dentures can be worn if appropriate care is taken to minimize soft-tissue trauma or irritation. Minimizing trauma and irritation is especially important in patients receiving antibiotic therapy. Particular effort should be made to minimize irritation to tissues overlying bone. Patients should be instructed to clean and remove dentures at night.

Intermittent or continuous antibiotic therapy has been shown to be beneficial; cultures should be collected to determine the appropriate antibiotic therapy (Novartis, data on file). The goal of antibiotic therapy is to prevent secondary soft-tissue infection, pain, and osteomyelitis. At this time, the duration of antibiotic therapy and the benefits of oral antiseptic rinses have not been defined, but improved pain control and mucosal disease control have been observed anecdotally with this management strategy. The decision to treat with an antibiotic is a clinical judgment that should be made by an oral maxillofacial surgeon or other dental specialist in consultation with the treat-

ing physician/oncologist. Cultures should be collected to determine the appropriate antimicrobial intervention. These should include assessment of aerobic, anaerobic, viral, and fungal species. The type of culture to collect for testing depends on the concerns for specific types of microbes. Several antimicrobial pharmacologic therapies have been recommended (Table 2) and oral rinses of 0.12% chlorhexidine gluconate (Peridex, Zila Pharmaceuticals, Inc., Phoenix, Arizona) or minocycline hydrochloride (Arestin, Orapharma, Inc., Warminster, Pennsylvania) in periodontal pockets also may be useful (Novartis, data on file).

All patients should be monitored every 3 months, or more frequently if symptoms continue or worsen. If temporary soft-tissue liners are used, patients should be seen every 3 months to closely monitor any potential tissue damage.

In severe cases of ONJ, or if surgery is required in patients with established ONJ, stopping or interrupting bisphosphonate therapy may be considered. However, close coordination between the oral surgeon or dental specialist and the medical oncologist is recommended. Assessing the potential risk of further osteonecrosis versus the risk of skeletal complications or hypercalcemia of malignancy is important. Because bisphosphonates are incorporated into the mineral matrix of bone, it is unknown whether stopping bisphosphonate therapy provides benefit for managing ONJ. Therefore, the decision to stop bisphosphonate therapy must be coordinated between the treating oncologist and an oral surgeon. Antibiotics are appropriate during and after dental surgery in this patient population and should be continued postoperatively for at least 10 days (Table 2; Novartis, data on file). Experience has shown that penicillin remains the drug of choice and that a combination of penicillin and metronidazole is useful in patients with refractory infections. In patients with penicillin allergy, azithromycin or one of the quinolone antibiotics is a reasonable second-line drug. The choice of antimicrobials would depend on potential or known pathogens, relative tolerance by patients, and cost. It is not known whether drugs with known bone affinity are more effective in managing ONJ. Cultures taken from the extraction site at the time of oral surgery can provide guidance in making this decision.

In studies reported to date, hyperbaric oxygen has not been shown to be effective for treating ONJ and, therefore, is not recommended at this time. Placement of osseointegrated dental implants in patients being treated with bisphosphonates is also not recommended because their use may result in further damage to bone, thereby exacerbating osteonecrosis.

## Treatment Recommendations From the International Myeloma Foundation

Additional information and treatment recommendations for patients with ONJ were circulated as part of *The Myeloma Minute*, a newsletter published by the International Myeloma Foundation (IMF).[56] The treatment recommendations en-



dorsed by the IMF are similar to those developed by this expert panel and are available online at http://myeloma.org/main.jsp?type=article&tab_id=1&menu_id=0&id=1223.

## Clinical Trials to Assess ONJ in Cancer Patients

A retrospective chart review is underway at The University of Texas M.D. Anderson Cancer Center (Houston, Texas) to obtain more information about the incidence, clinical features, and natural history of ONJ. More than 4,000 cancer patients being treated with IV bisphosphonates who have complete dental records have been identified. At the time of this writing, results from this study were expected in late 2005.

A large planned clinical trial of bisphosphonates has had protocol modifications to include monitoring for ONJ. Southwest Oncology Group (SWOG) 0307 is a large, randomized, prospective, comparative, phase III, 3-year trial of IV bisphosphonates (zoledronic acid, clodronate, and ibandronate) as adjuvant therapy for primary breast cancer with a planned enrollment of approximately 6,000 patients. Patients in this trial will undergo a dental exam at baseline and at study conclusion to evaluate for ONJ. Patients are expected to undergo standard dental examinations and care while on study. Any patient who develops ONJ while on study will be further evaluated for risk factors and clinical course. Additional trials to gain a better understanding of the incidence and clinical course of ONJ in cancer patients receiving bisphosphonate therapy are in the planning stages.

## Conclusion

The skeletal complications that occur as a result of bone metastases can be associated with severe morbidity. Bisphosphonates are important medications that have significant benefits for cancer patients, reducing the morbidity from the serious skeletal complications of bone metastases. The overall risk of developing ONJ appears to be low, even in cancer patients who have concomitant suspected risk factors for ONJ, but the true incidence of this condition is not known. At this time, solely on the basis of the residual potential risk of developing ONJ, there is no evidence to support withholding bisphosphonate therapy in cancer patients at risk for developing skeletal complications

secondary to metastatic bone disease. The confirmed clinical benefit of bisphosphonates in cancer patients outweighs the potential risk of developing ONJ. Even if ONJ develops, it is manageable with conservative intervention, provided that patients are pain free and are functioning in a normal or near-normal manner. This may be true for cancer patients who have established risk factors for ONJ, because the overall risk of developing ONJ remains small even in patients with more than one risk factor. With increased awareness of this potential complication, it is expected that health care practitioners will be able to better identify, prevent, and manage ONJ, and thereby provide optimal care to their patients with cancer.

## Acknowledgment

The authors would like to acknowledge the participation of Harry D. Harper, MD, as a member of the expert panel.

***Authors' Disclosures of Potential Conflicts of Interest***
*Although all authors completed the disclosure declaration, the following authors or their immediate family members indicated a financial interest. No conflict existed for drugs or devices used in a study if they are not being evaluated as part of the investigation.*

| Authors | Employment | Leadership | Consultant | Stock | Honoraria | Research Funds | Testimony | Other |
|---|---|---|---|---|---|---|---|---|
| Salvatore Ruggiero | | | | | Novartis (A) | | | |
| Kathryn Damato | | | Novartis (A) | | | | | |
| Julie Gralow | | | | | Roche (A) | Novartis (A); Roche (A) | | |
| Ana O. Hoff | | | Novartis (A) | | | Novartis (C) | | |
| Joseph M. Huryn | | | Novartis (A) | | Novartis (A) | | | |
| Robert E. Marx | | | Novartis (A) | | Novartis (A) | | | |
| Mark M. Schubert | | | Novartis (A) | | Novartis (A) | | | |
| Bela Toth | | | Novartis (A) | | Novartis (A) | Novartis (A) | | |
| Vicente Valero | | | Novartis (A) | | | | | |

Dollar Amount Codes (A) < $10,000 (B) $10,000-99,999 (C) ≥ $100,000 (N/R) Not Required

*Corresponding author: Salvatore Ruggiero, DMD, MD, Long Island Jewish Medical Center, 270-05 76th Avenue, New Hyde Park, NY 11040, ruggiero@lij.edu.*

## References

**1.** Assouline-Dayan Y, Chang C, Greenspan A, et al: Pathogenesis and natural history of osteonecrosis. Semin Arthritis Rheum 32:94-124, 2002

**2.** Assael L: New foundations in understanding osteonecrosis of the jaws. J Oral Maxillofac Surg 62:125-126, 2004

**3.** Schwartz HC: Osteonecrosis of the jaws: A complication of cancer chemotherapy. Head Neck Surg 4:251-253, 1982

**4.** Sung EC, Chan SM, Sakurai K, et al: Osteonecrosis of the maxilla as a complication to chemotherapy: A case report. Spec Care Dentist 22:142-146, 2002

**5.** Tarassoff P, Csermak K: Avascular necrosis of the jaws: Risk factors in metastatic cancer patients. J Oral Maxillofac Surg 61:1238-1239, 2003

**6.** Glueck CJ, Freiberg R, Gruppo R, et al: Thrombophilia and hypofibrinolysis: Pathogenetic etiologies of osteonecrosis. J Invest Med 45:243A, 1997 (abstr)

**7.** Wannfors K: Vascular changes after experimentally-induced inflammation in the mandible. Int J Oral Maxillofac Surg 18:79-82, 1989

**8.** Jones LC, Mont MA, Le TB, et al: Procoagulants and osteonecrosis. J Rheumatol 30:783, 2003

**9.** Glueck CJ, Freiberg R, Gruppo R, et al: Thrombophilia and hypofibrinolysis: Reversible pathogenetic etiologies of osteonecrosis, in Urbaniak RJ, Jones JP (eds): Osteonecrosis: Etiology, Diagnosis and Treatment. Rosemont, IL, American Academy of Orthopaedic Surgeons, 1997, pp 105-110

**10.** Glueck CJ, Freiberg R, Glueck HI, et al: Hypofibrinolysis: A common, major cause of osteonecrosis. Am J Hematol 45:156-166, 1994

**11.** Sano T: Recent developments in understanding temporomandibular joint disorders—Part 1: Bone marrow abnormalities of the mandibular condyle. Dentomaxillofac Radiol 29:7-10, 2000

**12.** Wannfors K, Gazelius B: Blood flow in jaw bones affected by chronic osteomyelitis. Br J Oral Maxillofac Surg 29:147-153, 1991

**13.** Gebhard KL, Maibach HI: Relationship between systemic corticosteroids and osteonecrosis. Am J Clin Dermatol 2:377-388, 2001

**14.** Drescher W, Weigert WP, Bunger MH, et al: Femoral head blood flow reduction and hypercoagulability under 24 h megadose steroid treatment in pigs. J Orthop Res 22:501-508, 2004

15. Bagan JV, Murillo J, Jimenez Y, et al: Avascular jaw osteonecrosis in association with cancer chemotherapy: Series of 10 cases. J Oral Pathol Med 34:120-123, 2005

16. Wang J, Goodger NM, Pogrel MA: Osteonecrosis of the jaws associated with cancer chemotherapy. J Oral Maxillofac Surg 61:1104-1107, 2003

17. Mattano LA Jr, Sather HN, Trigg ME, et al: Osteonecrosis as a complication of treating acute lymphoblastic leukemia in children: A report from the Children's Cancer Group. J Clin Oncol 18:3262-3272, 2000

18. Arico M, Boccalatte MFP, Silvestri D, et al: Osteonecrosis: An emerging complication of intensive chemotherapy for childhood acute lymphoblastic leukemia. Haematologica 88:747-753, 2003

19. Winquist EW, Bauman GS, Balogh J: Nontraumatic osteonecrosis after chemotherapy for testicular cancer: A systematic review. Am J Clin Oncol 24:603-606, 2001

20. Glueck CJ, Freiberg R, Tracy T, et al: Thrombophilia and hypofibrinolysis: Pathophysiologies of osteonecrosis. Clin Orthop Relat Res 334: 43-56, 1997

21. Schwartz O, Pindborg JJ, Svenningsen A: Tooth exfoliation and necrosis of the alveolar bone following trigeminal herpes zoster in HIV-infected patient. Tandlaegebladet 93:623-627, 1989

22. Shroyer JV III, Lew D, Abreo F, et al: Osteomyelitis of the mandible as a result of sickle cell disease: Report and literature review. Oral Surg Oral Med Oral Pathol 72:25-28, 1991

23. Pogrel MA, Miller CE: A case of maxillary necrosis. J Oral Maxillofac Surg 61:489-493, 2003

24. Mintz SM, Anavi Y: Maxillary osteomyelitis and spontaneous tooth exfoliation after herpes zoster. Oral Surg Oral Med Oral Pathol 73:664-666, 1992

25. Arikawa J, Mizushima J, Higaki Y, et al: Mandibular alveolar bone necrosis after trigeminal herpes zoster. Int J Dermatol 43:136-137, 2004

26. Bras J, de Jonge HK, van Merkesteyn JP: Osteoradionecrosis of the mandible: Pathogenesis. Am J Otolaryngol 11:244-250, 1990

27. Reuther T, Schuster T, Mende U, et al: Osteoradionecrosis of the jaws as a side effect of radiotherapy of head and neck tumor patients: A report of a thirty year retrospective review. Int J Oral Maxillofac Surg 32:289-295, 2003

28. Jereczek-Fossa BA, Orecchia R: Radiotherapy-induced mandibular bone complications. Cancer Treat Rev 28:65-74, 2002

29. Studer G, Gratz KW, Glanzmann C: Osteoradionecrosis of the mandibula in patients treated with different fractionations. Strahlenther Onkol 180:233-240, 2004

30. Sulaiman F, Huryn JM, Zlotolow IM: Dental extractions in the irradiated head and neck patient: A retrospective analysis of Memorial Sloan-Kettering Cancer Center protocols, criteria, and end results. J Oral Maxillofac Surg 61:1123-1131, 2003

31. Ruggiero SL, Mehrotra B, Rosenberg TJ, et al: Osteonecrosis of the jaws associated with the use of bisphosphonates: A review of 63 cases. J Oral Maxillofac Surg 62:527-534, 2004

32. Marx RE: Pamidronate (Aredia) and zoledronate (Zometa) induced avascular necrosis of the jaws: A growing epidemic. J Oral Maxillofac Surg 61:1115-1117, 2003

33. Glueck CJ, McMahon RE, Bouquot JE, et al: Heterozygosity for the Leiden mutation of the factor V gene, a common pathoetiology for osteonecrosis of the jaw, with thrombophilia augmented by exogenous estrogens. J Lab Clin Med 130:540-543, 1997

34. Kavadia-Tsatala S, Kolokytha O, Kaklamanos EG, et al: Mandibular lesions of vasoocclusive origin in sickle cell hemoglobinopathy. Odontology 92:68-72, 2004

35. Glueck CJ, McMahon RE, Bouquot JE, et al: A preliminary pilot study of treatment of thrombophilia and hypofibrinolysis and amelioration of the pain of osteonecrosis of the jaws. Oral Surg Oral Med Oral Pathol Oral Radiol Endod 85:64-73, 1998

36. Migliorati CA: Bisphosphanates and oral cavity avascular bone necrosis. J Clin Oncol 21:4253-4254, 2003

37. Estilo CL, Van Poznak CH, Williams T, et al: Osteonecrosis of the maxilla and mandible in patients treated with bisphosphonates: A retrospective study. J Clin Oncol 23:750s, 2004 (suppl; abstr 8088)

38. Durie BGM, Katz M, McCoy J, et al: Osteonecrosis of the jaws in myeloma: Time dependent correlation with Aredia and Zometa use. Blood 104:216a, 2004 (abstr 756)

39. Thakkar SG, Isada C, Englund K, et al: Bisphosphonate therapy associated with an increased incidence of mandibular/maxillary osteomyelitis in multiple myeloma patients. Blood 104:313b, 2004 (abstr)

40. Schuster MW, Dymek JM: Oral cavity avascular bone necrosis: A newly recognized complication of intravenous (IV) bisphosphonate therapy in cancer patients. Blood 104:308b, 2004 (abstr)

41. Kut V, Mehta J, Tariman J, et al: Osteonecrosis of the jaw in myeloma patients receiving pamidronate or zoledronate. Blood 104:315b, 2004 (abstr)

42. Van Poznak CH, Estilo CL, Sauter MP, et al: Osteonecrosis of the jaw in patients with metastatic breast cancer. Breast Cancer Res Treat 88:S131-S132, 2004 (suppl 1; abstr)

43. Carter G, Goss AN, Doecke C: Bisphosphonates and avascular necrosis of the jaw: A possible association. Med J Aust 182:413-415, 2005

44. Melo MD, Obeid G: Osteonecrosis of the maxilla in a patient with a history of bisphosphonate therapy. J Can Dent Assoc 71:111-113, 2005

45. Purcell PM, Boyd IW: Bisphosphonates and osteonecrosis of the jaw. Med J Aust 182:417-418, 2005

46. Hultborn R, Gundersen S, Ryden S, et al: Efficacy of pamidronate in breast cancer with bone metastases: A randomized, double-blind placebo-controlled multicenter study. Anticancer Res 19:3383-3392, 1999

47. Lipton A, Theriault RL, Hortobagyi GN, et al: Pamidronate prevents skeletal complications and is effective palliative treatment in women with breast carcinoma and osteolytic bone metastases: Long term follow-up of two randomized, placebo-controlled trials. Cancer 88:1082-1090, 2000

48. Berenson JR, Lichtenstein A, Porter L, et al: Long-term pamidronate treatment of advanced multiple myeloma patients reduces skeletal events. J Clin Oncol 16:593-602, 1998

49. Major P, Lortholary A, Hon J, et al: Zoledronic acid is superior to pamidronate in the treatment of hypercalcemia of malignancy: A pooled analysis of two randomized, controlled clinical trials. J Clin Oncol 19:558-567, 2001

50. Rosen LS, Gordon D, Kaminski M, et al: Long-term efficacy and safety of zoledronic acid compared with pamidronate disodium in the treatment of skeletal complications in patients with advanced multiple myeloma or breast carcinoma: A randomized, double-blind, multicenter, comparative trial. Cancer 98:1735-1744, 2003

51. Saad F, Gleason DM, Murray R, et al: Long-term efficacy of zoledronic acid for the prevention of skeletal complications in patients with metastatic hormone-refractory prostate cancer. J Natl Cancer Inst 96:879-882, 2004

52. Rosen LS, Gordon D, Tchekmedyian NS, et al: Long-term efficacy and safety of zoledronic acid in the treatment of skeletal metastases in patients with nonsmall cell lung carcinoma and other solid tumors: A randomized, phase III, double-blind, placebo-controlled trial. Cancer 100:2613-2621, 2004

53. Hillner BE, Ingle JN, Berenson JR, et al: American Society of Clinical Oncology guideline on the role of bisphosphonates in breast cancer. J Clin Oncol 18:1378-1391, 2000

54. Berenson JR, Hillner BE, Kyle RA, et al: American Society of Clinical Oncology clinical practice guidelines: The role of bisphosphonates in multiple myeloma. J Clin Oncol 20:3719-3736, 2002

55. Kyle RA: Monoclonal gammopathy of undetermined significance: Natural history in 241 cases. Am J Med 64:814-826, 1978

56. International Myeloma Foundation: Myeloma minute: http://myeloma.org/myeloma/myeloma_minute.jsp?type=detail&id=560.

